# United States Court of Appeals for the First Circuit

BIOPOINT, INC.,
Plaintiff - Appellee,

v.

ANDREW DICKHAUT;
CATAPULT STAFFING, LLC, d/b/a Catapult Solutions Group,
Defendants – Appellants,

LEAH ATTIS,
Defendant.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CASE NO. 1:20-CV-10118-RGS

## DEFENDANTS – APPELLANTS' OPENING BRIEF

Dana A. Zakarian (63652)
Christopher J. Hurst (1188843)
Steven D. Procopio (1208829)
SMITH DUGGAN CORNELL & GOLLUB LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
dana.zakarian@smithduggan.com
churst@smithduggan.com
sprocopio@smithduggan.com

Attorneys for Defendants - Appellants
ANDREW DICKHAUT, and CATAPULT STAFFING, LLC
Dated: November 15, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Catapult Staffing, LLC hereby discloses that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Andrew Dickhaut is a natural person, so no corporate disclosure statement is required for him.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ........................................................... v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .............. vi

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES .................................................... 1

STATEMENT OF THE CASE ........................................................ 3

      1.    Factual Background ................................................. 3

      2.    Procedural Background .......................................... 7

      3.    Jury Trial ........................................................... 11

      4.    Bench Trial ......................................................... 15

      5.    Post-Trial Motions and Entry of Judgment ......................... 18

SUMMARY OF THE ARGUMENT ................................................ 20

STANDARD OF REVIEW .......................................................... 23

ARGUMENT .......................................................................... 24

1.    The district court erred by awarding BioPoint exemplary damages and attorneys' fees under G. L. c. 93A where the predicate unfair or deceptive act was misappropriation of trade secrets, and the fact finder did not make a finding of malicious misappropriation ......................................... 25

      a.    The MUTSA supersedes inconsistent state laws ................. 25

      b.    The district court erred by awarding BioPoint exemplary damages ........................................................... 29

c. The district court erred by awarding BioPoint attorney's fees without making a finding of malicious misappropriation ..................................................................... 30

d. The Defendants did not waive their argument that the MUTSA supersedes Chapter 93A ......................................... 30

2. The district court erred by disgorging Catapult's gross profits from its entire relationship with Vedanta ......................... 38

a. The district court erred by allowing BioPoint to pursue its untimely claim for disgorgement of the Vedanta Profits and further compounded its error by failing to consider Defendants' offset evidence ..................................... 39

b. The district court should not have awarded damages that were not attributable to the use of misappropriation of a BioPoint trade secret ......................... 42

i. Sales commissions for placements made by other staffing companies are not attributable to BioPoint's trade secrets and the district court should not have awarded them as part of the lost profits claim .................................................................. 44

ii. Profits from placing consultants in non-life sciences fields such as information technology, accounting, and professional services are not attributable to BioPoint's trade secrets ....................... 44

iii. Profits from placing lower-level employees whom BioPoint does not place are not attributable to BioPoint's trade secrets, and the district court should not have awarded them .................................... 45

iv. Disgorged profits for the placement of consultants for which BioPoint did not claim misappropriation are not attributable to BioPoint's trade secrets ................................................. 45

v.  Profits from the placement of Jordan Pothier at Vedanta are not attributable to BioPoint's trade secrets, and the district court should not have awarded them.............................................. 46

vi.  Expenses from billing Vedanta for Andrew Dickhaut's time are not attributable to BioPoint's trade secrets ................................................ 46

vii.  The disgorged profits from the placement of Dr. Fratazzi must be remitted as it is duplicative of BioPoint's lost profits claim ........................................ 47

c.  The "head start" doctrine does not apply and is not a substitute for proof that the Vedanta Profits were attributable to the use of BioPoint's trade secrets .............. 48

3.  The district court erred in not remitting the jury award of gross profits ..................................................................... 52

4.  The district court abused its discretion by disgorging profits from Andrew Dickhaut that he never received ............................ 53

5.  The district court abused its discretion by not requiring the jury to make specific findings regarding the trade secrets that were allegedly misappropriated, warranting a new trial ...... 56

6.  The district court erred by awarding damages without the finding of use .................................................................... 62

CONCLUSION ........................................................................ 66

CERTIFICATE OF COMPLIANCE........................................................ 68

CERTIFICATE OF SERVICE.............................................................. 70

ADDENDUM

# TABLE OF AUTHORITIES

**CASE:**

Advanced Micro Devices, Inc. v. Feldstein,
   No. CV 13-40007-TSH, 2013 WL 10944934
   (D. Mass. May 15, 2013) ........................................................26

AIDS Action Comm. of Massachusetts, Inc. v. Massachusetts Bay
   Transp. Auth., 42 F.3d 1 (1st Cir. 1994) ..............................23

Alifax Holding Spa v. Alcor Sci., Inc.,
   C.A. No. WES 14-440, 2021 WL 3911258 (D.R.I. Sept. 1, 2021) .........50

Babcock v. Gen. Motors Corp.,
   299 F.3d 60 (1st Cir. 2002) ..................................................34

Bielunas v. F/V Misty Dawn, Inc.,
   621 F.3d 72 (1st Cir. 2010) ..................................................36

Burnett v. Ocean Props., Ltd.,
   987 F.3d 57 (1st Cir. 2021) ..................................................36

Cambridge Internet Solutions v. Avicon Group,
   No. 99–1841, 1999 WL 959673 (Mass. Super. Sept. 21, 1999) ...........57

CardiAQ Valve Techs., Inc. v. Neovasc Inc.,
   No. 14-CV-12405-ADB, 2016 WL 6465411 (D. Mass. Oct. 31, 2016),
   aff'd, 708 F. App'x 654 (Fed. Cir. 2017) ................................59

Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas
   Municipio, 754 F.3d 17 (1st Cir. 2014) ..................................52

Crabar/GBF, Inc. v. Wright,
   No. 8:16-CV-537, 2023 WL 6125519 (D. Neb. Sept. 19, 2023)............59

Crawford v. Clark,
   578 F.3d 39 (1st Cir. 2009) ..................................................35

Davignon v. Clemmey,
    322 F.3d 1 (1st Cir. 2003) ...................................................24

Dusa Pharm., Inc. v. BioFrontera, Inc.,
    2020 WL 5995979 (D. Mass. Oct. 9, 2020) ...........................63

Esposito v. Home Depot U.S.A., Inc.,
    590 F.3d 72 (1st Cir. 2009) ................................................23

I-Flow Corp. v. Apex Med. Techs., Inc.,
    No. 07CV1200 DMS (NLS), 2010 WL 141402
    (S.D. Cal. Jan. 8, 2010) .....................................................59

Incase Inc. v. Timex Corp.,
    488 F.3d 46 (1st Cir. 2007) .....................................42, 62-63

Jet Spray Cooler, Inc. v. Crampton,
    377 Mass. 159 (1979) ..........................................47, 49, 50

Liu v. Securities and Exchange Commission,
    140 S. Ct. 1936 (2020).................................................53, 54

M&A Metals, Inc. v. Fina,
    No. 21CV5570PKCPK, 2023 WL 2734794
    (E.D.N.Y. Mar. 31, 2023) ..................................................58

Milliman, Inc. v. Gradient A.I. Corp.,
    No. CV 21-10865-NMG, 2022 WL 18032957
    (D. Mass. July 11, 2022) ...................................................58

Nat'l Metal Finishing Co. v. BarclaysAmerican/Com., Inc.,
    899 F.2d 119 (1st Cir. 1990) ..............................................35

Netcracker Tech. Corp. v. Laliberte,
    20-11054-RGS, 2020 WL 6384312 (D. Mass. Oct. 30, 2020)................28

Neural Magic, Inc. v. Facebook, Inc.,
No. 1:20-CV-10444-DJC, 2020 WL 13538627
(D. Mass. Oct. 29, 2020)...................................................................27, 28

Neural Magic, Inc. v. Meta Platforms, Inc.,
No. 20-CV-10444-DJC, 2023 WL 2383172
(D. Mass. Mar. 6, 2023)..........................................................................59

Olaplex, Inc. v. L'Oreal USA, Inc.,
855 F. App'x 701 (Fed. Cir. 2021).........................................................60

Repat, Inc. v. Indiewhip, LLC,
281 F. Supp.3d 221 (D. Mass. 2017).....................................................63

Santos v. Posadas De P.R. Assocs., Inc.,
452 F.3d 59 (1st Cir. 2006) ...................................................................56

Securities Exchange Commission v. Bahgat,
2023 WL 3491733,n.5 (W.D.N.Y. May 17, 2023).................................55

Sheek v. Asia Badger, Inc.,
235 F.3d 687 (1st Cir. 2000) .................................................................56

Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.,
No. HSCV200700200, 2011 WL 1366584
(Mass. Super. Ct. Feb. 10, 2011) ..........................................................42

Staffbridge, Inc. v. Gary D. Nelson Assocs., Inc.,
2004 WL 1429935 (Mass. Super. June 11, 2004) .................................57

TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo,
966 F.3d 46 (1st Cir. 2020) ...................................................................57

United States v. Caraballo-Rodriguez,
480 F.3d 62 (1st Cir. 2007) ...................................................................36

United States v. Morgan,
384 F.3d 1 (1st Cir. 2004) .....................................................................36

Uphoff Figueroa v. Alejandro,
   597 F.3d 423 (1st Cir. 2010) ...............................................24

Viken Detection Corp. v. Videray Techs. Inc.,
   384 F.Supp.3d 168 (D. Mass. 2019) .....................................62

**STATUTES:**

18 U.S.C. § 1831, *et seq.* ..................................................7
18 U.S.C. § 1836, *et seq.* ................................. 1, 17, 47, 63
28 U.S.C. § 1291 ................................................................1
28 U.S.C. § 1331 ................................................................1

G. L. c. 93, § 42 ...............................................................7
G. L. c. 93, § 42B.............................. 1, 2, 17, 28, 30, 47
G. L. c. 93, § 42C...................................................15, 30
G. L. c. 93, § 42D ...........................................................58
G. L. c. 93, § 42F...................................................2, 26, 27
G. L. c. 93, § 42G ...........................................................26
G. L. c. 93A ............................................................*passim*
G. L. c. 93A, § 11...........................................................8, 29

**RULES:**

Fed. R. App. P. 26.1..........................................................i
Fed. R. App. P. 34..........................................................ix

Fed. R. Civ. P. 37.................................... 21, 24, 40, 43
Fed. R. Civ. P. 52.........................................................36

First Circuit Local Rule 34.0.........................................ix

**OTHER AUTHORITIES:**

Uniform Law Commission, Trade Secret Act (Nov. 3, 2023) .................25

UTSA, § 7(b) ...................................................................27

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to Fed. R. App. P. 34(a)(1) and First Circuit Local Rule 34.0(a), the appellants respectfully request that the Court schedule this matter for oral argument. This case involves issues of first impression, and the appellants believe that oral argument will assist the Court in reaching a decision.

# JURISDICTIONAL STATEMENT

This is an appeal from a judgment that the United States District Court for the District of Massachusetts entered on April 26, 2023 [ECF 228], and a July 18, 2023 amended judgment [ECF 254]. Defendants-appellants Andrew Dickhaut and Catapult Staffing, LLC ("Catapult") (collectively, "Defendants") timely filed a Notice of Appeal on July 12, 2023 [ECF 251], and an amended Notice of Appeal on July 18, 2023 [ECF 255]. The federal courts have subject matter jurisdiction in this matter under 28 U.S.C. § 1331, because plaintiff-appellee BioPoint, Inc. ("BioPoint") brought federal claims under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the district court.

# STATEMENT OF THE ISSUES

1.      Did the district court err by awarding BioPoint multiple damages and automatic attorney's fees under G. L. c. 93A for misappropriation of a trade secret, without finding that the misappropriation was "malicious," where the Massachusetts Uniform Trade Secrets Act, G. L. c. 93, § 42B(b), precludes a court from awarding

exemplary damages of any amount or attorney's fees for misappropriation of a trade secret in the absence of such a finding, and where the Massachusetts Uniform Trade Secrets Act expressly supersedes all "conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret"  G. L. c. 93, § 42F(a)?

2.     Did the district court err by awarding BioPoint treble damages under G. L. c. 93A for misappropriation of trade secrets where the Massachusetts Uniform Trade Secrets Act, G. L. c. 93, § 42B(a) limits remedies for misappropriation of a trade secret to double damages, and the statute expressly supersedes all conflicting laws?

3.     Did the district court err by disgorging gross profits that were not attributable to the misappropriation of a trade secret?

4.     Did the district court err by failing to remit the jury's verdict awarding gross profits?

5.     Did the district court err by disgorging profits from Andrew Dickhaut that he never received?

6.     Did the district court err by using, over Defendants' objection, a special verdict form that did not require the jury to make

specific findings regarding the trade secrets that were allegedly misappropriated?

7.    Did the district court err by awarding damages for a misappropriation of a trade secret claim without the finding of use?

## STATEMENT OF THE CASE

### 1.    Factual Background

BioPoint is a staffing company that works exclusively in the life sciences field (*e.g.*, pharmaceutical and biotech companies). See Record Appendix ("RA") 44 ¶8; RA 399:19-20. BioPoint works with both employer clients (who are seeking to fill a position) and consultants (the people who would be staffed at the employer client to fill the position). RA 397:19-398:10. An employer client only owes BioPoint a fee if BioPoint successfully places a consultant with the employer client. RA 400:10-11.

Placing a consultant is a multistep process that depends on factors outside of the staffing company's control. RA 467:3-468:15. First, the staffing company must have an employer client that has an open position. RA 401:18-19; RA 467:6-15. Second, the staffing company must identify a potential consultant to fill that position.

RA 401:19:402:5; RA 467:19-23.  Staffing companies find these consultants by searching publicly available websites, like LinkedIn, or through third-party referrals.  RA 399:11-12.  Third, the consultant must choose to work with the staffing company.  RA 402:4-5.  Fourth, the employer client must approve and interview the consultant. RA 402:6-13; RA 467:24-468:3.  And fifth, the employer client must make an offer that the consultant accepts.  RA 402:13-15; RA 468:4-10. During this process, both the employer client and the consultant are free to explore other opportunities or terminate the discussions. RA 402:17-21; RA 479:9-11.  Consultants frequently work with and provide their resumés to other staffing companies while they are working with BioPoint.  RA 403:3-11; RA 468:16-21; RA 479:9-11.

Catapult also is a national staffing company that operates in many industries, including accounting, information technology, and life sciences.  RA 393:21-23; RA 399:20-24.  In 2017, Catapult hired Andrew Dickhaut to open its Boston office.  Mr. Dickhaut's fiancée, Leah Attis,

worked at BioPoint and was its top salesperson.[1]  Indeed, Ms. Attis

brought in more business than all the other BioPoint salespeople

combined.  Because BioPoint paid her commissions, Ms. Attis earned

more money than the BioPoint owners.  RA 397:2-7.  Mr. Dickhaut was

friends with the BioPoint owners and even attended their corporate

functions and President's Club trips.  RA 396:1-9.  Indeed, the BioPoint

owners asked Mr. Dickhaut to help his fiancée, Ms. Attis, succeed for

BioPoint.  RA 396:13-15.

In 2017, Mr. Dickhaut connected with his high school friend, Jeff

Autenrieth, who worked at Moderna.  RA 497:11-14; RA 627:17-628:10;

RA 838:17-25; RA 882:7-21; RA 1110:1-1112:10; RA 38:11-15.  Mr.

Autenrieth presented Mr. Dickhaut with an opportunity for staffing

work at Moderna.  RA 845:18-846:6; RA 924:7-927:1; RA 1099:25-

1101:17.  In 2018, Mr. Autenrieth left Moderna to work for Vedanta

Biosciences, Inc. ("Vedanta").  RA 1128:4-6.  Again, Mr. Autenrieth

offered staffing opportunities at Vedanta to Mr. Dickhaut and Catapult.

---

[1] As a salesperson, Ms. Attis worked with the employer clients to
identify opportunities.  BioPoint also employed recruiters who found
consultants to fill roles that Ms. Attis identified at the employer client.
RA 398:8-23; RA 1446:18-21.

One such opportunity was for Catapult to serve as Vedanta's managed service provider ("MSP"). As MSP, Catapult would oversee all of Vedanta's vendor relationships—including its relationships with staffing companies that presented consultants to fill roles at Vedanta. RA 1128:7-10. Mr. Dickhaut, in turn, offered BioPoint an opportunity to place consultants at Vedanta through the MSP program. RA 407:12-24; RA 408:18-24; RA 498:23-499:25; RA 644:18-24; RA 1443:18-1444:10; RA 1609:17-1610:16; RA 2301-2303. In this sense, Catapult was akin to the salesperson (identifying the role at the employer client) and BioPoint would be the recruiter (presenting the consultant). BioPoint, however, repeatedly refused because it did not want to work with its competitor, Catapult. RA 409:3-11; RA 498:23-500:8; RA 644:15-24; RA 785:24-786:6; RA 1001:12-18; RA 1443:18-1444:23; RA 1639:2-1640:24; RA 2301-2303.

In 2019, Catapult (through Andrew Dickhaut) was trying to fill a position at Vedanta. At the same time, BioPoint (through Leah Attis) was trying to fill a different position at Shire. RA 403:17-24. The consultant being considered for both positions was Dr. Candida Fratazzi. The recruiters working with Dr. Fratazzi were Greta Hunt for

BioPoint and Corey Swiniarski for Catapult. RA 404:14-25; RA 548:24-549:17; RA 1141:22-1142:15; RA 1151:15-1152:13; RA 1564:12-1565:2; RA 2323; RA 3082. When Dr. Fratazzi accepted the position at Vedanta, BioPoint fired Ms. Attis (and stopped paying her commissions) claiming that she must have given its "trade secrets" concerning Dr. Fratazzi to Mr. Dickhaut and Catapult. BioPoint then sued Catapult, Mr. Dickhaut, and Ms. Attis. RA 43-67.

## 2. Procedural Background

The district court dismissed claims between Ms. Attis and BioPoint without prejudice to refile in state court pursuant to her employment contract.[2] RA 36-42. BioPoint's claims against Defendants proceeded in the district court. Following summary judgment motion practice, the remaining claims for trial were BioPoint's claims for misappropriation of trade secrets in violation of MUTSA, G. L. c. 93, § 42 (Count I of the Second Amended Complaint); misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1831, *et seq*. (Count II); tortious interference with prospective relationships (Count III); and

---

[2] Ms. Attis' counterclaims include violation of the Massachusetts Wage Act for failing to pay her over $450,000 in commissions due. RA 397:2-11; RA 413:17-19; RA 531:12-534:21.

unfair and deceptive trade practices in violation of G. L. c. 93A, § 11 (Count IV).  RA 43-67.

In discovery, BioPoint repeatedly failed to disclose the damages that it was seeking.  It did so despite its obligations to disclose its damages calculation via its: (1) initial disclosures; (2) answers to interrogatories; and (3) in Rule 30(b)(6) deposition questioning on the subject of  damages.  BioPoint repeatedly stonewalled—claiming that it needed additional information and that it would have an expert testify as to damages.  However, BioPoint never requested additional information from Catapult, and it never provided an expert report. RA 100.

Prior to trial, Defendants moved *in limine* to preclude BioPoint from offering any evidence of damages that was not disclosed in discovery.  RA 100-128.  BioPoint responded to this motion by serving a supplemental interrogatory answer that disclosed *for the first time* that it was seeking over $5 million in damages—including disgorgement of Catapult's entire profits from Vedanta.  RA 272.  This disclosure came on the eve of trial and over one year *after* the close of discovery.  Id.

The court granted Defendants' motion *in limine* but reserved the issue of disgorgement damages to the court. RA 272-273. Thereafter, the court limited the scope of the jury trial to issues regarding the placement of Dr. Fratazzi. RA 276-277. BioPoint then filed a motion to reconsider the court's ruling on the scope of the jury trial and the court scheduled a hearing for May 19, 2022. RA 303-304.

During the May 19, 2022 hearing, the court ruled that it would bifurcate the legal and the equitable claims, with a jury to decide two sets of issues: (1) whether Defendants misappropriated trade secrets; and (2) whether Defendants tortiously interfered with BioPoint's prospective relationship with regard to one consultant, Dr. Candida Fratazzi. RA 337:23-24; RA 338:22-23; RA 339:18-340:6; RA 345:2-3. The court ruled that it would decide all remaining claims and issues after the jury trial. RA 347:7 ("Then the rest is for me."). Consistent with the colloquy at the pre-trial hearing, the court issued a docket text order following the hearing which provided:

> the court determines that the issues of liability at law - that is, on plaintiff's claims for trade secret misappropriation and tortious interference - will be presented at the jury trial. The bulk of the asserted damages (with the exception as to Ms. Fratazzi) are those sounding in equity and they will be considered together with the equitable unfair competition

claim at a subsequent bench proceeding, should the jury return a finding of liability.

RA 333.

At the same hearing, the court decided that it would require BioPoint to identify with precision each of the trade secrets that were stolen, and that the jury would be asked to render a verdict as to each category of trade secrets that were allegedly stolen:

> The plaintiff is going to have to identify for the jury precisely what those trade secrets are that are alleged to have been stolen. I am going to ask the jury then to render a verdict as to each category of secret plaintiffs identify as to whether they find trade secret, first issue; appropriation, the second issue.

RA 339:9-14.

The court further commented that, "the defendants' proposed verdict slip is much more to the mark." RA 339:8. Defendants' proposed verdict slip, if accepted by the court, would have required the jury to decide "yes" or "no" on the elements of the misappropriation claim for each specific trade secret identified by BioPoint. RA 312. In the court's post-hearing docket text order, it ordered BioPoint to, by June 9, 2022, "submit a complete list identifying the asserted misappropriated trade secrets by category to enable the jury to make specific fact findings." RA 333.

Less than a week before the jury trial was set to commence, on June 9, 2022, BioPoint filed a proposed verdict form that purported to incorporate a list of misappropriated trade secrets. RA 351-356. The proposed verdict slip did not identify specific alleged trade secrets, but rather, set out broad categories such as: "consultant information;" "client information;" "vendor/supplier information;" and "business information." Id.

### 3.    Jury Trial

Between June 14-22, 2022, the case was tried to a jury. Because BioPoint did not disclose at the outset of trial the specific trade secrets that it sought to prove were misappropriated, as the court contemplated, to try to elicit the claimed trade secrets at trial, Defendants had to cross-examine BioPoint witnesses based on the vague disclosures made to date. RA 1438:21-1440:7; RA 1442:11-14; RA 1443:9-17; RA 1444:20-23; RA 1445:5-19; RA 1446:1-12; RA 1447:9-13; RA 1449:17-1450:13; RA 1453:20-25; RA 1455:3-5; RA 1455:7-13; RA 1672-1677, ¶¶9-44; RA 2270-2274; RA 2287; RA 2449; RA 2711-2712; RA 2954-2955. BioPoint claimed everything under the sun was its trade secret—including the names and resumés of third-party

consultants, the names of third-party employer clients like Vertex (most of which were federally trademarked by the employer client), and general information that was in the public domain.  RA 469:17-25; RA 477:4-9; RA 478:12-479:11; RA 1457:17-23; RA 1458:6-7.

The issue of the verdict form and the specificity of which the trade secrets would be identified was next addressed by the court at the end of the fourth day of trial, after which most of the evidence had already come in.  The court made the following remark:

> THE COURT: I'm going back and forth on it. The question is how granular we want the slip to be. I don't think I want to go quite as far as BioPoint would like to go. But I do want to go far enough that we get what we lawyers would call "issue preclusion," in the sense that there will be a definitive verdict one way or another that is not going to puzzle anyone as to what exactly the jury decided to do with respect to various aspects of information that are being claimed as trade secrets in the case.

RA 1072:23-1073:6.  Thereafter, the court submitted a proposed verdict slip to the parties, to which Defendants objected in writing, and sought revisions.  RA 1261-1292.  Defendants requested that the court modify the verdict slip so that the jury would have to identify the specific trade secrets that they found misappropriated, if any:

> As drafted, the verdict slip does not ask the jury to identify what information it finds is a trade secret.  Thus, in its current

> form, if there is a plaintiff's verdict, it will be impossible to know what "trade secret" it is based on. Without that knowledge, Defendants will be unfairly hampered in their JNOV motion and/or appeal.

RA 1263; RA 1265; RA 1288-1292. Defendants further requested that the court modify the verdict slip so that the jury would determine whether any misappropriated trade secret was used by Defendants. RA 1262-1264; RA 1288-1292. The court refused to adopt Defendants' proposed changes to the verdict slip. Defendants reiterated their objections to the verdict slip after the court presented its final version. RA 1244:23-1245:1.

The central question for the jury concerned BioPoint's claims surrounding Catapult's placement of a consultant, Dr. Candida Fratazzi. Specifically, Catapult was trying to place Dr. Fratazzi in a position at Vedanta while BioPoint was trying to place her in a different position at Shire. Ultimately, Dr. Fratazzi chose to accept the Vedanta job. BioPoint claimed that Defendants caused BioPoint to lose $312,000 in gross profits that it would have earned had Dr. Fratazzi accepted the position at Shire.

The jury found that Defendants "misappropriated" trade secrets "concerning" Dr. Fratazzi, Vedanta, and Shire. RA 1300-1302. The jury

also found that Defendants tortiously interfered with BioPoint's prospective business relationships with Dr. Fratazzi—but *not* Vedanta. Id.  The jury awarded BioPoint $312,000 in damages related to its claims concerning the placement of Dr. Fratazzi.  Id.[3]

Throughout the jury trial, Defendants steadfastly maintained the position that for BioPoint to recover attorney's fees or multiple damages, it would have to prove that any misappropriation of trade secrets was both "willful and malicious" under MUTSA.  In its proposed special jury questions number 5, Defendants requested that the jury answer whether each trade secret was misappropriated "willfully and maliciously," but the court did not put that issue to the jury.  RA 313. Defendants' sixth proposed jury question also incorporated reference to another element of MUTSA.  Specifically, Defendants requested that the jury decide whether BioPoint pursued its trade secrets claims against Defendants in bad faith.  See id. ("Do you find by a preponderance of the evidence that BioPoint pursued its trade secret

---

[3] The $312,000 represented BioPoint's lost *gross* profits. RA 1469:25-1471:1.  BioPoint, however, would have had to pay twenty-three (23%) percent in commissions to its salesperson (Ms. Attis) and recruiter (Ms. Hunt).  Id.  Thus, the *net* profits were $240,240.

claims against either Defendant in bad faith?").  Under MUTSA, a defendant accused of misappropriating trade secrets may obtain attorney's fees if a plaintiff pursues its trade secrets claims in bad faith. G. L. c. 93, § 42C.  Defendants repeatedly informed the court that provisions of MUTSA were controlling.

### 4.    Bench Trial

Following the jury trial, the court conducted a two-day bench trial on October 18-19, 2022, to resolve BioPoint's claims for equitable remedies (*e.g.*, unjust enrichment/disgorgement), attorney's fees, multiple damages, and for violation of G. L. c. 93A.  The court heard opening statements and received evidence.

Defendants reminded the court that BioPoint must prove "willful and malicious" misappropriation to recover attorney's fees and multiple damages under MUTSA.  For example, in their opening statement counsel argued BioPoint must prove that the misappropriation was both willful *and malicious*:

> Your Honor, I also disagree with my sister as to a statement of law that she made when she told you under the trade secrets statute all they had to prove was willfulness. That's simply not true. The statute says willful and malicious. Malice is an intent [element] under the trade secret statute. So we

> intend to present additional evidence that there was
> absolutely no malice in anything that occurred.

RA 1408:8-14.

Defendants followed through on that promise of demonstrating that there was no malice. <u>See</u> RA 1696-1697, ¶¶167-173. Furthermore, in responding to opposing counsel's objection to a line of cross-examination, Defendants' counsel commented that questions bore on the issue of malice, so the court was reminded that malicious misappropriation was a live issue during the trial. RA 1645:17-22.

In their bench trial motion for a "directed verdict," Defendants argued that BioPoint had not adduced any evidence of malicious misappropriation, and therefore, could not recover for attorney's fees under DTSA and MUTSA. RA 1666. ("BioPoint must prove that Defendants willfully *and maliciously* misappropriated its trade secrets," citing DTSA and MUTSA) (emphasis in original).

In their proposed findings of fact and rulings of law submitted to the court, Defendants reiterated multiple times that BioPoint would have to prove "willful and malicious" misappropriation under MUTSA and DTSA to recover the damages it was seeking. RA 1670; RA 1696. In fact, in the *second sentence* of their submission, Defendants noted for

the court that among the three issues that the court reserved for determination at the bench trial was "whether a trade secret was 'willfully and maliciously misappropriated,' which is a predicate finding for a discretionary award of multiple damages (or attorney's fees) to a plaintiff." RA 1670. Furthermore, Defendants requested the following ruling of law: "To recover attorney's fees for misappropriation of a trade secret claim, BioPoint must prove that Defendants willfully *and maliciously* misappropriated its trade secrets. See 18 U.S.C. § 1836(b)(3)(C); M.G.L. c. 93 §42B(b) . . . BioPoint failed to adduce *any* evidence of malice." RA 1696, ¶¶167-168.

On April 25, 2023, the court issued its findings of fact and rulings of law. RA 1822-1850. The court adopted the jury's verdict, finding that Defendants misappropriated BioPoint's "confidential trade secret information." RA 1844, ¶59. In addition to the $312,000 that the jury awarded on BioPoint's claims concerning Dr. Fratazzi, the court awarded BioPoint $1,375,148—which represented Catapult's gross profits for its entire relationship with Vedanta—including its profit on placements that had nothing to do with BioPoint's alleged trade secrets (the "Vedanta Profits"). RA 1849-1850, ¶77. As a discovery sanction,

the court refused to consider Defendants' evidence showing: (1) that most of the Vedanta Profits had no connection to BioPoint's alleged trade secrets; and (2) the expenses (*i.e.*, commissions) associated with earning those profits (the "Offset Evidence").[4]  RA 1839-1840, ¶¶46-47; RA 1849, ¶74.  The court found that Defendants' misappropriation of trade secrets violated Chapter 93A and trebled the damages award based on a finding that the Defendants' conduct with respect to BioPoint's trade secrets was "knowing and willful."  RA 1849, ¶75.  The court did *not* find malice, nor would there have been a basis in the record to make such a finding.  RA 1843, ¶¶55-57; RA 1849, ¶75.  The court also awarded BioPoint automatic attorney's fees under Chapter 93A without finding *malicious* misappropriation.  RA 1844, ¶58; RA 1849, ¶76.

### 5.    Post-Trial Motions and Entry of Judgment

After the court issued its  findings of fact and rulings of law, Defendants filed a post-trial motion styled as a Motion for Judgment as a Matter of Law, Motion for a New Trial, Motion for Remittitur, and

---

[4] Defendants' Offset Evidence is recounted in Section 2a of this brief.  *Infra* Section 2.

Motion to Amend the Judgment (the "Post-Trial Motion"). RA 2023-2024. In their Post-Trial Motion, among other things, Defendants argued that the court's award of exemplary damages and attorney's fees could not be sustained in the absence of a finding of malice. Defendants further argued that any award of exemplary damages was limited to double damages in keeping with the provisions of MUTSA. RA 2029-2031. The court denied Defendants' motion. RA 2141-2149. Rather than addressing the merits of Defendants' argument (*i.e.*, the plain language of MUTSA), the court erroneously ruled that Defendants "waived" the argument. RA 2147.

On April 26, 2023, the court entered a $5,061,444 judgment, which did not include an amount for attorney's fees or costs. RA 1851. Subsequently, the court awarded BioPoint $2,503,457 in attorney's fees—approximately eight (8) times the amount of the jury award—and $24,290.27 in costs. RA 2152-2157. Defendants timely filed a notice of appeal on July 12, 2023. RA 2158-2159. On July 18, 2023, the court entered an amended judgment, which incorporated the awards of attorney's fees and costs, and prejudgment interest for a total $7,711,470.27 judgment—approximately twenty-five (25) times the

amount of the jury award.  RA 2160.  On July 18, 2023, Defendants

filed an Amended Notice of Appeal, and these proceedings followed.

RA 2161-2162.

## SUMMARY OF THE ARGUMENT

The district court made multiple legal errors on the issue of

damages and fees.

*First*, the court erred in awarding treble damages ($3,374,296) and

attorney's fees ($2,503,457) under G. L. c. 93A based on the jury's

finding that Defendants misappropriated BioPoint's trade secrets.  To

the extent the provisions of MUTSA conflict with Chapter 93A, MUTSA

supersedes Chapter 93A where the underlying conduct is theft of a

trade secret.  MUTSA requires a finding of *malice* for there to be an

award of exemplary damages and attorney's fees.  Here, there was no

finding of malice—nor could there be.  As such, there is no basis for

awarding multiple damages and attorney's fees.  And even with a

finding of malice (which does not exist here), exemplary damages are

limited to double damages—not treble.

*Second*, the court erred in awarding Catapult's entire gross profits

($1,375,148) from its relationship with its client.  To begin, BioPoint

20

never disclosed that it was seeking to disgorge the Vedanta Profits in discovery. As such it should have been precluded from seeking such damages at trial under Fed. R. Civ. P. 37. Additionally, most of the Vedanta Profits were *not* attributable to BioPoint's claimed trade secrets. Instead, they were for placing accountants and bottle washers, for Catapult employee services, and for vendor management services that BioPoint does not provide. The court, however, ignored this fact as a "discovery sanction"—stating that Catapult should have provided a breakdown of its total profits in discovery. However, BioPoint never requested that information *and* Catapult had no reason to offer it *sua sponte* because BioPoint never disclosed that it was seeking to disgorge the Vedanta Profits. Finally, the undisputed evidence was that the $1,375,148 figure was Catapult's *gross profits*. Again, the court refused to consider these facts as a "sanction." In short, the court allowed BioPoint to seek damages that were never disclosed in discovery, but barred Catapult (as a discovery sanction) from presenting evidence (that was never requested in discovery) to show that the profits BioPoint sought to disgorge were both unrelated to BioPoint's alleged trade secrets and a gross figure.

*Third*, the court erred in refusing to remit the jury's award of $312,000 for lost profits.  It is undisputed that the value awarded by the jury is BioPoint's *gross* profits.  The court should have remitted the award to reflect BioPoint's net profits.

*Fourth*, the court erred by disgorging profits from Andrew Dickhaut that he never received.

*Fifth*, the court erred by refusing to grant Defendants a new trial. To begin, the court erred by failing to require BioPoint to identify its trade secrets with sufficient particularity.  That error was compounded by the court's use of a verdict form that did not identify the misappropriated trade secrets, despite having stated before trial that the verdict form would identify the trade secrets.  The verdict form was improper because it did not address all factual issues essential to the judgment, and this Court should remand the case for a new trial.

*Sixth*, the court erred by failing to find the required element of "use" in a misappropriation of a trade secret claim.  The jury never decided the issue of Catapult's alleged use of BioPoint's trade secrets, and the court relied on the mistaken premise that the jury determined

use.  Therefore, this Court should remand for a new trial on the issue of
use.

## STANDARD OF REVIEW

The standard of review for Defendants' objections to the court's
bench trial award of treble damages and attorney's fees under G. L.
c. 93A without a finding of malice is *de novo*.  <u>See</u> <u>AIDS Action Comm.</u>
<u>of Massachusetts, Inc. v. Massachusetts Bay Transp. Auth.</u>, 42 F.3d 1, 7
(1st Cir. 1994) (stating that in a bench trial, the court reviews "*de novo*
the district court's legal determinations.").

The standard of review for Defendants' objections to the court's
bench trial award of disgorgement of Catapult's profits without the
finding of use of a misappropriated trade secret is *de novo*. <u>See</u> <u>id.</u>

The standard of review for Defendants' objection to the court
allowing BioPoint to pursue an untimely claim for disgorgement of
profits is abuse of discretion.  The standard of review for Defendants'
objection to the court's failure to consider Defendants' Offset Evidence
is abuse of discretion.  <u>Esposito v. Home Depot U.S.A., Inc.</u>, 590 F.3d 72,
78 (1st Cir. 2009) (noting that the standard of review regarding
sanction orders pursuant to Rule 37(c) is abuse of discretion).

The standard of review for the court's refusal to remit damages awarding disgorgement of Catapult's gross profits and the jury's verdict awarding gross profits is abuse of discretion. <u>Davignon v. Clemmey</u>, 322 F.3d 1, 11 (1st Cir. 2003) ("[a] district court ruling rejecting a motion for remittitur is reviewed for abuse of discretion.").

The standard of review for Defendants' objection to the special verdict form and their motion for a new trial is abuse of discretion. <u>Uphoff Figueroa v. Alejandro</u>, 597 F.3d 423, 434 (1st Cir. 2010) ("We review preserved objections to special verdict forms for abuse of discretion and objections not raised in the district court for plain error.").

## **ARGUMENT**

The court's damages award is riddled with legal errors and should not stand. Furthermore, Defendants are entitled to a new trial for two reasons: (1) the court did not require the jury to make specific findings regarding the trade secrets that were misappropriated, which unfairly prejudiced and deprived Defendants of the opportunity to challenge the specific findings in this appeal; (2) neither the jury nor the court at the

bench trial made a finding of use of trade secrets, a critical element of a misappropriation claim.

1. **The district court erred by awarding BioPoint exemplary damages and attorney's fees under G. L. c. 93A where the predicate unfair or deceptive act was misappropriation of trade secrets, and the fact finder did not make a finding of malicious misappropriation.**

MUTSA explicitly supersedes other laws of the Commonwealth to the extent they are inconsistent with MUTSA. For that reason, the court should not have awarded exemplary damages or attorney's fees under Chapter 93A because neither the jury nor the court made a finding of malicious misappropriation of trade secrets, as would have been required under MUTSA to award those damages. Even if it were appropriate for the court to award exemplary damages, it should not have awarded treble damages because MUTSA caps exemplary awards at double damages.

*a. MUTSA supersedes inconsistent state laws.*

Massachusetts was one of the last states to adopt some form of the Uniform Trade Secrets Act ("UTSA"), doing so over forty years after the uniform law was first promulgated. Uniform Law Commission, Trade Secret Act (Nov. 3, 2023),

https://www.uniformlaws.org/committees/community-home?communitykey=3a2538fb-e030-4e2d-a9e2-90373dc05792.  Prior to

the enactment of MUTSA, Massachusetts plaintiffs could pursue claims

for misappropriation of trade secrets under the common law or by the

statutory predecessor to MUTSA; however, statutory and common law

claims were often subject to different legal standards, creating

ambiguity and disharmony in the law surrounding trade secrets.  See,

e.g., Advanced Micro Devices, Inc. v. Feldstein, No. CV 13-40007-TSH,

2013 WL 10944934, at *7 (D. Mass. May 15, 2013) (discussing the

different definitions of misappropriation which apply to common law

and statutory claims).  The stated legislative purpose of MUTSA is to

"make uniform the law with respect [sic] trade secrets."  G. L. c. 93,

§ 42G.  To that end, MUTSA states that its provisions "shall supersede

any conflicting laws of the commonwealth providing civil remedies for

the misappropriation of a trade secret."  Section 42F(a).  The law

clarifies, however, that it "does not affect . . . other civil remedies to the

extent that they are not based upon misappropriation of a trade secret."

Section 42F(b)(3).[5]

Neither this Court, nor the Massachusetts appellate courts have addressed the scope of MUTSA Section 42F's superseding provision with respect to Chapter 93A claims. The only reported Massachusetts district court level decision on the issue decided that MUTSA supersedes Chapter 93A claims that are based on misappropriation of trade secrets, but not theft of confidential information (including tortious interference claims where the improper means was theft of confidential information). See Neural Magic, Inc. v. Facebook, Inc., No. 1:20-CV-10444-DJC, 2020 WL 13538627, at *3 (D. Mass. Oct. 29, 2020) ("the Court does *not* conclude that MUTSA preemption applies to the state law claims that Defendants now challenge where these claims rely

---

[5] The UTSA, upon which MUTSA is based, contains similar language: "this [Act] displaces conflicting tort, restitutionary, and other laws of this State providing civil remedies for misappropriation of a trade secret . . . this [Act] does not affect other civil remedies that are not based upon misappropriation of a trade secret." UTSA, § 7(b).

upon the alleged [sic] theft of alleged confidential and information.")
(emphasis added).[6]

Where, as here, a plaintiff alleges unfair and deceptive conduct
based on misappropriation of trade secrets *and* other conduct (*e.g.*,
tortious interference or theft of confidential information) the court must
*first* determine the offending conduct.  Neural Magic, Inc., 2020 WL
13538627, at *3.  With that finding, the court can then determine
whether a plaintiff's remedies are limited to those stated in MUTSA.

This is important because MUTSA and Chapter 93A conflict as to
both the quantum of proof required for exemplary damages and the
maximum measure of exemplary damages.  MUTSA permits double
damages where the misappropriation was *both* willful *and malicious*.
See G.L. c. 93, §42(B)(b) ("if willful and malicious misappropriation
exists, the court may award exemplary damages in an amount not
exceeding twice any award under subsection (a)."  In contrast, Chapter

---

[6] The district court was presented with this issue in Netcracker
Tech. Corp. v. Laliberte, and the court declined to rule on it because the
factual record was not complete.  No. CV 20-11054-RGS, 2020 WL
6384312, at *5 (D. Mass. Oct. 30, 2020) (recognizing that the question
may be appropriate to certify to the Supreme Judicial Court but
declined to do so at the motion to dismiss stage of the case).

93A does not require malice and permits double or treble damages.

G. L. c. 93A, § 11.  Simply put, MUTSA and Chapter 93A conflict with respect to the civil remedies available for claims based on theft of trade secrets.

    b.    *The district court erred by awarding BioPoint exemplary damages.*

Here, the court based its finding of Chapter 93A liability on the jury's finding of misappropriation of trade secrets and tortious interference (presumably based on theft of trade secrets).[7]  As such, BioPoint's remedies under Chapter 93A were limited to those set forth in MUTSA.  In other words, BioPoint could recover double damages *if* it proved that the misappropriation was both willful and malicious.

The court found that Defendants' misappropriation was willful— *not* malicious.  Indeed, the court declined to find malice in its findings of fact and conclusions of law (RA 1822-1850) and in its Order denying Defendants' Post-Trial Motion (RA 2141-2149).  The court also refused Defendants' request to have the jury decide the question of malice.

---

[7] The jury found both theft of trade secrets and tortious interference with respect to the placement of Dr. Candida Fratazzi.  <u>See</u> RA 1300-1302.

RA 137-143; RA 1261-1292.  Because there was no finding of malicious

misappropriation at either the jury or bench trial, the court erred by

awarding BioPoint *any* measure of exemplary damages.  <u>See</u> G. L. c. 93,

§ 42B(b).  Even if exemplary damages were appropriate (which they are

not), MUTSA limits them to double damages.  <u>Id.</u>  As such, the court's

award of treble damages cannot stand.

> c.    *The district court erred by awarding BioPoint attorney's fees*
> *without making a finding of malicious misappropriation.*

A finding of malice also is required for an attorney's fees award.

<u>See</u> G. L. c. 93, § 42C ("The court may award reasonable attorney's fees

and costs to the prevailing party if:  . . . (iii) willful and malicious

misappropriation exists.").  Because there was no finding of malice, the

court erred in awarding BioPoint attorney's fees.

> d.    *The Defendants did **not** waive their argument that the*
> *MUTSA supersedes Chapter 93A.*

The court's ruling that Defendants waived their argument that

MUTSA supersedes Chapter 93A is erroneous and this Court should

reverse it.

As described above, MUTSA only affects Chapter 93A claims that

are based on theft of a trade secret.  As such, whether MUTSA

superseded BioPoint's remedies under Chapter 93A could not be determined until *after* the court decided what conduct, if any, was unfair and deceptive.  Indeed, BioPoint did not limit its Chapter 93A claim to theft of trade secrets.  See RA 57, ¶89 ("Dickhaut and Catapult committed unfair and deceptive acts toward BioPoint, including their *tortious interference* with BioPoint's prospective business relationships and their misappropriation of BioPoint's *confidential information* and/or trade secrets, in violation of M.G.L. c. 93A §11.") (emphasis added). Accordingly, the court could have found a Chapter 93A violation based on something other than theft of trade secrets.[8]

The court rejected this argument stating that it warned Defendants during the May 19, 2022 pre-trial hearing that "the jury verdict on whether defendants stole BioPoint's trade secrets would serve as the 'factual predicate' of any eventual Chapter 93A determination."  RA 2147.

---

[8] The court was *not* bound by the jury's verdict in deciding the Chapter 93A claim.  See RA 1841, ¶50.  The jury's verdict, moreover, did not identify what it found to be trade secrets as opposed to mere confidential information.  See RA 1300-1302.

To the contrary, what the court actually said at the pre-trial hearing was that it would reserve the Chapter 93A claim to itself, but that there had to be a finding of liability on the underlying claims first:

> THE COURT: No. Unfair competition, which is a part of your verdict slip, that's a 93A claim. That doesn't go to the jury.
>
> * * *
>
> I mean, if what you're saying is that the jury should rule the issue of unfair competition, no, of course they're not going to do. That's for the Court. I'll decide. Treble damages? I'll decide. But there has to be a finding of liability first.

RA 344:17-19; RA 346:3-7. In other words, if the jury found *no* liability for either trade secret misappropriation *or tortious interference*, then there would be no reason for the court to decide whether the underlying conduct also amounted to an unfair and deceptive trade practice.[9] Similarly, had the jury found tortious interference *but not* trade secret misappropriation, there *still* would have been a bench trial on Chapter 93A.

In short, the court could have found a Chapter 93A violation based on something other than trade secrets. The court also could have found no Chapter 93A violation at all. Therefore, the issue of whether

---

[9] Similarly, if there was no finding of trade secret misappropriation, then there would be no need for the court to decide whether to award equitable damages or attorney's fees on that claim.

BioPoint's civil remedies were limited to those under MUTSA was not ripe until *after* the court found a Chapter 93A claim based on theft of trade secrets. As soon as the court made that finding, Defendants moved for remittitur.[10]

Notably, Defendants raised this issue before filing their Post-Trial Motion, so it should have come as no surprise to the court or to BioPoint. During both the jury trial and the bench trial, Defendants argued that BioPoint must prove malice to recover multiple damages and attorney's fees. Defendants raised the malice issue in their proposed verdict slip, during opening statements in the bench trial, with the court in response to an objection, in their "motion for a directed verdict" at the bench trial, in their proposed finding of fact and rulings of law, and finally in thier Post-Trial Motion. RA 313; RA 1408:8-18; RA 1645:17-22; RA 1666; RA 1670-1709; RA 2030-2031.

Indeed, the second sentence of Defendants' proposed findings of fact and rulings of law states that one of the issues that the court reserved for determination at the bench trial was "whether a trade

---

[10] Additionally, had the court found a Chapter 93A violation based on a *malicious* misappropriation of trade secrets and awarded double damages, then MUTSA would not supersede the Chapter 93A award.

secret was 'willfully and maliciously misappropriated,' *which is a predicate finding for a discretionary award of multiple damages (or attorney's fees) to a plaintiff*." RA 1670 (emphasis added). Even BioPoint itself acknowledged that the court would have to find malice in its proposed findings and rulings of law. <u>See</u> RA 1717 ("As to enhanced damages and fees, BioPoint presented evidence at the jury and bench trials showing that Defendants acted with intent to injure BioPoint. Their conduct rises to the level of willful, knowing *and malicious*. Accordingly, multiple damages should be awarded on BioPoint's lost profits (awarded by the jury) for $312,000 and on the disgorgement award.") (emphasis added). In short, the court's assertion that Defendants waited until their Post-Trial Motion to raise their MUTSA argument is without support and belied by the record.

The court's waiver ruling is erroneous for several other reasons as well. *First*, the ruling does *not* serve the underlying rationale for the waiver doctrine—which is to encourage the court and parties to address any alleged errors before the jury is discharged or fact finding is complete, so the court can remedy them prior to entry of final judgment. <u>Babcock v. Gen. Motors Corp.</u>, 299 F.3d 60, 63 (1st Cir. 2002)

("objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged."); <u>Crawford v. Clark</u>, 578 F.3d 39, 41, 44 (1st Cir. 2009) (holding court properly rejected a defendant's attempt to *introduce new evidence* following an adverse bench trial decision).

Here, Defendants did *not* ask the court to consider additional evidence or make additional factual findings following the conclusion of the bench trial. With their Post-Trial Motion, Defendants merely asked the court to apply the *correct* law to the facts that the court already found. While Defendants did not style it as such, their Post-Trial Motion was in part a Fed. R. Civ. P. 52(b) motion seeking that the judge amend his rulings of law. Defendants brought manifest errors of law to the court's attention and gave the court a chance to correct them, which is the purpose of a Rule 52(b) motion. <u>See</u> <u>Nat'l Metal Finishing Co. v. BarclaysAmerican/Com., Inc.</u>, 899 F.2d 119, 123 (1st Cir. 1990) ("Although Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court . . . its purpose is to permit the correction of any manifest errors of law or fact that are discovered, upon reconsideration, by the trial court.").

*Second*, the court confused the terms "waiver" and "forfeiture" in its decision on the Post-Trial Motion. "Waiver is the intentional relinquishment or abandonment of a right; forfeiture is generally defined as the mere failure to raise an issue in a timely manner." United States v. Morgan, 384 F.3d 1, 7 (1st Cir. 2004). The court may have used the term "waiver," but what it made was a forfeiture ruling.

Forfeited arguments are reviewed for plain error. Burnett v. Ocean Props., Ltd., 987 F.3d 57, 72 (1st Cir. 2021) ("we review unpreserved claims for plain error, meaning Appellants must show '(1) error which (2) is so clear that a trial judge should act even without an objection and which (3) affects the [appellants'] substantial rights.'") quoting Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 78 (1st Cir. 2010). Thus, even if this Court were to find that Defendants forfeited their argument that MUTSA superseded Chapter 93A (which they did not), this Court should review the issue under the civil plain error standard. Id.

Here, it was plain error for the court to disregard § 42F of MUTSA and give it *no effect* whatsoever. See United States v. Caraballo-Rodriguez, 480 F.3d 62, 70 (1st Cir. 2007) ("Applying the plain error

test, we ask whether [the] proposed construction . . . is compelled by the language of the statute itself, construction of the statute in light of the common law, or *binding* judicial construction of the statute.") (emphasis in original). Furthermore, the court's refusal to consider MUTSA argument on its merits resulted in a miscarriage of justice. The court had an opportunity to remedy the error but simply chose not to. Without statutory authority, the court awarded BioPoint almost $6 million in exemplary damages and attorney's fees, the great majority of the resulting $7.7 million judgment—a fundamentally unfair result which should shake the public's confidence in the integrity of the judicial proceeding. These amounts stand in staggering contrast to the $312,000 that the jury found appropriate to award to BioPoint on its trade secret and tortious interference claims. Upon learning that it could not award attorney's fees or exemplary damages (capped at double damages) without a finding of malice, the court invoked the "waiver" rule as an easy way out.

For these reasons, this Court should reverse the district court's award of treble damages and attorney's fees.

**2.   The district court erred by disgorging Catapult's gross profits from its entire relationship with Vedanta.**

The jury found that Defendants misappropriated trade secrets "concerning Vedanta" without ever identifying the specific trade secrets.[11]  RA 1300-1302.  From this, the court disgorged *all* of Catapult's gross profits from its relationship with Vedanta ($1.375 million).  As described below, this was erroneous because: (1) the court should not have permitted BioPoint to seek disgorgement of the Vedanta Profits because BioPoint did not disclose that claim in discovery; (2) the vast majority of the Vedanta Profits have nothing to do with (and were not attributable to) BioPoint's alleged trade secrets; (3) these were gross profits—not net profits; and (4) Andrew Dickhaut never received the Vedanta Profits and, therefore, they could not be "disgorged" from him.

---

[11] The jury also found that Catapult misappropriated trade secrets concerning "Shire/Takeda."  RA 1300-1302.  Most likely, the jury concluded that because Catapult placed Dr. Fratazzi at Vedanta and BioPoint was trying to place her at Shire/Takeda, the trade secrets concerning Dr. Fratazzi also *concerned* Vedanta and Shire/Takeda. Because the court refused to have the jury identify the alleged trade secrets, we will never know what the jury truly intended.  But the jury's rejection of BioPoint's tortious interference claims as to Vedanta, strongly suggests that it *never* intended its finding to warrant a seizure of all of Catapult's profits at Vedanta.

a. *The district court erred by allowing BioPoint to pursue its untimely claim for disgorgement of the Vedanta Profits and further compounded its error by failing to consider Defendants' Offset Evidence.*

The court abused its discretion by allowing BioPoint to pursue a $1.375 million claim that was never disclosed in discovery, while preventing Defendants from offering any evidence to defend against this surprise claim. Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), *the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial*, unless the failure was substantially justified or is harmless." Fed R. Civ. P. 37(c)(1) (emphasis added). The language of the rule is clear that a party "is not allowed" to use undisclosed and untimely disclosed information at trial.

BioPoint was required to disclose its damages calculations via its: (1) initial disclosures; (2) answers to interrogatories; and (3) in Rule 30(b)(6) deposition questioning on the subject of damages. Despite its obligation to provide this information, BioPoint refused. RA 100. Subsequently, Defendants filed a motion *in limine* to exclude damage

39

calculations that were not provided in discovery.[12]  RA 100-128.  Only

*after* Defendants filed their motion *in limine*, did BioPoint provide a

supplemental interrogatory response claiming approximately $5 million

in damages including a combination of lost profits and disgorgement.

This disclosure, however, was too little too late as it came on the eve of

trial and more than a year after the close of discovery.  RA 272-273.

The court granted Defendants' motion *in limine* because BioPoint

had no excuse for failing to disclose the damages sought.  RA 272-273.

The court, therefore, excluded BioPoint's undisclosed lost profits claim

at the jury trial and reserved the undisclosed disgorgement damages for

itself.  RA 272-273.  Prior to the bench trial, Defendants again moved *in

limine* to exclude evidence of the Vedanta Profits, as that claim was not

disclosed in discovery.  RA 1310-1396.

The court abused its discretion by allowing BioPoint to pursue this

$1.375 million claim even though it was not disclosed in discovery.  The

court then compounded its error by refusing to consider the undisputed

Offset Evidence presented by Defendants showing that most of the

---

[12] Defendants requested a hearing on their Motion *in Limine* to
exclude damages calculations that were not provided in discovery,
however, the court refused to hold a hearing on the issue.  RA 264-271.

Vedanta Profits were from placements of consultants for whom BioPoint claimed no trade secrets. The court's puzzling and contradictory reasoning was that Defendants failed to disclose the Offset Evidence information during discovery. RA 1848, ¶74.

Defendants first learned that BioPoint sought to disgorge the Vedanta Profits over a year *after* the close of discovery, three months after summary judgment was decided, and just weeks before the trial. Had Defendants known that BioPoint was seeking the Vedanta Profits, it would have responded with evidence showing that these profits were not attributable to BioPoint's alleged trade secrets.

BioPoint, moreover, *never requested* this information in discovery. Instead, BioPoint asked that for each of its life sciences clients (which would include Vedanta), Catapult identify and produce documents *sufficient to show* "(6) the revenue Catapult has derived from the client; and (7) the profit Catapult has derived from the client." Catapult responded: "6. Catapult's revenue from the Vedanta relationship is approximately $8,500,068 to date. 7. Catapult's profit from the Vedanta relationship is approximately $1,375,148 to date." RA 2960. BioPoint never requested Catapult's *net* profits, the commissions on those

placements, other related costs, or any further breakdown of the profits. Because BioPoint neither disclosed that it was seeking to disgorge the Vedanta Profits nor requested this information in discovery, Catapult had no reason to provide it.

In short, the court gave BioPoint a "free pass" on proving that the profits it sought to disgorge were attributable to the use of its trade secrets, by turning a blind eye to the evidence. The result was a gross miscarriage of justice and an undeserved windfall to BioPoint. Indeed, the court's rulings *rewarded* BioPoint for not disclosing its damages claim in discovery—a result contrary to the letter and spirit of Rule 37.

> b. *The district court should not have awarded damages that were not attributable to the use of misappropriation of a BioPoint trade secret.*

It is well established that courts may only disgorge profits attributable to the *use* of a misappropriated trade secret. See Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007); Specialized Tech. Res., Inc. v. JPS Elastomerics Corp., No. HSCV200700200, 2011 WL 1366584. at *1 (Mass. Super. Ct. Feb. 10, 2011). Yet, remarkably the

court in this case disgorged profits to tune of $1,309,633,[13] without a legal basis to do so—comprising ninety-five (95%) percent of the disgorged Vedanta Profits.

As detailed below, Catapult placed forty (40) life sciences consultants at Vedanta. RA 1678, ¶55. BioPoint's database contained information about only eleven (11) of those consultants. RA 1678, ¶54. The jury found trade secret misappropriation with respect to only three of those consultants—Drs. Candida Fratazzi, Stephen Haworth, and Chris Da Costa. RA 1300-1302. Catapult's gross profits with respect to these consultants were: $52,356 for Dr. Fratazzi (RA 2965-2966); $41,595 for Dr. Haworth (RA 2967); and $23,920 for Dr. Da Costa (RA 2964). Nevertheless, the court awarded BioPoint *all* of Catapult's profits from its placements at Vedanta—even placements for non-life sciences consultants. The court then compounded its error by trebling those profits.

---

[13] This figure represents the Vendanta Profits ($1,375,148) less the profits for Drs. Haworth and Da Costa ($65,515).

i. Sales commissions for placements made by other staffing companies are not attributable to BioPoint's trade secrets and the district court should not have awarded them as part of the lost profits claim.

Catapult served as a managed services provider ("MSP") for Vedanta. RA 2262-2266. In that role, Catapult worked with other staffing companies to place consultants at Vedanta. RA 1501:4-12; RA 1502:2-4. It is undisputed that $60,511.58 of the Vedanta Profits were Catapult's commissions for placements made by other staffing companies through the MSP program. RA 1501:4-12; RA 1502:2-4. BioPoint does not, nor has it ever, served as an MSP. RA 493:9-10; RA 1022:2-6; RA 1634:9-11. Thus, these profits have no connection whatsoever to a BioPoint trade secret and the court should not have awarded them to BioPoint.

ii. Profits from placing consultants in non-life sciences fields such as information technology, accounting, and professional services are not attributable to BioPoint's trade secrets.

At the bench trial, Angelo Salustri, President of Catapult, testified that Catapult's profits for Vedanta included profits for placing consultants in non-life sciences fields such as information technology, accounting, and professional services. RA 1499:11-1500:16. BioPoint

does not make placements in the fields of information technology, accounting, and professional services, therefore profits from these placements could not possibly be attributed to the misappropriation of BioPoint's trade secrets. RA 463:22-464:3; RA 1311; RA 1316.

> iii. Profits from placing lower-level employees whom BioPoint does not place are not attributable to BioPoint's trade secrets, and the district court should not have awarded them.

The undisputed evidence further showed that $528,753.13 of the Vedanta Profits (approximately forty (40%) percent) were from the placement of lower-level technicians (*e.g.*, bottle washers, rat cage cleaners, *etc.*) whom BioPoint does not staff. RA 420:5-14; RA 931:11-24; RA 1503:1-17. As such, these profits are not attributable to BioPoint's trade secrets.

> iv. Disgorged profits for the placement of consultants for which BioPoint did not claim misappropriation are not attributable to BioPoint's trade secrets.

The undisputed evidence showed that $371,591.59 of the Vedanta Profits are for the placement of nine (9) consultants for whom BioPoint did not establish any trade secrets, and for which the jury did not find liability. RA 1677, ¶48; RA 1679, ¶¶58, 60; RA 1681 ¶71. Indeed, six (6) of the nine (9) consultants were not even in BioPoint's database—

and BioPoint never once claimed that it had trade secrets concerning these consultants—or even knew who they were. RA 1681, ¶71a. As such, the profits associated with these placements was not attributable to the use of BioPoint's trade secrets.

As such, the court improperly awarded BioPoint profits for the placements of eight (8) life sciences consultants for which there was *no claim or finding* of trade secret misappropriation. RA 1300-1302.

> v. Profits from the placement of Jordan Pothier at Vedanta are not attributable to BioPoint's trade secrets, and the district court should not have awarded them.

The jury found no trade secret misappropriation with respect to Jordan Pothier, a consultant who Catapult placed at Vedanta. RA 1300-1302; RA 1358, ¶50. Despite the jury finding no misappropriation of a trade secret concerning Jordan Pothier, the court erroneously disgorged (and then tripled) Catapult's profits for placing Ms. Pothier at Vedanta ($19,800). RA 2971.

> vi. Expenses from billing Vedanta for Andrew Dickhaut's time are not attributable to BioPoint's trade secrets.

The gross profits awarded also include $288,269 from billing Vedanta for Andrew Dickhaut's time. RA 1502:5-23. As Mr. Autenrieth

testified, he and Mr. Dickhaut went to high school together and already had an established relationship. Their relationship and any time billed by Mr. Dickhaut could not, and was not, attributable to the use of BioPoint's trade secret.

> vii. The disgorged profits from the placement of Dr. Fratazzi must be remitted as it is duplicative of BioPoint's lost profits claim.

Both DTSA and MUTSA provide that unjust enrichment is an alternative remedy that must not duplicate damages for actual loss. 18 U.S.C. §1836(3)(B)(i) ("damages for actual loss caused by the misappropriation of the trade secret; and . . . damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."); G. L. c. 93, §42(B) ("[d]amages can include both actual loss caused by misappropriation and the unjust enrichment caused by misappropriation *that is not taken into account computing actual loss.*") (emphasis added); see <u>Jet Spray Cooler, Inc. v. Crampton</u>, 377 Mass. 159, 170 (1979) ("Of course, a plaintiff is not entitled to both the profits made by the defendant and his own lost profits."). The court awarded and tripled the disgorged profits of $52,356 for the placement of Dr.

Fratazzi,[14] even though BioPoint conceded that it cannot recover those damages twice. RA 1404:12-19. BioPoint elected to seek its lost profits ($312,000) for Dr. Fratazzi, which the jury awarded, and the court tripled. The court then awarded both BioPoint's lost profits *and* Catapult's profits for the placement of Dr. Fratazzi. The court then compounded the error by trebling both the $312,000 BioPoint lost profits *and* the $52,356 disgorged profits. Therefore, pursuant to DTSA and MUTSA, the disgorged profits for the placement of Dr. Fratazzi, which the court tripled, should be remitted. Combined, the damage errors identified in the subsections above represent a gross misjustice, which this Court should remedy.

> c.   *The "head start" doctrine does not apply and is not a substitute for proof that the Vedanta Profits were attributable to the use of BioPoint's trade secrets.*

The court did not even attempt to determine whether the Vedanta Profits were attributable to the use of BioPoint's trade secrets. Instead, the court simply concluded that "Defendants' misappropriation of these trade secrets gave Catapult a head start in developing a working

---

[14] These profits were disclosed in Catapult's Second Supplemental Responses to BioPoint's Second Set of Interrogatories. RA 2966.

relationship with Vedanta, enabling it to obtain the MSP agreement."

RA 1844, ¶60. The court further found that "Catapult's entire

relationship with Vedanta was enabled and sustained with BioPoint

information." RA 1847-1848, ¶71. The court's findings, however, are

legally erroneous and unsupported by the record.[15]

The "head start" rule applies in cases involving products and

limits damages to the "***period of time*** in which others in the trade are

likely, through legitimate business procedures, to have become aware of

these secrets." Jet Spray Cooler, Inc., 377 Mass. at 171 n.11 (emphasis

---

[15] For example, the court found that "[i]n March of 2018, Attis not only assisted Dickhaut with his search method for locating the candidate who was to become Catapult's first life sciences placement at Vedanta, but she also ran searches for prospective candidates herself." RA 1844-1845, ¶61. The undisputed testimony was that Ms. Attis' helping her fiancée run LinkedIn searches (which involves *zero* trade secrets) yielded *no candidates*. RA 1446:1-12; RA 1611:4-13. In fact, Catapult's first life sciences placement at Vedanta (Meg Carini) was identified and given to Defendants by Jeff Autenrieth. RA 196-197; RA 1612:8-1613:1; RA 1681, ¶71(b)(i); RA 2907; RA 2963-2964. In the face of this evidence, BioPoint abandoned its claim that Defendants misappropriated trade secrets with respect to Meg Carini. Yet the court awarded BioPoint all profits with respect to Ms. Carini (as they were included in the Vedanta Profits) and tripled them. Similarly, the court found that Mr. Dickhaut *must have* used BioPoint's information in presenting Vedanta with an offer of Catapult's MSP services. RA 1845, ¶62. What information? It is undisputed that BioPoint does not (and never has) offered MSP services. RA 493:9-10; RA 1022:2-6; RA 1634:9-11.

added, internal citations omitted).[16]  Thus, to prove damages under the "head start" theory, there must be evidence of the "head start"—*i.e.*, *how long* it would have taken Defendants (or others) to achieve the same result *without* using BioPoint's trade secrets.  Id.  And there must be "admissible evidence tying that head start to a measure of unjust enrichment."  Alifax Holding Spa v. Alcor Sci., Inc., C.A. No. WES 14-440, 2021 WL 3911258, at *1 (D.R.I. Sept. 1, 2021).

Here, BioPoint presented *neither evidence*: (1) sufficient to determine the "head start" period; nor (2) tying that head start to the Vedanta Profits that were earned over an eighteen-month period. Therefore, any award of damages under the "head start" theory is reversible error.

Indeed, the undisputed evidence is that Catapult landed Vedanta as a client because of Mr. Dickhaut's long standing relationship with his high school friend, Jeff Autenrieth.  RA 496:5-10; RA 111:3-23;

---

[16] "Generally, the 'head start rule' has been applied in cases where the plaintiff's product, including the trade secret, has been marketed. The marketing of the product gives competitors a legitimate opportunity to study the product and to learn the principles of the trade secret through reverse engineering or similar procedures."  Jet Spray Cooler, Inc., 377 Mass. at 171 n.11

RA 1117:21-1118:9; RA 1128:2-1131:3. Mr. Autenrieth gave Catapult business at Moderna. RA 845:18-846:6; RA 924:7-927:1; 1099:25-1101:17. When Mr. Autenrieth moved to Vedanta, he oversaw choosing the staffing firms with whom Vedanta would work. RA 1128:7-10. Mr. Autenrieth testified that he chose Catapult because he trusted Mr. Dickhaut and that Catapult's experience in life sciences was not important to him because "recruiting is recruiting." RA 1111:3-1113:15, 1117:21-1118:9, 1130:10-22. Mr. Autenrieth further testified that most of Vedanta's staffing needs were lower-level technicians (bottle washers, rat cage cleaners) that anybody could recruit. RA 1111:24-1113:15. Based on Mr. Autenrieth's testimony, no reasonable finder of fact could find that Catapult received a "head start" from alleged misappropriation of a trade secret that led to the relationship with Vedanta.

In fact, the jury rejected BioPoint's argument that Defendants tortiously interfered with BioPoint's prospective relationship with Vedanta. RA 1300-1302. Therefore, Catapult's "head start" was Mr. Dickhaut's relationship with Mr. Autenrieth, which had nothing to do with any alleged misappropriation of a trade secret. In the face of

uncontested evidence and direct testimony from the decisionmaker of
Vedanta, the court's finding regarding the "head start" doctrine and
awarding the entirety of Catapult's profits from Vedanta must be
overturned as Catapult's profits from Vedanta could not be attributable
to the use of BioPoint's trade secrets.

3.    **The district court erred in not remitting the jury award of
      gross profits.**

Remittitur is warranted where the award exceeds any rational
appraisal or estimate of the damages that could be based upon the
evidence before it.  See Climent-Garcia v. Autoridad de Transporte
Maritimo y Las Islas Municipio, 754 F.3d 17, 21 (1st Cir. 2014).  Here
remittitur is appropriate because both the jury and the court awarded
BioPoint *gross* profits.

The jury's award of $312,000 represented BioPoint's gross profits
on the placement of Candida Fratazzi.  RA 1469:19-1470:1. Specifically,
Mr. Nash testified that to get the net profit, he would have to deduct
the commissions paid to Ms. Attis and Ms. Hunt, which totals
approximately twenty-three percent (23%).  Id.  Accordingly, the court
should have remitted the award to deduct the 23% sales commissions,

which would have resulted in a net profit of $240,240, instead of $312,000.

Similarly, the Vedanta Profits are *gross profits*. RA 1494:19-2. The undisputed testimony is that approximately forty percent (40%) of those profits were paid to the Catapult salesperson and recruiter who landed the business. RA 1497:11-1948:3. Again, the court refused to consider this evidence as part of its erroneous sanction as discussed above. Thus, if this Court were to remit the disgorgement award to net profits associated with the placements of Drs. Haworth and Da Costa, then the remitted amount would be $39,309 (*i.e.*, $65,515 gross profits less $26,206 in associated expenses and commissions).

## 4. The district court abused its discretion by disgorging profits from Andrew Dickhaut that he never received.

The court should not have held Andrew Dickhaut, a Catapult employee with no ownership or partnership stake in the company, individually liable for disgorged profits.

It is black letter law that a plaintiff cannot disgorge profits from someone who never received them. See Liu v. Securities and Exchange Commission, 140 S. Ct. 1936, 1945 (2020) ("The rule against joint-and-several liability for profits that have accrued to another appears

throughout equity cases awarding profits."). Disgorgement of profits from someone who never received them is fundamentally inconsistent with the equitable nature of the disgorgement remedy, which is not to punish, but rather to deprive the wrongdoer of the fruits of his or her wrongdoing. Id. at 1943. Mr. Dickhaut never received the fruits in dispute, and therefore, cannot be held individually liable for their disgorgement. In Liu, the United States Supreme Court carefully outlined its precedent on the issue, collecting cases dating back two centuries, which establish that a finding of individual liability alone is insufficient to place an individual on the hook for disgorged profits they did not receive. Id. at 1945 ("The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits"). Specifically, the Lui Court cited the following authority:

> Belknap v. Schild, 161 U.S. 10, 25–26 (1896) ("The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation"); Keystone Mfg. Co. v. Adams, 151 U.S. 139, 148 (1894) (reversing profits award that was based not on what defendant had made from infringement but on what third persons had made from the use of the invention); Jennings v. Carson, 4 Cranch 2, 21 (1807) (holding that an order requiring restitution could not

apply to "those who were not in possession of the thing to be restored" and "had no power over it") (citing <u>Penhallow v. Doane's Administrators</u>, 3 Dall. 54, 1 L.Ed. 507 (1795) (reversing a restitution award in admiralty that ordered joint damages in excess of what each defendant received)).

<u>Id.</u> Thus, it is clear that a finding of joint and several liability must be accompanied by a showing that the profits flowed to an individual either directly, or indirectly, for example, through a partnership or ownership relationship. Here, it is undisputed that Mr. Dickhaut did not receive the Vedanta profits directly or indirectly, and it was error for the court to disgorge them from him, overlooking over two centuries of equitable law in the process. In supposed support of its seemingly unsupportable ruling, the court reasoned that it could award profits from Mr. Dickhaut because he "'collaborated with and ranks high in the firm,'" citing <u>Securities Exchange Commission v. Bahgat</u>, 2023 WL 3491733, at *9 n.5 (W.D.N.Y. May 17, 2023). However, the <u>Bahgat</u> case actually supports Defendants' position in the instant case. In <u>Bahgat</u>, the individual from whom profits were disgorged was the *managing member* of the entity in dispute and received the fruits of the wrongdoing through his ownership interest, not merely an employee like Mr. Dickhaut. <u>Id.</u> The court's disgorgement order was incredibly

unfair, saddling an employee with a massive judgment encompassing profits he did not receive.  To add insult to injury, the court trebled those damages on top of it.

**5.    The district court abused its discretion by not requiring the jury to make specific findings regarding the trade secrets that were allegedly misappropriated, warranting a new trial.**

The verdict form was improper because it did not address all factual issues essential to the judgment, and the court misled Defendants about its intentions with the verdict form, resulting in prejudicial error because the defense was structured around that decision.

"A verdict form must be reasonably capable of an interpretation that would allow the jury to address all factual issues essential to the judgment." Sheek v. Asia Badger, Inc., 235 F.3d 687, 699 (1st Cir. 2000)).  The form must "present the case fairly and accurately," and "address all factual issues essential to judgment." Santos v. Posadas De P.R. Assocs., Inc., 452 F.3d 59, 65 (1st Cir. 2006).  Here, the verdict form was invalid and the resulting judgment unfair because it did not sufficiently identify the trade secrets allegedly misappropriated, and

thus, failed to address a factual issue that was essential to the judgment under trade secret law.

Courts have long recognized that unlike patents and trademarks—which are publicly filed documents that define intellectual property rights—trade secrets are far more amorphous.  See, e.g., Cambridge Internet Solutions v. Avicon Group, No. 99–1841, 1999 WL 959673, at *2 (Mass. Super. Sept. 21, 1999) ("A plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue.");  Staffbridge, Inc. v. Gary D. Nelson Assocs., Inc., No. 024912BLS, 2004 WL 1429935, at *4 (Mass. Super. June 11, 2004) (ordering plaintiff to define its trade secrets with clarity and in way that "distinguish[es] what is protectable from that which is not.");  TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo, 966 F.3d 46, 52 (1st Cir. 2020) (describing trade secrets as having a "potentially amorphous nature").  The requirements of specificity and particularly exist "for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret and so that the defendant can defend itself at

any trial." M&A Metals, Inc. v. Fina, No. 21CV5570PKCPK, 2023 WL 2734794, at *5 (E.D.N.Y. Mar. 31, 2023).

Because of the amorphous nature of trade secrets, MUTSA, and the common law that was displaced by MUTSA, require that trade secrets be identified by a plaintiff with sufficient particularity at every step of a litigation.  At the pleading stage, a party "must state with reasonable particularity the circumstances" of the misappropriation. G. L. c. 93, § 42D(b).  Next, "before commencing discovery relating to an alleged trade secret, the party alleging misappropriation shall identify the trade secret with sufficient particularity under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense."  Id.  General and incomplete descriptions of trade secrets are insufficient to open the door to discovery for a plaintiff.  Milliman, Inc. v. Gradient A.I. Corp., No. CV 21-10865-NMG, 2022 WL 18032957, at *2 (D. Mass. July 11, 2022) (ordering plaintiff to supplement MUTSA trade secret disclosure where "The general and incomplete descriptions in plaintiffs' disclosure, [were] deficient under the statute.").  At the summary judgment stage, a court should enter summary judgment

where a plaintiff has only provided a vague and ambiguous disclosure of trade secrets. <u>Neural Magic, Inc. v. Meta Platforms, Inc.</u>, No. 20-CV-10444-DJC, 2023 WL 2383172, at *15 (D. Mass. Mar. 6, 2023) (granting summary judgment where trade secrets were "vaguely and indefinitely defined.").

At trial, the allegedly misappropriated trade secrets are usually identified in either the jury instructions, the verdict form, or both. <u>See</u>, <u>e.g.</u>, <u>CardiAQ Valve Techs., Inc. v. Neovasc Inc.</u>, No. 14-CV-12405-ADB, 2016 WL 6465411, at *3 (D. Mass. Oct. 31, 2016), <u>aff'd</u>, 708 F. App'x 654 (Fed. Cir. 2017) (plaintiffs maintained that defendants had misappropriated six of its trade secrets, and the verdict form asked the jury to make a separate finding as to each one.); <u>Crabar/GBF, Inc. v. Wright</u>, No. 8:16-CV-537, 2023 WL 6125519, at *6 (D. Neb. Sept. 19, 2023) (no error where the trial court identified the alleged trade secrets in its instructions and neither party requested they be identified in a special verdict form); <u>I-Flow Corp. v. Apex Med. Techs., Inc.</u>, No. 07CV1200 DMS (NLS), 2010 WL 141402, at *3 (S.D. Cal. Jan. 8, 2010) (plaintiff not entitled to an injunction covering all twelve items listed as trade secrets in jury instructions, where plaintiff failed to request the

jury to specify on the verdict form which items were trade secrets and were misappropriated).  In this case, the alleged trade secrets were not identified with any particularity in the jury instructions or the verdict form, or at any point at trial whatsoever.  Other courts have explained that without such particularity there can be no fair adjudication of the matter:

> The requirement of reasonable particularity matters here because a trade secret described in general terms will usually be widely known or readily ascertainable by proper means and thus not a trade secret. It matters, too, because, *without particularity (pre-trial **and at trial**), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants.*

Olaplex, Inc. v. L'Oreal USA, Inc., 855 F. App'x 701, 712 (Fed. Cir. 2021) (emphasis added) (internal quotations omitted).

Cementing the prejudice to Defendants, the court bait-and-switched Defendants *after* they presented their case.  Despite its comments and promise to the parties before the trial, the court circulated a verdict slip that was more amorphous than the one submitted by BioPoint.  Defendants objected in writing, proposed modifications, and implored the court to ask the jury to identify the specific trade secrets that they found misappropriated, if any.  RA 1263.

The court, however, refused—and over Defendants' repeated objections, gave the jury a vague and amorphous verdict slip that created more questions than answers. RA 1300-1302.

Defendants presented their case and made strategic trial decisions with the express understanding that the verdict slip would identify the alleged trade secrets at issue. Specifically, Defendants structured their examinations around the types of materials that BioPoint claimed was a trade secret—*e.g.*, customer names, consultant names, resumes, *etc.*—because that is what the court said would be on the verdict slip. Had Defendants known that the district court would reverse course and instead ask about trade secrets "concerning" a consultant or a client, it would have presented its case differently. For instance, Defendants would have asked BioPoint's representatives to identify each alleged trade secret "concerning Vedanta," the language that the district court ultimately used on the verdict form. RA 1300-1302. Defendants then would have shown that each such item was neither a trade secret nor used by Defendants. Ultimately, this is what Defendants did in the bench trial; Defendants used BioPoint's closing argument chalk entitled "Trade Secrets Taken by Defendants" to question BioPoint's witnesses

about each alleged trade secret "concerning Vedanta." The BioPoint representatives admitted that most of these items were not actually trade secrets. RA 1443:9-17; RA 1672-1677, ¶¶6-44; RA 2270-2274; RA 2287; RA 2449; RA 2711-2712; RA 2954-2955. In sum, the eleventh-hour switch to a vague verdict slip that neither identified the alleged trade secrets nor asked if they were *used* tainted the entire process requiring a new trial.

## 6. The district court erred by awarding damages without the finding of use.

"To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire *and use* the trade secret." Incase Inc., 488 F.3d at 52 (emphasis added); see also Viken Detection Corp. v. Videray Techs. Inc., 384 F.Supp.3d 168, 177 (D. Mass. 2019) ("the standard for misappropriation under [federal law] is substantially similar to that under Massachusetts law."). To recover damages for trade secret misappropriation, BioPoint must prove that Defendants actually ***used*** the trade secret at issue—*i.e.*, causation. See Incase, Inc., 488 F.3d at

52; <u>Repat, Inc. v. Indiewhip, LLC</u>, 281 F. Supp.3d 221, 231-32 (D. Mass. 2017); <u>Dusa Pharm., Inc. v. BioFrontera, Inc.</u>, 2020 WL 5995979, at *1, *3 (D. Mass. Oct. 9, 2020). This is true even where the remedy sought is disgorgement. <u>See</u> 18 U.S.C. § 1836(b)(3)(B)(i)(II) (authorizing award of "damages for any unjust enrichment *caused by* *the misappropriation* *of the trade secret* that is not addressed in computing damages for actual loss") (emphasis added).

The verdict form asks two questions regarding BioPoint's claim for misappropriation of a trade secret: (1) "Has BioPoint proven by preponderance of the evidence that Andrew Dickhaut and Catapult misappropriated trade secrets owned by BioPoint?"; and (2) "Has BioPoint proven by preponderance of the evidence that Andrew Dickhaut and Catapult misappropriated BioPoint's trade secrets concerning one or more of the following individuals/entities (please specify by placing a check mark as appropriate)?" RA 1300-1302.[17]

---

[17] Defendants objected to the verdict form used by the court and proposed that the verdict form specifically ask the jury whether Defendants used the trade secret without BioPoint's permission. RA 310-322; RA 1261-1292; RA 1244:23-1251:1

Neither jury verdict question asks the jury whether any misappropriated trade secret was ever *used* by Catapult.

Further, the instructions to the jury state "[t]o prevail on its trade secrets claim, BioPoint must prove by a preponderance of the evidence. . . that Catapult misappropriated *and used* this secret information without BioPoint's permission." RA 1236:23-1237:5 (emphasis added). The court's jury instructions also provide that "[m]isappropriation occurs when a business knows, or should know, that secret information belonging to a competitor is being shared with them in violation of a contractual duty of confidentiality. . ." RA 1236. Based on the definition of misappropriation provided by the court, the jury verdict simply asks the jury whether BioPoint has proven by preponderance of the evidence that Mr. Dickhaut and Catapult knew or should have known that secret information from BioPoint was shared with them in violation of a contractual duty of confidentiality. While the jury found misappropriation based on the definition provided, the equally important element of "use" was never put to the jury.

The court stated in its findings of fact that "Catapult's use of BioPoint's trade secrets has already been determined by the jury."

RA 1838, ¶44. That finding is erroneous. To the contrary, in advance of the jury-trial the court specifically reserved for itself the determination of "causation" that is "whether the profits sought disgorged are attributable to the use of the misappropriated trade secret." RA 1397. Defendants asked the jury to decide use in their proposed verdict form, but the court denied that request. RA 310-322. As a result, the jury was never asked whether Catapult *used* any misappropriated trade secret and therefore, the jury did not make any determination regarding *use*.

Since the jury never made any determination regarding use of the trade secret, and the court improperly concluded that the jury determined use, no factual decision was made in this case regarding a crucial element for which BioPoint had the burden of proof. Therefore, any award for damages cannot stand. The court had no basis to award Catapult's entire Vedanta Profits of $1.375 million without a jury finding that Defendants actually *used* any misappropriated trade secret of BioPoint. As a result of these fatal errors, this action should be remanded for a new trial.

## CONCLUSION

This Court should *not* permit the $7.7 million judgment below to stand because it is devoid of analytical precision and without legal footing. The district court had no statutory authority under MUTSA to award BioPoint exemplary damages or attorney's fees without a finding of malicious misappropriation, and at the very least, this Court should remit the judgment by $5,877,753, the combined award of exemplary damages and attorney's fees. Moreover, this Court should remand the case for a new trial on the issue of trade secret liability because of the serious errors below bearing on critical elements of BioPoint's trade secrets claims. Finally, the district court's award of Catapult's entire Vedanta Profits of $1.375 million from both Defendants was seriously flawed. Given the multitude of errors, which are impossibly intertwined, this Court should also grant a new trial on the issue of disgorgement of profits, or remand to the district court for further proceedings with appropriate instructions.

Dated: November 15, 2023          Respectfully submitted,

*/s/ Christopher J. Hurst*

Dana A. Zakarian (63652)
Christopher J. Hurst (1188843)
Steven D. Procopio (1208829)
SMITH DUGGAN CORNELL
GOLLUB, LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
dana.zakarian@smithduggan.com
churst@smithduggan.com
sprocopio@smithduggan.com

Attorneys for Defendants –
Appellants ANDREW
DICKHAUT, and CATAPULT
STAFFING, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,886 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Version 16.66.1 in 14-point Century Schoolbook.

Dated: November 15, 2023

Respectfully submitted,

*/s/ Christopher J. Hurst*

Dana A. Zakarian (63652)
Christopher J. Hurst (1188843)
Steven D. Procopio (1208829)
SMITH DUGGAN CORNELL
GOLLUB, LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
dana.zakarian@smithduggan.com
churst@smithduggan.com
sprocopio@smithduggan.com

Attorneys for Defendants –
Appellants ANDREW
DICKHAUT, and CATAPULT
STAFFING, LLC

## CERTIFICATE OF SERVICE

I, Christopher J. Hurst, attorney for Defendants-Appellants Andrew Dickhaut and Catapult Staffing, LLC hereby certify that on the 15th day of November, 2023, a true copy of the foregoing Appellants' Opening Brief will be filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served via first-class mail, postage prepaid, upon anyone indicated as a non-registered participant.

Allison L. Anderson
Rachel L. Kerner
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210-2600
alanderson@foleyhoag.com
rkerner@foleyhoag.com

Dated: November 15, 2023          Respectfully submitted,

*/s/ Christopher J. Hurst*
Dana A. Zakarian (63652)
Christopher J. Hurst (1188843)
Steven D. Procopio (1208829)
SMITH DUGGAN CORNELL
GOLLUB, LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
dana.zakarian@smithduggan.com
churst@smithduggan.com
sprocopio@smithduggan.com

Attorneys for Defendants –
Appellants ANDREW
DICKHAUT, and CATAPULT
STAFFING, LLC

# ADDENDUM
## TABLE OF CONTENTS

## Appealed Judgment and Orders

ECF 135 Order Granting Motion in Limine to Exclude Damages Not Disclosed During Discovery ............................ Add. 1

ECF 151 Order Granting in Part and Denying in Part BioPoint's Motion for Reconsideration and/or Clarification............................................................. Add. 3

ECF 175 Order Denying Defendants' Motion for Directed Verdict ................................................................... Add. 5

ECF 208 Order Denying Defendants' Motion for Directed Verdict ................................................................... Add. 7

ECF 227 Order entered Findings of Fact, Rulings of Law, and Order After a Bench Trial................................ Add. 9

ECF 228 Judgment.................................................................. Add. 38

ECF 248 Memorandum and Order on Defendants' Motion for Judgment as a Matter of Law.............................. Add. 39

ECF 249 Order Granting in Part and Denying in Part BioPoint's Motion to Amend the Judgment for Prejudgment and Post Judgment Interest .......................... Add. 48

ECF 250 Memorandum and Order on BioPoint's Bill for Attorneys' Fees and Costs.................................. Add. 50

ECF 254 Amended Judgment ........................................ Add. 56

## Statutes

18 U.S.C. § 1836 ........................................................ Add. 57

28 U.S.C. § 1291 ........................................................ Add. 63

28 U.S.C. § 1331 ........................................................ Add. 64

G. L. c. 93, § 42B.................................................................. Add. 65

G. L. c. 93, § 42F.................................................................. Add. 66

**Subject:** Activity in Case 1:20-cv-10118-RGS BioPoint, Inc.. v. Attis et al Order on Motion in Limine

**Date:** Tuesday, January 4, 2022 at 9:44:30 PM Eastern Standard Time

**From:** ECFnotice@mad.uscourts.gov

**To:** CourtCopy@mad.uscourts.gov

<span style="color:red">This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.</span>

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 1/4/2022 at 9:44 PM EST and filed on 1/4/2022

**Case Name:** BioPoint, Inc.. v. Attis et al

**Case Number:** [1:20-cv-10118-RGS](#)

**Filer:**

**Document Number:** 135(No document attached)

**Docket Text:**

<span style="color:blue">Judge Richard G. Stearns: ELECTRONIC ORDER entered granting [107] Motion in Limine to Exclude Damages Not Disclosed During Discovery. Defendants seek to exclude plaintiff's claim for damages to the extent not disclosed during discovery. During discovery, plaintiff repeatedly demurred on providing specific damages computations (with the exception of identifying in its Interrogatory Responses the alleged lost profits associated with the placement of consultant Candida Fratazzi, at the rate of $5,000 a week for 6-12 months). Although plaintiff indicated it intended to utilize a damages expert and obtained an additional discovery period to this end, *see* Dkt # 51, it did not ultimately identify an expert or produce a damages report. After defendants filed this motion, plaintiffs provided supplemental interrogatory responses claiming approximately $5 million in damages including a combination of lost profits and disgorgement.</span>

<span style="color:blue">Plaintiff, for its part, claims that it complied with its disclosure obligations or that the failure was harmless. Plaintiff first contends that it was unable to compute its damages until defendants produced evidence of its profits, which evidence plaintiff had to compel by way of a motion to the court. This, however, does not excuse plaintiff's failure to timely disclose. Plaintiff acknowledges that the information compelled was produced in September of 2020, *see* Opp'n at 6, before fact discovery closed at the end of October of 2020, *see* Dkt #57 (plaintiff then had until end of November of 2020 to serve its expert report).</span>

<span style="color:blue">Plaintiff next argues that it was not required to produce damages computations because it would just be to "regurgitate" defendants' figures back to them, and it is not obligated to produce evidence already in defendants' possession. Opp'n at 11. This argument conflates two types of damages. Lost profits are the profits plaintiff would have made from the use of the trade secret BUT FOR defendants' alleged misappropriation and has no relation to defendants' profits. Although defendants are aware of their own profits, they have no way to discern and defend against plaintiff's lost profits claim absent a timely disclosure. These last-minute lost profit claims (such as derived from Moderna as a client account, further placement of Candida Fratazzi, or BioPoint's lost profits during the period of most misappropriation) total nearly $3 million and could hardly be considered</span>

Add. 1

harmless.

Plaintiff finally suggests that defendants should have done more to ascertain its damages claim, such as by way of a motion to compel. This is a nonstarter - plaintiff bears the burden of proof on damages, not defendants.

Accordingly, to the extent that lost profits damages were not disclosed during discovery, they will be excluded. Plaintiff's claim of unjust enrichment is an equitable remedy to which the right to a jury trial does not attach. *See Bonina v. Sheppard*, 91 Mass. App. Ct. 622, 624 (2017). Disgorgement damages, therefore, shall be reserved to the court and not presented to the jury.(Tang, Danni)

**1:20-cv-10118-RGS Notice has been electronically mailed to:**

Christopher A. Duggan    Chris.Duggan@SmithDuggan.com, Andrew.Black@SmithDuggan.com, christine.omalley@smithduggan.com, dana.zakarian@smithduggan.com, danielle.murphy@smithduggan.com, katherine.wasilewsky@smithduggan.com, lorena.vogel@smithduggan.com, nicole.cordeiro@smithduggan.com

James W. Bucking    jbucking@foleyhoag.com

Dana A. Zakarian    dana.zakarian@smithduggan.com, christine.omalley@smithduggan.com, danielle.murphy@smithduggan.com

Charlotte L. Bednar    cbednar@eckertseamans.com, cbarber@eckertseamans.com

Gabriel T. Dym    gdym@eckertseamans.com, vroy@eckertseamans.com

Madeleine K. Rodriguez    mrodriguez@foleyhoag.com

Allison L. Anderson    alanderson@foleyhoag.com, nchalmers@foleyhoag.com

**1:20-cv-10118-RGS Notice will not be electronically mailed to:**

---

**Total Control Panel**                                                                 Login

To:
danielle.murphy@smithduggan.com          Message Score: 1                     High (60): Pass
From: ecfnotice@mad.uscourts.gov          My Spam Blocking Level: Medium      Medium (75): Pass
                                                                              Low (90): Pass

                                          Block this sender
                                          Block mad.uscourts.gov

*This message was delivered because the content filter score did not exceed your filter level.*

Add. 2

**Subject:** Activity in Case 1:20-cv-10118-RGS BioPoint, Inc.. v. Attis et al Order on Motion for Reconsideration

**Date:** Thursday, May 19, 2022 at 1:50:56 PM Eastern Daylight Time

**From:** ECFnotice@mad.uscourts.gov

**To:** CourtCopy@mad.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 5/19/2022 at 1:50 PM EDT and filed on 5/19/2022

**Case Name:** BioPoint, Inc.. v. Attis et al

**Case Number:** 1:20-cv-10118-RGS

**Filer:**

**Document Number:** 151(No document attached)

**Docket Text:**
Judge Richard G. Stearns: ELECTRONIC ORDER entered granting in part and denying in part [144] Motion for Reconsideration re [144] Emergency MOTION for Reconsideration re [143] Order, *or Clarification* filed by BioPoint, Inc. Having carefully considered the contours of the dispute in this case and the parties' respective positions, the court determines that the issues of liability at law - that is, on plaintiff's claims for trade secret misappropriation and tortious interference - will be presented at the jury trial. The bulk of the asserted damages (with the exception as to Ms. Fratazzi) are those sounding in equity and they will be considered together with the equitable unfair competition claim at a subsequent bench proceeding, should the jury return a finding of liability. Plaintiff shall inform the court no later than 6/9/2022 whether it intends to present lost profits damages as to Ms. Fratazzi to the jury or reserve it to the court. By that date, the plaintiff shall also submit a complete list identifying the asserted misappropriated trade secrets by category to enable the jury to make specific fact findings. (Tang, Danni)

**1:20-cv-10118-RGS Notice has been electronically mailed to:**

Christopher A. Duggan    Chris.Duggan@SmithDuggan.com, Andrew.Black@SmithDuggan.com, danielle.murphy@smithduggan.com, lorena.vogel@smithduggan.com, nicole.cordeiro@smithduggan.com, sherry.assi@smithduggan.com

James W. Bucking    jbucking@foleyhoag.com

Dana A. Zakarian    dana.zakarian@smithduggan.com, danielle.murphy@smithduggan.com, lorena.vogel@smithduggan.com

Gabriel T. Dym    gdym@eckertseamans.com, vroy@eckertseamans.com

Add. 3

Madeleine K. Rodriguez    mrodriguez@foleyhoag.com

Allison L. Anderson    alanderson@foleyhoag.com, nchalmers@foleyhoag.com

**1:20-cv-10118-RGS Notice will not be electronically mailed to:**

Charlotte L. Bednar
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Flr.
Boston, MA 02110

---

**Total Control Panel**                                                                                          Login

To:                                    Message Score: 1                        High (60): Pass
danielle.murphy@smithduggan.com        My Spam Blocking Level: Medium           Medium (75): Pass
From: ecfnotice@mad.uscourts.gov                                                Low (90): Pass

                                       Block this sender
                                       Block mad.uscourts.gov

*This message was delivered because the content filter score did not exceed your filter level.*

**Subject:** Activity in Case 1:20-cv-10118-RGS BioPoint, Inc.. v. Attis et al Order on Motion for Directed Verdict
**Date:** Monday, June 27, 2022 at 12:31:54 PM Eastern Daylight Time
**From:** ECFnotice@mad.uscourts.gov
**To:** CourtCopy@mad.uscourts.gov

<span style="color:red">**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 6/27/2022 at 12:31 PM EDT and filed on 6/27/2022

| | |
|---|---|
| **Case Name:** | BioPoint, Inc.. v. Attis et al |
| **Case Number:** | 1:20-cv-10118-RGS |
| **Filer:** | |
| **Document Number:** | 175(No document attached) |

**Docket Text:**
<span style="color:blue">**Judge Richard G. Stearns: ELECTRONIC ORDER entered denying [165] Motion for Directed Verdict. The evidence entered at trial sufficiently permits the jury to reach a verdict for the plaintiff. (Tang, Danni)**</span>

**1:20-cv-10118-RGS Notice has been electronically mailed to:**

Christopher A. Duggan    Chris.Duggan@SmithDuggan.com, Andrew.Black@SmithDuggan.com, danielle.murphy@smithduggan.com, lorena.vogel@smithduggan.com, nicole.cordeiro@smithduggan.com, sherry.assi@smithduggan.com

James W. Bucking    jbucking@foleyhoag.com

Dana A. Zakarian    dana.zakarian@smithduggan.com, danielle.murphy@smithduggan.com, lorena.vogel@smithduggan.com

Gabriel T. Dym    gdym@eckertseamans.com, vroy@eckertseamans.com

Madeleine K. Rodriguez    mrodriguez@foleyhoag.com

Allison L. Anderson    alanderson@foleyhoag.com, nchalmers@foleyhoag.com

**1:20-cv-10118-RGS Notice will not be electronically mailed to:**

Charlotte L. Bednar
Eckert Seamans Cherin & Mellott, LLC

Add. 5

Two International Place, 16th Flr.
Boston, MA 02110

**Total Control Panel**                                                                                          Login

To:                                              Message Score: 1                                    High (60): Pass
danielle.murphy@smithduggan.com                  My Spam Blocking Level: Medium                      Medium (75): Pass
From: ecfnotice@mad.uscourts.gov                                                                     Low (90): Pass

                                                 Block this sender
                                                 Block mad.uscourts.gov

*This message was delivered because the content filter score did not exceed your filter level.*

Add. 6

**Subject:** Activity in Case 1:20-cv-10118-RGS BioPoint, Inc.. v. Attis et al Order on Motion for Directed Verdict
**Date:** Wednesday, January 4, 2023 at 11:42:03 AM Eastern Standard Time
**From:** ECFnotice@mad.uscourts.gov
**To:** CourtCopy@mad.uscourts.gov

<span style="color:red">**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 1/4/2023 at 11:42 AM EST and filed on 1/4/2023
**Case Name:** BioPoint, Inc.. v. Attis et al
**Case Number:** 1:20-cv-10118-RGS
**Filer:**
**Document Number:** 208(No document attached)

**Docket Text:**
<span style="color:blue">**Judge Richard G. Stearns: ELECTRONIC ORDER entered denying [207] Motion for Directed Verdict. (RGS, law1)**</span>

**1:20-cv-10118-RGS Notice has been electronically mailed to:**

Christopher A. Duggan    Chris.Duggan@SmithDuggan.com, Andrew.Black@SmithDuggan.com,
danielle.murphy@smithduggan.com, kellie.johnson@smithduggan.com, lorena.vogel@smithduggan.com,
nicole.cordeiro@smithduggan.com

James W. Bucking    jbucking@foleyhoag.com

Dana A. Zakarian    dana.zakarian@smithduggan.com, danielle.murphy@smithduggan.com

Gabriel T. Dym    gdym@eckertseamans.com, vroy@eckertseamans.com

Madeleine K. Rodriguez    mrodriguez@foleyhoag.com

Allison L. Anderson    alanderson@foleyhoag.com, nchalmers@foleyhoag.com

**1:20-cv-10118-RGS Notice will not be electronically mailed to:**

Charlotte L. Bednar
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Flr.

Add. 7

Boston, MA 02110

---

**Total Control Panel**                                                     *Login*

To:                          Remove this sender from my allow list
danielle.murphy@smithduggan.com
From: ecfnotice@mad.uscourts.gov

*You received this message because the sender is on your allow list.*

Add. 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT & CATAPULT STAFFING, LLC
D/B/A CATAPULT SOLUTIONS GROUP

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

April 25, 2023

STEARNS, D.J.

At the conclusion of a June 14-22, 2022 trial, a jury found defendants Andrew Dickhaut and Catapult Staffing, LLC (Catapult) liable for the misappropriation of trade secrets from plaintiff BioPoint, Inc. (BioPoint). Catapult and BioPoint are competitors in the highly lucrative life sciences consultant search market.  The jury found that Catapult and Dickhaut had misappropriated trade secrets with respect to three candidate consultants recruited by BioPoint and had tortiously interfered with BioPoint's prospective business relationships with one of those candidates.  The jury awarded BioPoint $312,000 on the successful tortious interference claim. The jury also found that Catapult and Dickhaut misappropriated BioPoint's

trade secrets concerning two of its prospective clients, Vedanta and Shire. Following the jury trial, a two-day bench trial was convened on October 18-19, 2022, to try BioPoint's remaining equitable claims for unjust enrichment, violations of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A, and for an award of enhanced damages and attorneys' fees.

## FACTUAL FINDINGS

### The Parties

1.     Plaintiff BioPoint is a Massachusetts-based company founded in 2011.  BioPoint is a life sciences consulting firm that recruits consultants and short-term labor for pharmaceutical companies, biopharmaceutical companies, and medical device companies.

2.     Defendant Catapult is a Texas-based company founded in 2013. Catapult opened a Boston office in 2017. Catapult provides consulting services similar to those of BioPoint, though originally not to the life sciences industry.

3.     Defendant Dickhaut is an employee of Catapult.  Dickhaut served as the Managing Director of Catapult's Boston office, which he was hired to

open in April of 2017.  At the time, Dickhaut was engaged to Leah Attis,[1] a BioPoint employee to whom he is now married.

### *The Consultant Placement Industry*

4.      BioPoint and Catapult identify, recruit, and place qualified candidates with employer clients looking to fill vacancies with consultants hired to perform specialized roles.  If an employer client makes an offer that a consultant accepts, the headhunting firm will charge the employer client a "bill rate" for the consultant's work, a substantial portion of which, termed the "pay rate," is paid to the consultant.  The difference between the bill and pay rates, less certain administrative costs, makes up the recruiting firm's profit.  DeGroot Test., Jury Trial Day 1 Tr. [Dkt # 214] at 108-110, 111-112.

5.      Catapult intended for its Boston office to focus on placements in the technology, light industrial, accounting, and finance industries.  It had little, if any, experience in the fields of life sciences and pharmaceuticals and initially had no plans to use the Boston office to expand into either area. Dickhaut Test., Jury Trial Day 3 Tr. [Dkt # 216] at 153.  Angelo Salustri, the senior Catapult executive overseeing the Boston office, did not have life

---

[1] Attis is not a named defendant in this case but has a starring role in the events giving rise to the litigation.  Attis was employed as a business development manager at BioPoint from May of 2015 to December of 2019. She now works in a similar position at Catapult.

sciences consulting experience.  Salustri Test., Jury Trial Day 4 Tr. [Dkt # 217] at 102-104.

6.     In 2018, Catapult rethought an entry into the life sciences field. Catapult asserts that it began to place consultants in life sciences positions after Jeff Autenrieth, a friend of Dickhaut's from high school, began working as a talent acquisition consultant at Vedanta, a biotechnology company.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J. [Dkt # 91] at 3.  In June of 2018, Salustri asked Dickhaut to identify life sciences clients that were "realistic[] . . . not hopefully, Pie in the sky, long shot maybes" that Catapult could enroll in thirty to sixty days.  Ex. 108.  A recruiter stated that Catapult employees had to learn about the life sciences industry "on our own" because it "was a new section for us, a new industry for us."  Flynn Test., Jury Trial Day 5 Tr. [Dkt # 218] at 5.

7.     BioPoint, for its part, was conceived as a life sciences staffing firm.  DeGroot Test., Day 1 Jury Tr. at 60-61; Ex. 34.  BioPoint's founders brought years of life sciences consulting experience to the fledgling firm.  *See* DeGroot Test., Jury Trial Day 1 Tr. at 59-61.  For example, BioPoint co-founder Robert DeGroot first began working in the life sciences recruiting industry in 2006.  *Id.*  Co-founder Chris Nash also had about fifteen years of experience in the life sciences staffing industry.  Nash Test., Jury Trial Day 4

Tr. at 170.  BioPoint invested years in building an understanding of the life sciences industry's needs and gaining the trust of consultants and company clients.  DeGroot Test., Jury Trial Day 1 Tr. at 64-65.  It took BioPoint years to build a successful record of making entry-level placements before earning the respect of its life sciences clients with respect to its recommendations of consultants for placements in high-level, more lucrative positions.  *Id.* at 64.  BioPoint built its business from making three placements in its first year to a total of over 200 active placements, involving over eighty clients.  *Id.* at 73-74.

8.   BioPoint uses an internal database called Crelate to store records of past, current, and prospective employer clients and consultants.  *Id.* at 68.  In compiling consultant information, "a name isn't just a name."  Nash Test., Jury Trial Day 4 Tr. at 175.  The Crelate records include the hourly pay rates that BioPoint establishes for its consultants, the bill rates employer clients will pay BioPoint, BioPoint's impressions of the consultants' skills and abilities and suitability to specific tasks, strategic documents on BioPoint's business operations, and its business proposals.  *Id.*  at 76-77.  Access to BioPoint's Crelate database was limited to BioPoint employees, Attis among them.  *Id.* at 78-79.

9.     The private pricing information of a recruiting firm like BioPoint – how much it will offer a consultant for his or her work and how much it will charge the employer client – is a valuable secret because a competitor could use this information to underbid BioPoint's offers to its client and offer higher pay rates to prospective consultants.  *Id.* at 17-19.   Determining competitive bill and pay rates is an art requiring years of experience in the market.  *Id.* at 17-18.

10.    Speed to market is important to successfully place consultants with employer clients because "it's a race to fill the need."  *Id.* at 15-16. Employer clients will turn to competing firms if a consulting firm cannot immediately fill an open position.  *Id.*  Stealing the information that BioPoint had acquired and stored in Crelate, even if only the names that it had identified as potential candidates for a position, can be akin to "starting a marathon in mile 25."  *Id.* at 16.  This is especially true with respect to high-level consultants for which "there is more demand" than supply.  DeGroot Test., Jury Trial Day 1 Tr. at 71.

### *Attis's Disclosure of BioPoint Information to Dickhaut*

11.    The evidence at trial established that Attis, while hesitant at times, repeatedly disclosed BioPoint's pricing information, candidate information, and internally marked-up client agreements to Dickhaut.  *See,*

*e.g.*, Ex. 8 (pricing information); Ex. 78 (pricing information); Ex. 70 (consultant candidate information); Ex. 80 (consultant candidate information); Kokoros Test., Jury Trial Day 4 Tr. at 116-119 (client agreement with BioPoint annotations).

12.     In 2016, prior to Dickhaut's employment at Catapult, Attis asked Dickhaut to introduce her to Autenrieth, at the time a hiring manager at Moderna, with the goal of selling BioPoint's services.  Ex. 2.  In December of 2017, Autenrieth offered Attis the opportunity to place a BioPoint consultant at Moderna.  Attis Test., Jury Trial Day 2 Tr. [Dkt # 215] at 124-127.

13.     In late February of 2018, Autenrieth left Moderna to manage contractor hiring at Vedanta, a biotechnology company focused on developing immunotherapies.  Autenrieth Test., Jury Trial Day 5 Tr. at 33-36.  Consonant with Autenrieth's move, Attis flagged Vedanta to BioPoint as a potential client.  DeGroot Test., Jury Trial Day 1 Tr. at 96.

14.     Autenrieth testified that while Dickhaut and Catapult had little experience with the life sciences industry, he had turned to Catapult for staffing needs because he trusted Dickhaut and because most of the roles Vedanta was looking to fill were "somewhat entry level," a task he felt that Catapult could handle.  Autenrieth Test., Jury Trial Day 5 Tr. at 36-37.   At

the same time, he did not believe that Catapult had a rich enough consultant network to fill higher-level life sciences positions. *Id.* at 36-37, 56.

15.    In March of 2018, Dickhaut told Salustri that Attis had helped him identify a quality assurance life sciences candidate for Vedanta. Ex. 72; Dickhaut Test., Bench Trial Day 1 Tr. [Dkt # 210] at 49.

16.    In September of 2018, Dickhaut pitched Catapult's managed services provider (MSP) agreement to Vedanta. Under the MSP agreement, Catapult would manage consultant labor contracts for an employer client by either directly making placements or by subcontracting the work to another vendor. Dickhaut insisted that, while he had used BioPoint's information to pitch services to other potential life sciences clients, he did not do so in approaching Vedanta. *See* Dickhaut Test., Bench Trial Day 2 Tr. [Dkt # 211] at 36-37.

17.    In December of 2018, Vedanta agreed to the MSP agreement. Catapult thereby acquired "master vendor status" with Vedanta, meaning that it had the first opportunity to fill vacancies at Vedanta as they became available. *Id.* at 15.

18.    For Dickhaut's first placement under Vedanta's MSP agreement in January of 2019, Attis provided Dickhaut with "a few names" along with BioPoint's pay rate for a consultant in a comparable role and the bill rate for

the client employer.  Ex. 11; Ex. 80.  When Dickhaut requested that Attis provide names directly from BioPoint's Crelate database, Attis told him that sharing BioPoint's information was "shady," saying, "Andrew - I can't give you names from our system.  People have [gone] to jail for that."  Ex. 80.

19.    Around the same time, Attis asked BioPoint's founders whether BioPoint would have an interest in becoming a vendor through Catapult's MSP program.  DeGroot Test., Jury Trial Day 1 Tr. at 96.  The BioPoint founders told her that they were not interested because BioPoint did not work through MSPs and did not want to provide competitors with access to its confidential information.  *Id.* at 98.  Attis was cautioned against sharing any of BioPoint's information with Dickhaut.

20.    Dickhaut called Attis after she had raised with BioPoint the idea of becoming a Catapult vendor, but she did not pick up, texting him that she could not talk openly at her desk.  Ex. 59.  Dickhaut wrote back, noting that he "need[ed] to crush this first month and the quicker [he could] fill roles the better start [his] program [would get] off to."  *Id.*  Attis replied that she wanted to help him but that she could not risk losing her job.  *Id.*

21.    Despite BioPoint's rejection of a working relationship with Catapult, Dickhaut continued to solicit Attis for information about BioPoint's pay rate and placement candidates to facilitate his work with Vedanta.  *See,*

*e.g.*, Attis Test., Jury Trial Day 3 Tr. at 11, 13.   Attis said she would look up BioPoint's pay rates for Dickhaut and discuss with him candidates with whom she was familiar.   *Id.* at 12-15.   In one instance, while assisting Dickhaut, Attis replied, "Next time wait for me to check my system," referring to BioPoint's Crelate database.   Ex. 89; Attis Test., Jury Trial Day 3 Tr. at 17.

22.    Attis continued to supply Dickhaut with BioPoint's confidential information.   In September of 2019, she gave him the name of the hiring manager of one of BioPoint's clients, noting that it would be a great place to recruit consultants for Vedanta.   Attis Test., Jury Trial Day 3 Tr. at 36.   In November of 2019, she provided Dickhaut with the medical monitor bill rates of two consultants whom she was interviewing on behalf of BioPoint. Ex. 28.

### *Medical Director Placements at Vedanta*

23.    As part of its MSP agreement with Vedanta, Catapult sought to fill a medical director's role in March of 2019.   Dickhaut sent Attis the job description on March 11, 2019, and again on April 9, 2019.   Attis testified that Dickhaut was not having success finding anyone in his network to fill the role.   Attis Test., Jury Trial Day 3 Tr. at 43-44.

24.    In April of 2019, Attis revisited her conversation with BioPoint's founders about working with Catapult through their MSP program to fill the

role, but BioPoint again rejected the offer.  Dickhaut was upset that BioPoint had no interest in working with Catapult on the project.  Attis responded, "I understand if you don't want to work with BioPoint, but I do have those 2 candidates set aside for you."  Ex. 22 at 2.

25.    Later that year, Dickhaut made three successive placements for the medical director's role at Vedanta, each time with a consultant from BioPoint's system supplied by Attis.

26.    First, Catapult placed Chris Da Costa in Vedanta's medical director's role on May 21, 2019.  In March of 2019, BioPoint had been vetting Da Costa for another position and received feedback from a client that Da Costa would be better suited to a clinical development role, as Vedanta's medical director position entailed.  Attis testified that she would have thought of Da Costa as a good fit for this role.  Attis Test., Jury Trial Day 3 Tr. at 42.

27.    Second, Catapult placed Stephen Haworth in the role on July 30, 2019.  Attis had previously vetted Haworth for a BioPoint placement in November of 2018, had noted his clinical experience, and was told by BioPoint founder Chris Nash that BioPoint "should probably keep this guy for a clin dev role."  Ex. 64.

28.    Finally, Catapult placed Candida Fratazzi in the role in November of 2019.   BioPoint had begun working with Shire (another pharmaceutical company) in October of 2019 to fill a medical director role in clinical development.   Gretta Hunt, a recruiter at BioPoint, was on the verge of placing Fratazzi at Shire when Catapult lured her away for the Vedanta opening.   Attis was ultimately responsible for BioPoint's Shire account and discussed with Hunt BioPoint's efforts to place Fratazzi.  *See, e.g.*, Ex. 25.   In late October, Fratazzi expressed to Hunt concerns of a potential conflict of interest issue,[2] which Hunt relayed to Attis on October 22, 2019.  *Id.*  Fratazzi withdrew from consideration for the Shire job on October 25, 2019.

29.    On October 23, 2019, Dickhaut texted a Catapult recruiter, Corey Swiniarski, with the name "Candida Fratazzi MD" with no other comment. Ex. 20; Ex. 122 at 10 (Catapult's interrogatory noting that Catapult had become aware of Fratazzi on or about October 23, 2019).   Swiniarski reached out to Fratazzi on LinkedIn twenty minutes later.   Ex. 20; Ex. 30.

30.    On November 5, 2019, Fratazzi reached back to Hunt and said she had changed her mind and would like to pursue the Shire role.   BioPoint

---

[2] At the time, Takeda Pharmaceuticals was in the process of acquiring Shire.  Fratazzi was also interviewing for a role at Takeda and was initially concerned about whether she would be working on Takeda products in the Shire role.

submitted Fratazzi's name to Shire, offering Fratazzi a pay rate of $250 an hour and Shire a bill rate of $400 an hour.  Hunt Test., Jury Trial Day 2 Tr. at 54.

31.    On November 18, 2019, Dickhaut texted Attis for Takeda's bill rates.  Ex. 28.  Attis responded that she was driving and could not then provide the rates via text.  *Id.*

32.    On November 21, 2019, Fratazzi told Hunt that she was dropping out of BioPoint's process because she had accepted another opportunity. Hunt Test., Jury Trial Day 2 Tr. at 48.

33.    Hunt observed that Attis appeared panicked by the news that Fratazzi had dropped out of BioPoint's placement process, acting distraught and "kind of funny."  Hunt testified that Attis knew Fratazzi was working with Catapult because Dickhaut had asked her for a backdoor reference.  *Id.* at 56-57.

34.    On the same day, Dickhaut texted Swiniarski that Fratazzi had "canceled her interview at Shire," which was "for Leah."  Ex. 20.  Swiniarski responded, "Gulp," to which Dickhaut responded "Hahahahaha[.] We win!" *Id.*

35.    Catapult placed Fratazzi at Vedanta for a pay rate of $300 an hour and a bill rate of $350 an hour, paying $50 dollars more an hour to Fratazzi than her offer from BioPoint.  Ex. 134.

36.    After learning that Dickhaut had placed Fratazzi at Vedanta using confidential BioPoint information obtained from Attis, BioPoint terminated Attis on December 4, 2019.  DeGroot Test., Jury Trial Day 1 Tr. at 102-104.  Attis now works at Catapult as Director of Life Sciences.  *Id.*

37.    After Attis was terminated by BioPoint, Catapult did not make any additional life sciences placements at Vedanta.  Dickhaut Test., Jury Trial Day 4 Tr. at 6.

### *Discovery Disputes*

38.    During discovery, BioPoint requested that Catapult provide information and documents about the number of life sciences consultants it had placed with Vedanta and the revenue and profits it earned for each placement.  Pl.'s Second Set of Interrogs. [Dkt # 178-1] at 6-7; Pl.'s Am. Second Set of Reqs. for Doc. Produc. [Dkt # 178-1] at 9.  Catapult initially refused to answer BioPoint's interrogatories and document requests.  Def.'s Resp. to Pl.'s Second Set of Interrogs. [Dkt # 178-3] at 4-5; Def.'s Resp. to Pl.'s Am. Second Set of Reqs. for Doc. Produc. [Dkt # 178-4] at 15-16.  It later supplemented its responses with the following:

Vedanta:

. . .

5. Catapult has placed and/or attempted to place approximately 42 life sciences consultants at Vedanta.

6. Catapult's revenue from the Vedanta relationship is approximately $8,500,068 to date.

7. Catapult's profit from the Vedanta relationship is approximately $1,375,148 to date.

. . .

2c. Chris Da Costa

. . .

5. Catapult derived approximately $130,000 in revenue and $23,920 in profit as a result of Mr. Da Costa's placement at Vedanta.

. . .

2g. Candida Fratazzi

. . .

5. Catapult has derived approximately $411,600 in revenue and $52,356 in profit, to date, as a result of Ms. Fratazzi's placement at Vedanta.

. . .

2j. Stephen Haworth

. . .

4. Catapult derived approximately $177,000 in revenue and $41,595 in profit as a result of Mr. Haworth's placement at Vedanta.

Def.s' Second Supp. Resp. to Pl.'s Second Set of Interrogs. [Dkt # 178-6] at 5, 9-12.

## *Jury Trial*

39.   After six days of trial, the jury found that Catapult and Dickhaut had misappropriated BioPoint's trade secrets regarding Fratazzi, Haworth, Da Costa, Vedanta, and Shire/Takeda, and had tortiously interfered with BioPoint's business relationship with Fratazzi.  Jury Verdict [Dkt # 169].

40.    The jury awarded BioPoint $312,000 in lost profits stemming from defendants' conduct with respect to Fratazzi.  *Id.*

41.    Following the jury's finding, Catapult provided an itemized list of profits it had earned from Vedanta with respect to each of the named consultants, with deductions for commissions paid to its employees.  In setting the subsequent bench trial, the court held that damages evidence would be "limited to information disclosed and exchanged during discovery." 8/08/2022 Order [Dkt # 198].

## RULINGS OF LAW

### *Unjust Enrichment*

42.    "The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's profits . . . attributable to the use of the trade secret."  Restatement (Third): Unfair Competition § 45, cmt. f (Am. Law. Inst. 1995).  The plaintiff bears the burden of proving defendant's profits attributable to the use of the trade secrets.  *Id.*

43.    An award of unjust enrichment need not be calculated with "mathematical exactness," but the plaintiff must provide a "sufficient foundation for a rational conclusion."  *Id.*  In addition to profits earned directly from misuse of the trade secret, defendant's unjust gain may also

include ancillary profits that were indirectly realized through the defendant's wrongful appropriation. *Id.* (profits on spare parts and service may be included in an accounting of unjust enrichment to the extent that those profits were made possible by defendant's sale of a product embodying a misappropriated trade secret).

44. The unjust enrichment "attributable" to trade secret misappropriation is distinct from the issue of whether a defendant appropriated a trade secret. Catapult's use of BioPoint's trade secrets has already been determined by the jury. *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007) ("To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire *and use* the trade secret.") (emphasis added); *see also* Jury Day 5 Tr. at 161-162 ("To prevail on its trade secret claim, BioPoint must prove by a preponderance of the evidence . . . [t]hat Catapult misappropriated and used this secret information without BioPoint's permission.").

45. One theory of unjust enrichment is a plaintiff's trade secret giving a defendant a head start. To establish that a misappropriated trade

secret gave a defendant a head start, plaintiff must proffer evidence "(1) that the alleged misappropriation gave [defendant] a head start and (2) that the head start helped to bring about certain earnings over the following months or years." *Alifax Holding Spa v. Alcor Sci. Inc.*, 2021 WL 3911258, at *1 (D.R.I. Sept. 1, 2021).

### *Setoff Amount*

46.    Defendants bear the burden of demonstrating that costs should be offset against the profits Catapult earned from its Vedanta account. *Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.*, 2011 WL 1366584, at *1 (Mass. Super. Ct. Feb. 10, 2011) ("The plaintiff bears the burden of demonstrating that JPS profited from the sale of products produced by the improper use of the trade secret.  Once established, it is the defendant's burden to demonstrate what costs should be properly offset against gross profits, as well as what portion of the profits are attributable to factors other than the misuse of the trade secret."), citing *USM Corp. v. Marson Fastener Corp.*, 392 Mass. 334, 337 (1984); *USM Corp.*, 392 Mass. at 338 ("If a defendant cannot meet its burden as to costs and profits, the defendant must suffer the consequences. . . . Of course, such a process may result in the plaintiff's recovering far more than its actual loss.").

47.   The Federal Rules of Civil Procedure bar the use of evidence not disclosed in discovery.   Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

### Chapter 93A

48.   To determine whether conduct violates Chapter 93A, the court considers "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass 593, 596 (1975).

49.   The court has discretion whether to apply a jury's factual findings to a Chapter 93A claim or whether to ask the jury for a non-binding advisory opinion with respect to the chapter 93A claim. *See Bero v. Ill. Tool Works, Inc.*, 2002 WL 33730949, at *1 (D. Mass. July, 30, 2002) (a "trial judge has the option of allowing the jury to find the facts on all claims tried, reserving for his decision all aspects of the 93A claim, or of asking for an advisory with

respect to the c. 93A claim"), citing *Int'l Totalizing Sys., Inc. v. PepsiCo., Inc.*, 29 Mass. App. Ct. 424, 435-436 (1990).

50.    While the judge is "free to make findings that may vary from those of the jury," the First Circuit has noted that "the problem is unlikely to arise because 'where a chapter 93A decision follows the jury's resolution of a common-law claim, there will rarely be inconsistent findings as between the jury and the judge because of the unique findings required from the judge.'" *Bero*, 2002 WL 33730949, at \*2, quoting *Troy v. Bay State. Comp. Grp.*, 141 F.3d 378, 383 n.3 (1st Cir. 1998); *see also Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987) (finding that the district court was not required to make specific findings of fact as to a Chapter 93A claim where the jury verdict "resolved all material, factual issues relating to the 93A claim.").

51.    A finding of trade secret misappropriation is also sufficient to establish an unfair or deceptive act under Chapter 93A.  *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005) ("Under Massachusetts law, misappropriation of trade secrets alone can constitute a violation of Chapter 93A."); *see also Prescott v. Morton Int'l, Inc.*, 769 F. Supp. 404, 407 (D. Mass. 1990) ("The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair

or deceptive act."); *Juncker Assocs. & Co. v. Enes*, 2002 WL 31104013, at *4 (Mass. Sup. Ct. Sept. 5, 2002) (same). The same is true with respect to a jury's finding of tortious interference. *See People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*, 2010 WL 1267373, at *18 (Mass. Super. Ct. Mar. 31, 2010) ("Topdot's actions constituted a tortious interference with an advantageous business relationship. Thus, Topdot's actions were within a concept of unfairness established at common-law. For this reason, the court concludes that Topdot's actions merit relief under [Mass. Gen. Laws ch.] 93A, § 11.").

52. The court finds that the jury's verdict amply supports a determination that Catapult violated Chapter 93A and that no further findings of fact on this issue are required.

53. Vicarious liability applies in a Chapter 93A context when an agent's acts taken in service of or for the benefit of the corporation fall within the scope of his or her employment. *See Wang Lab'ys, Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859 (1986); *Dias v. Brigham Med. Ass'n, Inc.*, 438 Mass. 317, 319-320 (2002) (same). A master need not be aware of its agent's unfair or deceptive acts to be held vicariously liable. *See Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 672 (1996) ("Vicarious liability may be imposed by either of the two routes that we have set out above[,] . . . [n]either

route contains a requirement of awareness or personal involvement by the person held vicariously liable.").

54.    These vicarious liability principles also apply when multiple damages are at issue.    *Id.* at 673 ("[O]ur cases have routinely held corporations liable for multiple damages because of the knowing and wilful acts of their agents.").

### *Enhanced Damages*

55.    If the Chapter 93A violation was committed willfully or knowingly, plaintiff's "recovery shall be . . . up to three, but no less than two times [the amount of actual damages]."  Mass. Gen. Laws ch. 93A § 11.

56.     Willfulness "implies not only intent to do an act, but also intent that the act be unfair or deceptive." *Juncker*, 2002 WL 31104013, at *4 n.4. Knowing violations occur "where a defendant is aware that his act is unfair or deceptive or will cause such a result." *Labouef v. St. Laurent*, 2010 WL 3328012, at *2 (Mass. Super. Ct. July 28, 2010).

57.    A plaintiff must prove that defendant had a "subjectively culpable state of mind" to establish a willful or knowing violation. *Pro. Servs. Grp. v. Town of Rockland*, 515 F. Supp. 2d 179, 197 (D. Mass. 2007), quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991).

***Attorneys' Fees***

58.   Reasonable attorneys' fees are automatically awarded when a plaintiff prevails on Chapter 93A Section 2 claims.  Mass. Gen. Laws ch. 93A § 11 ("If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."); *see also Specialized Tech. Res.*, 2011 WL 1366584, at *9 ("G.L. c. 93A, § 11 provides for the award of reasonable attorney's fees and costs wherever there has been a violation of § 2.").

## ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW

59.   Consistent with the jury's verdict, the court finds that defendants misappropriated BioPoint's confidential trade secret information with respect to Vedanta, Shire, Candida Fratazzi, Stephen Haworth, and Chris Da Costa.

60.   Defendants' misappropriation of these trade secrets gave Catapult a head start in developing a working relationship with Vedanta, enabling it to obtain the MSP agreement.

61.   In March of 2018, Attis not only assisted Dickhaut with his search method for locating the candidate who was to become Catapult's first

life sciences placement at Vedanta, but she also ran searches for prospective candidates herself.

62.   In September of 2018, Dickhaut presented Vedanta with the offer of Catapult's MSP services.  Although Dickhaut testified at trial that he did not use BioPoint's information to pitch Vedanta, the court does not find his testimony credible, particularly considering his admission that he used Attis's information to pitch other life sciences companies in 2018.

63.   Even after the MSP agreement with Vedanta was in place, Attis continued to supply Dickhaut with confidential information, including suggested names for Dickhaut's first placement under the MSP agreement, BioPoint's pay and bill rates for comparable roles, and a referral to a BioPoint client from which he could recruit Vedanta consultants.  The evidence permits the fair inference that Attis extracted information to pass along to Dickhaut from BioPoint's Crelate database.  Ex. 89; Attis Test., Jury Trial Day 3 Tr. at 17.

64.   The evidence at trial as confirmed by the jury's verdict also establishes that Attis identified for Dickhaut the names of his three medical director placements – Da Costa, Haworth, and Fratazzi – all of whom were

potential BioPoint clients.  *See, e.g.*, Ex. 22 at 2 ("I do have those 2 candidates set aside for you.")[3]; *see also* Ex. 19; Ex. 64.

65.    Attis disclosed to Dickhaut Fratazzi's name, who was then in discussions with BioPoint about another placement option.  A day after Attis was told that Fratazzi had questions about the role she was considering with BioPoint, Dickhaut forwarded Fratazzi's name to Swiniarski.   Ex. 20. Swiniarski reached out to Fratazzi twenty minutes later.   Ex. 30.   The temporal proximity of Hunt's disclosure to Attis, Dickhaut's text to Swiniarski identifying Fratazzi, and Swiniarski's reaching out to Fratazzi support the jury's implicit finding that Fratazzi's ultimate placement at Vedanta was a direct result of the information supplied to Dickhaut by Attis.

66.    This interpretation is further corroborated by Hunt's account of Attis's conduct after she found out that Dickhaut had placed Fratazzi with Vedanta.  Hunt testified that Attis became panicky and confessed that she knew that Fratazzi had been working with Catapult because Dickhaut had asked her for a backdoor reference.

---

[3] Attis testified that while she had told Dickhaut that she had two candidates set aside for him, she actually had only one candidate, Joe Warnocky.  Attis Test., Bench Trial Day 1 Tr. at 127-128; Ex. 21.  But this assertion seeks to challenge whether defendants misappropriated BioPoint's trade secrets with respect to Da Costa and Haworth, a fact that the jury has already found adversely to Catapult.

67.     Additionally, the temporal proximity of Dickhaut asking Attis the bill rate for Takeda – the company acquiring Shire – three days before Fratazzi accepted the Vedanta position over the offer from Shire for an incrementally higher pay rate supports the inference that Attis disclosed pricing information to Dickhaut.

68.  That Catapult's Vedanta profits can be attributed to its misappropriation of BioPoint's trade secrets is further supported by the fact that Catapult did not make any further placements at Vedanta after BioPoint terminated Attis.

69.     In sum, Catapult's relationship with Vedanta was facilitated and buoyed by BioPoint's confidential information, which took BioPoint years to cultivate.  Attis assisted Dickhaut with his first life sciences placement at Vedanta and provided pricing information and the names of qualified consultants (namely Da Costa, Haworth, and Fratazzi) to sustain Catapult's relationship with Vedanta.

70.     Catapult's sustained profits with Vedanta were made possible because of BioPoint's trade secret information and therefore amount to unjust enrichment.

71.     The court rejects defendants' argument that Catapult's full profits from its relationship with Vedanta cannot constitute unjust

enrichment because they include earnings from placements for which BioPoint did not make trade secret misappropriation claims. But for the misappropriation of BioPoint's trade secrets, there would have been no ongoing relationship between Catapult and Vedanta. Catapult's entire relationship with Vedanta was enabled and sustained with BioPoint information.

72.   Dickhaut at all times was acting within the scope of his employment for the benefit of Catapult.

73.   While there is affirmative evidence that Catapult knew of Dickhaut's unfair acts,[4] a finding of knowledge is not required for Catapult to be held liable for Dickhaut's wrongful acts.

74.   No setoff is warranted because defendants failed to provide any offset evidence until after the jury's verdict.

---

[4] The record supports the inference that Catapult executives knew of and yet allowed Dickhaut's solicitation of confidential information from Attis. *See, e.g.*, Ex. 72 (Dickhaut emailing Salustri that Attis was helping him with the search for a Vedanta placement); Dickhaut Test., Jury Trial Day 3 Tr. at 165-166 (confirming that Dickhaut stated, "I positioned our capability using the Vedanta story and Shire projects I learned from Leah" in a weekly report to Salustri); Salustri Test., Jury Trial Day 4 Tr. at 79 (Catapult executive stating he had no intention to discipline Dickhaut for his actions with respect to BioPoint).

75.    The court also determines that Catapult and Dickhaut's conduct was unfair and deceptive within the meaning of Chapter 93A.  The court further finds that Dickhaut's collusion with Attis with respect to BioPoint's trade secrets was knowing and willful.   Dickhaut was aware that surreptitiously obtaining BioPoint's confidential information from Attis was illegal because Attis told him as much.   Among other indicia of guilty conscience, Dickhaut texted the boast to Swiniarski that "We win!" when he learned that Fratazzi had cancelled an interview to the detriment of BioPoint after Attis had provided Dickhaut information that ultimately influenced Fratazzi to work through Catapult instead.  Dickhaut's conduct and culpable state of mind is imputable to Catapult as his employer under the long-established principles of vicarious liability.  Consequently, BioPoint will be awarded treble damages jointly against both Dickhaut and Catapult.

76.    Because defendants' conduct violated Chapter 93A, BioPoint is also entitled to reasonable costs and attorneys' fees.

77.    BioPoint's total damage award is $5,061,444, the sum of the unjust enrichment with respect to Vedanta and lost profits for Fratazzi's

placement, enhanced ($4,125,444[5] and $936,000,[6] respectively), plus reasonable attorneys' fees.

**ORDER**

The Clerk will enter judgment for BioPoint consistent with the court's and jury's findings and rulings.  BioPoint will have twenty-one (21) days from the date of this Order to submit a bill with supporting documentation for its reasonable costs and attorneys' fees.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

[5] This amount represents the court's findings that Catapult's profit from the Vedanta relationship is $1,375,148.  The court then multiplied that finding by three.

[6] This amount is the jury's award for the tortious interference of BioPoint relationship with Fratazzi, $312,000, multiplied by three.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

BioPoint, Inc.

**Plaintiff**

v.                                    **Civil Action No. 1:20-10118-RGS**

Andrew Dickhaut & Catapult Staffing, LLC
d/b/a Catapult Solutions Group

**Defendant**

## JUDGMENT

**STEARNS, D.J.**

In accordance with the court's Findings of Fact, Rulings of Law, and Order after a

Bench Trial [Dkt # 227], it is **ORDERED** and **ADJUDGED:**

- The court finds that defendant Catapult was unjustly enriched by the sum of $1,375,148 by defendant Dickhaut's misappropriation of BioPoint's trade secrets.

- The court finds that Dickhaut and Catapult's conduct also violated the Massachusetts Fair Business Practices Act, Gen. Laws ch. 93A.

- The court finds that defendants' conduct was knowing and willful.

- The court in its discretion awards treble damages to plaintiff BioPoint for a total sum of $5,061,444.

- The court further determines that BioPoint is entitled to an award of reasonable costs and attorneys' fees.

|  |  |
|---|---|
|  | By the court, |
| April 26, 2023 | /s/ Arnold Pacho |
| Date | Deputy Clerk |

Add. 38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT & CATAPULT STAFFING, LLC
d/b/a CATAPULT SOLUTIONS GROUP

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR
JUDGMENT AS A MATTER OF LAW, A NEW TRIAL,
REMITTITUR, AND TO AMEND THE JUDGMENT

June 22, 2023

STEARNS, D.J.

On June 22, 2022, a jury found defendants Andrew Dickhaut and Catapult Staffing, LLC (Catapult) liable for the misappropriation of trade secrets from plaintiff BioPoint, Inc. (BioPoint). The court thereafter held a bench trial on BioPoint's equitable claims for unjust enrichment, violation of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A (Chapter 93A), and an award of enhanced damages and attorneys' fees. The court issued its ruling on April 25, 2023, finding that Catapult was unjustly enriched through its appropriation of BioPoint's trade secret information and that defendants had engaged in unfair and deceptive acts within the

Add. 39

meaning of Chapter 93A. The court also awarded Biopoint enhanced damages and attorneys' fees. Defendants now move for judgment as a matter of law, for a new trial, for remittitur, and to amend the judgment. For the following reasons, the court will deny each request.

## I.   Judgment as a Matter of Law

A verdict may be set aside under Rule 50(b) only on a "determination that the evidence could lead a reasonable person to *only one conclusion*." *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993) (emphasis in original), quoting *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 12 n.2 (1st Cir. 1991). Defendants cannot meet this stringent standard on any of the jury claims for which they seek judgment as a matter of law.

### a. Tortious Interference

The court will not disturb the jury's finding that defendants tortiously interfered with BioPoint's prospective business relationship with Candida Fratazzi. While they claim that it is "legally impossible" to attribute BioPoint's losses to their tortious conduct, Mem. in Supp. of Defs.' Mot. [Dkt # 237] at 2, the evidence indicated that Catapult used BioPoint's information about Fratazzi to recruit her at BioPoint's expense, *see* Hunt Test., Jury Trial Day 2 Tr. [Dkt # 215] at 48; Trial Ex. 20; Trial Ex. 28; *see also* 4/25/2023 Order [Dkt # 227] ¶¶ 65-68 (noting the temporal proximity

between the chain of events leading up to Fratazzi's placement at Vedanta as additional evidentiary support for the jury's implicit finding that Fratazzi's ultimate placement at Vedanta was a direct result of the information supplied to Dickhaut by Leah Attis).

### b. Trade Secret Misappropriation

The court will not depart from the jury verdict and its bench trial finding that Catapult misappropriated BioPoint's trade secrets. Defendants argue that neither the jury nor the court identified the misappropriated trade secrets, or found that the purloined trade secrets were actually exploited, or found that Catapult's profits were attributable to the use of BioPoint's trade secrets. These assertions are blatantly incorrect. *See* 4/25/2023 Order ¶¶ 11, 59 (noting the various forms of BioPoint's trade secret information that Attis disclosed to defendants and finding that defendants misappropriated BioPoint's confidential trade secret information with respect to Vedanta, Shire, Candida Fratazzi, Stephen Haworth, and Chris Da Costa); *id.* ¶ 44 (noting that the jury had already determined that Catapult had used BioPoint's trade secrets); *id.* ¶¶ 42-45, 65-71 (finding Catapult's Vedanta profits attributable to defendants' trade secret misappropriation).

### c. Chapter 93A Claim

Defendants merely cite to their proposed findings of fact to support the assertion that the evidence does not support a finding of a Chapter 93A violation.  Even if Fed. R. Civ. P. 50(b) governed bench trials, which it does not, the court cited evidence to the contrary in its bench trial order.  *See, e.g.*, *id.* ¶¶ 51, 52 (noting that the jury's findings of Catapult's wholesale trade secret misappropriation and rampant tortious interference with  BioPoint's clients were independently sufficient to establish a willful Chapter 93A violations); *id.* ¶ 75 (discussing record evidence of Dickhaut's knowledge and willfulness).

## II.    Remittitur or Amendment of the Judgment

Relief under Fed. R. Civ. P. 59(e) is to be granted "sparingly" and "only when the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations."  *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 930 (1st Cir. 2014), quoting *Global Naps, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 25 (1st Cir. 2007).  A party cannot use a motion to amend "to advance arguments it should have developed prior to judgment," or to "regurgitate 'old arguments previously considered and rejected.'"  *Id.*, quoting first *Iverson v. City of Boston*, 452

F.3d 94, 104 (1st Cir. 2006), then *Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990).

For purposes of a remittitur, "the award must exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" *Climent-Garcia v. Autoridad de Transporte Maritmo y Las Islas Municipo*, 754 F.3d 17, 21 (1st Cir. 2014), quoting *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003). Remittitur is appropriate only when a verdict is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1197 (1st Cir. 1995), quoting *Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 81 (1st Cir. 1984).

### a. Remittitur of Gross Profits

The court will explain, for at least the third time, why defendants cannot rely on their proffered net profits evidence. Defendants yet again argue that awarding gross profits as a sum total is inappropriate and that this figure should be offset by sales commissions. The court cannot do so in light of defendants' own decisions made during discovery. Defendants did not produce setoff evidence during discovery despite it being requested by BioPoint and defendants having the information. *See* Salustri Test., Bench Trial Day 1 Tr. [Dkt # 210] at 110-114. They cannot stonewall during the

discovery process, *see, e.g.*, Trial Ex. 120 at 19-20 (BioPoint requesting from defendants documents sufficient to show Catapult's revenue and profit and defendants rejecting the request as a "fishing expedition"), and then seek to bring this evidence into the case only after it becomes advantageous to do so. To permit this would encourage the very behavior Rule 37(c)(1) seeks to prevent.

### b. Remittitur or Amendment of Unjust Enrichment Award

Defendants attempt to relitigate the issues with respect to their argument for remitting or amending the unjust enrichment award, once again arguing that Catapult's profits had nothing to do with BioPoint's trade secrets. The court will not further address these regurgitated arguments.

Defendants also request that the court specify that the unjust enrichment award is against Catapult only and not Dickhaut. The court will not. The case on which defendants rely, *Liu v. SEC*, 140 S. Ct. 1936 (2020), did not address situations in which multiple parties engage in concerted wrongdoing. *Id.* at 1945. Following *Liu*, courts have found that parties can be held joint-and-severally liable where the individual "collaborated with and ranks high in the firm." *SEC v. Bahgat*, 2023 WL 3491733, at *9 n.5 (W.D.N.Y. May 17, 2023). Such is the case here, where Dickhaut was Managing Director of Catapult's Boston office and the court has found that

the record supports the inference that Catapult executives were communicating with Dickhaut about his solicitation of BioPoint's trade secrets. *See* 4/25/2023 Order ¶ 73 n.4.

### c. Remittitur of Treble Damages

Defendants' argument that the Massachusetts Uniform Trade Secrets Act (MUTSA) supersedes Chapter 93A is waived. *See Crawford v. Clark*, 578 F.3d 39, 44 (1st Cir. 2009) ("We have emphasized that Rule 59(e) '. . . certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment.'"), quoting *Aybar v. Crispin-Reyes*, 118 F.3d 10, 16 (1st Cir. 1997). Defendants argue that they did not waive this argument because the court could have found a Chapter 93A violation based on something other than defendants' theft of trade secrets. This argument fails because the court stated (without objection) *prior to the jury trial* that the jury verdict on whether defendants stole BioPoint's trade secrets would serve as the "factual predicate" of any eventual Chapter 93A determination. *See* 5/19/2022 Emergency Motion for Reconsideration Tr. [Dkt # 155] at 10-11. Despite the warning, defendants did not raise the MUTSA argument prior to this post-bench trial motion.

### d. Attorneys' Fees

Defendants argue that MUTSA requires a finding of malice for attorneys' fees and that MUTSA supersedes Chapter 93A. For the same reasons stated above with respect to enhanced damages, this argument is waived.

## III.   New Trial

A new trial under Rule 59 will be granted only "if [the court] believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993). "A federal court may not set aside a jury verdict and direct the entry of a contrary verdict unless no reasonable jury could have returned a verdict adverse to the moving party." *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1483 (1st Cir. 1994).

Defendants have not met this high burden. The jury reasonably found that Catapult and Dickhaut misappropriated BioPoint's trade secrets. The court, as it is permitted to do under First Circuit law, *see Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 294 (1st Cir. 1987), adopted the jury's factual findings in finding that defendants had violated the Massachusetts Fair Business Practices Act and had misappropriated BioPoint's trade

secrets.  The court also made independent findings that defendants' trade secret misappropriation led to their unjust enrichment.  *See* 4/25/2023 Order ¶¶ 60-71.  No new trial is warranted.

## ORDER

For the foregoing reasons, the court will <u>DENY</u> defendants' motions.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

**Subject:** Activity in Case 1:20-cv-10118-RGS BioPoint, Inc.. v. Attis et al Order on Motion to Alter Judgment

**Date:** Tuesday, July 11, 2023 at 5:41:34 PM Eastern Daylight Time

**From:** ECFnotice@mad.uscourts.gov

**To:** CourtCopy@mad.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 7/11/2023 at 5:41 PM EDT and filed on 7/11/2023

**Case Name:** BioPoint, Inc.. v. Attis et al

**Case Number:** 1:20-cv-10118-RGS

**Filer:**

**WARNING: CASE CLOSED on 04/26/2023**

**Document Number:** 249(No document attached)

**Docket Text:**
Judge Richard G. Stearns: ELECTRONIC ORDER entered granting in part and denying in part BioPoint's motion to amend the judgment for prejudgment and postjudgment interest. BioPoint's unjust enrichment award is restitutionary in nature. *See* 4/25/2023 Order [Dkt # 227] para. 42. Because restitutionary awards "are not designed to make the plaintiff whole," but rather are measured by defendants' gain, providing prejudgment interest on the award would produce a windfall for BioPoint. *Governo Law Firm LLC v. Bergeron*, 487 Mass. 188, 199-200 (2021); *see also USM Corp. v. Marson Fastener Corp.*, 392 Mass 334, 467 (1984) (finding that disgorgement of defendant's profits already accounted for defendant's gain after the onset of the action and that imposing prejudgment interest would be inappropriate). The court will, however, grant prejudgment interest to the jury's tortious interference award, which is compensatory in nature. *See Governo*, 487 Mass. at 199 (noting that prejudgment interest is awarded under the common law of torts to ensure a party is fully compensated for its injuries). Prejudgment interest will be assessed at the Massachusetts statutory rate of 12% beginning from the onset of the action (January 21, 2020), *see* Mass. Gen. Laws c. 231, s. 6B, on the jury's award of $312,000, which is $122,279.

BioPoint is also entitled to postjudgment interest. *See* 28 U.S.C. s. 1961. The court will apply the federal interest rate to the entire judgment, including awarded attorneys' fees and costs. *See id.* ("[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."); *Fryer v. A.S.A.P. Fire & Safety Corp. Inc.*, 750 F. Supp. 2d 331, 341-342 (D. Mass. 2010). (RGS, law1)

**1:20-cv-10118-RGS Notice has been electronically mailed to:**

Christopher A. Duggan    Chris.Duggan@SmithDuggan.com, Andrew.Black@SmithDuggan.com, danielle.murphy@smithduggan.com, nadia.ilaj@smithduggan.com, nicole.cordeiro@smithduggan.com

Add. 48

James W. Bucking      jbucking@foleyhoag.com

Dana A. Zakarian      dana.zakarian@smithduggan.com, danielle.murphy@smithduggan.com

Gabriel T. Dym      gdym@eckertseamans.com, vroy@eckertseamans.com

Madeleine K. Rodriguez      mrodriguez@foleyhoag.com

Allison L. Anderson      alanderson@foleyhoag.com, cnigro@foleyhoag.com, hallis@foleyhoag.com, nchalmers@foleyhoag.com

**1:20-cv-10118-RGS Notice will not be electronically mailed to:**

Charlotte L. Bednar
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Flr.
Boston, MA 02110

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT & CATAPULT STAFFING, LLC
d/b/a CATAPULT SOLUTIONS GROUP

MEMORANDUM AND ORDER ON
PLAINTIFF'S BILL FOR
ATTORNEYS' FEES AND COSTS

July 11, 2023

STEARNS, D.J.

Having prevailed on its Chapter 93A Section 2 claim, BioPoint now submits its bill of attorneys' fees and costs. Courts in the First Circuit use the lodestar method to determine a reasonable attorney fee. Mass. Gen. Laws ch. 93A, § 11 ("If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."). "A court arrives at the lodestar by determining the number of hours productively spent on the litigation and multiplying those hours by

Add. 50

reasonable hourly rates." *In re Thirteen Appeals*, 56 F.3d 295, 305 (1st Cir. 1995).

BioPoint seeks $2,505,394.00 in attorneys' fees and $24,290.27 in costs. In determining whether these amounts are reasonable, the court considers "the nature of the case and the issues presented, the time and labor required, the amount of the damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Linthicum v. Archambault*, 379 Mass. 381, 388-389 (1979).

BioPoint seeks fees for 3,690.60 hours of work, including 2,671.2 hours in pre-trial work and 1,019.4 hours in jury trial, bench trial, and post-trial work. This proceeding ran for over three years, included an extensive motions practice, and both jury and bench trials. This case involved complex trade secrets and 93A claims. Given these factors, the court finds the number of hours spent on the matter well within the range of reason. This conclusion is confirmed by looking at comparable matters with a similar course of events and result. *See, e.g.*, *Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.*, 2011 WL 1366584, at *10-11 (Mass. Super. Ct. Feb. 10, 2011) (finding 8,250 hours an appropriate number of hours for attorneys seeking fees after

litigating trade secret misappropriation and Chapter 93A claims over the course of over three years).

A table of the fee rates requested by BioPoint is provided below:

| Person | Title (Year Admitted) | Average Billing Rate |
|---|---|---|
| James Bucking | Partner (1991) | $956 |
| Mark Finsterwald | Counsel (2007) | $839 |
| Allison Anderson | Partner (2013) | $741 |
| Madeleine Rodriguez | Partner/Associate (2012) | $718 |
| Rachel Kerner | Associate (2018) | $676 |
| Mary Kate Sexton | Associate (2018) | $576 |
| Erin Olsen | Associate (2016) | $570 |
| Ethan Severance | Associate (2017) | $557 |
| Marissa Mugan | Associate (2021) | $544 |
| Nicholas Bergara | Law Clerk (2023) | $495 |
| Howard Weiss | Associate (2021) | $495 |
| David Zaleznik | Associate (2021) | $489 |
| Carla Nigro | Paralegal | $376 |

Looking at rates for each attorney and considering each attorneys' qualifications and seniority levels, the court finds that the fees are appropriate and comparable to, if not lower than, those charged by similar commercial law firms in the Boston area. *See* Bucking Aff. [Dkt # 233] ¶ 9 (noting that Foley Hoag charges over 20% less than its peer firms); *see also Vaks v. LumiraDx, Inc.*, 2021 WL 395565, at *2 (D. Mass. Feb. 4, 2021) (finding hourly rates consistent with AmLaw 100 peer firms, and similar to those here, reasonable). *Compare id.* ¶ 10, *with* Leone-Quick Decl. [Dkt # 233-1] at 5 (comparing 2020 Foley Hoag rates with average Boston AmLaw 100 hourly rates). The rates are also commensurate with the skill of the

attorneys, whose professional profiles reflect extensive experience and credentials.  *See* Anderson Aff. Ex. E [Dkt # 232-5].

Finally, the court finds a $24,290.27 expenditure for costs reasonable, particularly considering the length of the litigation.  *See* Anderson Aff. Ex. D [Dkt # 232-4] (invoices itemizing costs sought); *Benchmark Techs., Inc. v. Tu*, 2023 WL 3727913, at *2-3 (D. Mass. May 30, 2023) (finding invoices itemizing charges sufficient for purposes of fee award and awarding $105,104 in costs in a similar matter).

Aside from the reasonableness of the fees, already addressed above, defendants contend that the award should be reduced for several reasons, which the court will address in turn.

First, defendants argue that BioPoint overstaffed the case.  However, it does not dispute the overall reasonableness of the hours BioPoint's attorneys billed except for the costs of defending counterclaims and two motions.  The number of attorneys assigned to BioPoint's legal team is of no import to the calculation of reasonable fees, absent any showing that the eleven attorneys were conducting overlapping or duplicative work.  Indeed, if James Bucking, Allison Anderson, and Madeleine Rodriguez (the three attorneys defendants suggest as a reasonable team) were to have performed all the billed work in

lieu of their associates, they would have sought substantially higher fees because their hourly billing rates are higher.

Second, defendants argue that BioPoint is seeking fees incurred in defending Counterclaims III (tortious interference) and IV (Chapter 93A claim) and that these are unrelated to the claims for which BioPoint is entitled to fees.  In these counterclaims, defendants alleged that BioPoint had interfered with Catapult's relationship with Vedanta by filing this suit and accusing it of trade secret misappropriation.  BioPoint successfully sought summary judgment on these claims.  *See* 7/14/2021 Order.  The court finds that the counterclaims are sufficiently related to the core Chapter 93A claim to entitle BioPoint to fee compensation – defendants' trade secret misappropriation lays at the center of the entire litigation.

Third, defendants argue that BioPoint seeks fees for motions that it lost.  Defendants argue that BioPoint sought $60,000 in fees to oppose Attis's motion to dismiss, which it lost.  However, BioPoint filed a combined opposition to two motions to dismiss, *see* Opp'n to Defs.' Mots. to Dismiss [Dkt # 36], Attis's as well as Catapult and Dickhaut's combined.  The opposition devotes a short section to an argument unique to Attis's case, but the bulk of the document addresses defendants' motion to dismiss, which was denied by the court.  Given the joint nature of the opposition, the court

will decline to reduce these fees. Defendants also argue that BioPoint erroneously sought $56,000 for opposing their motion to exclude damages calculations that were not disclosed during discovery. Although BioPoint's time entries could be clearer, there were other motions in limine filed at and around that time. *See, e.g.* Pl.'s Mot. in Limine to Exclude Drug Evidence [Dkt # 113]. Additionally, the time entries defendants seek to have deducted include other pretrial matters, such as witness preparation, drafting demonstratives, and working up BioPoint's opening statement. The court will therefore deduct only the amounts identified by BioPoint as concerning the motion in limine to exclude damages calculations not provided by BioPoint in discovery, that is, $1,937.

In sum, the court will award BioPoint $2,503,457.00 in attorneys' fees and $24,290.27 in costs, plus pre- and post-judgment interest as specified in its 7/11/2023 Electronic Order [Dkt # 249].

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT and CATAPULT STAFFING, LLC
d/b/a CATAPULT SOLUTIONS GROUP

## AMENDED JUDGMENT

**STEARNS, D.J.**

Consistent with the court's Findings of Fact, Rulings of Law, and Order after a Bench Trial [Dkt # 227], it is **ORDERED** and **ADJUDGED**:

1. The court finds that defendant Catapult was unjustly enriched by the sum of $1,375,148 by defendant Dickhaut's misappropriation of BioPoint's trade secrets.

2. The court finds that Dickhaut and Catapult's conduct also violated the Massachusetts Fair Business Practices Act, Gen. Laws ch. 93A.

3. The court finds that defendants' conduct was knowing and willful.

4. The court in its discretion awards treble damages to plaintiff BioPoint for a total sum of $5,061,444.

5. The court further determines that BioPoint is entitled to an award of reasonable costs in the amount of $ 24,290.27 and attorneys' fees in the amount of $2,503,457.

6. The court further determines that BioPoint is entitled to an award of prejudgment interest in the amount of $122,279 and postjudgment interest, applying the federal interest rate to the entire judgment, including awarded attorneys' fees and costs.

Date: 7/18/23

_A. S. Vacho_
Deputy Clerk

Add. 56

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 90. Protection of Trade Secrets

18 U.S.C.A. § 1836

§ 1836. Civil proceedings

Effective: May 11, 2016
Currentness

**(a)** The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this chapter.

**(b) Private civil actions.**--

**(1) In general.**--An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

**(2) Civil seizure.**--

  **(A) In general.**--

  **(i) Application.**--Based on an affidavit or verified complaint satisfying the requirements of this paragraph, the court may, upon ex parte application but only in extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action.

  **(ii) Requirements for issuing order.**--The court may not grant an application under clause (i) unless the court finds that it clearly appears from specific facts that--

    **(I)** an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

    **(II)** an immediate and irreparable injury will occur if such seizure is not ordered;

Add. 57

**(III)** the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

**(IV)** the applicant is likely to succeed in showing that--

   **(aa)** the information is a trade secret; and

   **(bb)** the person against whom seizure would be ordered--

   **(AA)** misappropriated the trade secret of the applicant by improper means; or

   **(BB)** conspired to use improper means to misappropriate the trade secret of the applicant;

**(V)** the person against whom seizure would be ordered has actual possession of--

   **(aa)** the trade secret; and

   **(bb)** any property to be seized;

**(VI)** the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

**(VII)** the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

**(VIII)** the applicant has not publicized the requested seizure.

**(B) Elements of order.**--If an order is issued under subparagraph (A), it shall--

   **(i)** set forth findings of fact and conclusions of law required for the order;

   **(ii)** provide for the narrowest seizure of property necessary to achieve the purpose of this paragraph and direct that the seizure be conducted in a manner that minimizes any interruption of the business operations of third parties and, to the extent possible, does not interrupt the legitimate business operations of the person accused of misappropriating the trade secret;

Add. 58

**(iii)(I)** be accompanied by an order protecting the seized property from disclosure by prohibiting access by the applicant or the person against whom the order is directed, and prohibiting any copies, in whole or in part, of the seized property, to prevent undue damage to the party against whom the order has issued or others, until such parties have an opportunity to be heard in court; and

**(II)** provide that if access is granted by the court to the applicant or the person against whom the order is directed, the access shall be consistent with subparagraph (D);

**(iv)** provide guidance to the law enforcement officials executing the seizure that clearly delineates the scope of the authority of the officials, including--

　**(I)** the hours during which the seizure may be executed; and

　**(II)** whether force may be used to access locked areas;

**(v)** set a date for a hearing described in subparagraph (F) at the earliest possible time, and not later than 7 days after the order has issued, unless the party against whom the order is directed and others harmed by the order consent to another date for the hearing, except that a party against whom the order has issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the applicant who obtained the order; and

**(vi)** require the person obtaining the order to provide the security determined adequate by the court for the payment of the damages that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure under this paragraph.

**(C) Protection from publicity.**--The court shall take appropriate action to protect the person against whom an order under this paragraph is directed from publicity, by or at the behest of the person obtaining the order, about such order and any seizure under such order.

**(D) Materials in custody of court.**--

**(i) In general.**--Any materials seized under this paragraph shall be taken into the custody of the court. The court shall secure the seized material from physical and electronic access during the seizure and while in the custody of the court.

**(ii) Storage medium.**--If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).

**(iii) Protection of confidentiality.**--The court shall take appropriate measures to protect the confidentiality of seized materials that are unrelated to the trade secret information ordered seized pursuant to this paragraph unless the person against whom the order is entered consents to disclosure of the material.

Add. 59

**(iv) Appointment of special master.**--The court may appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property and data to the person from whom the property was seized. The special master appointed by the court shall agree to be bound by a non-disclosure agreement approved by the court.

**(E) Service of order.**--The court shall order that service of a copy of the order under this paragraph, and the submissions of the applicant to obtain the order, shall be made by a Federal law enforcement officer who, upon making service, shall carry out the seizure under the order. The court may allow State or local law enforcement officials to participate, but may not permit the applicant or any agent of the applicant to participate in the seizure. At the request of law enforcement officials, the court may allow a technical expert who is unaffiliated with the applicant and who is bound by a court-approved non-disclosure agreement to participate in the seizure if the court determines that the participation of the expert will aid the efficient execution of and minimize the burden of the seizure.

**(F) Seizure hearing.**--

**(i) Date.**--A court that issues a seizure order shall hold a hearing on the date set by the court under subparagraph (B)(v).

**(ii) Burden of proof.**--At a hearing held under this subparagraph, the party who obtained the order under subparagraph (A) shall have the burden to prove the facts supporting the findings of fact and conclusions of law necessary to support the order. If the party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

**(iii) Dissolution or modification of order.**--A party against whom the order has been issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the party who obtained the order.

**(iv) Discovery time limits.**--The court may make such orders modifying the time limits for discovery under the Federal Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of a hearing under this subparagraph.

**(G) Action for damage caused by wrongful seizure.**--A person who suffers damage by reason of a wrongful or excessive seizure under this paragraph has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to the same relief as is provided under section 34(d)(11) of the Trademark Act of 1946 (15 U.S.C. 1116(d)(11)). The security posted with the court under subparagraph (B)(vi) shall not limit the recovery of third parties for damages.

**(H) Motion for encryption.**--A party or a person who claims to have an interest in the subject matter seized may make a motion at any time, which may be heard ex parte, to encrypt any material seized or to be seized under this paragraph that is stored on a storage medium. The motion shall include, when possible, the desired encryption method.

**(3) Remedies.**--In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may--

Add. 60

**(A)** grant an injunction--

**(i)** to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not--

**(I)** prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

**(II)** otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

**(ii)** if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

**(iii)** in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

**(B)** award--

**(i)(I)** damages for actual loss caused by the misappropriation of the trade secret; and

**(II)** damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

**(ii)** in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

**(C)** if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

**(D)** if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

**(c) Jurisdiction.**--The district courts of the United States shall have original jurisdiction of civil actions brought under this section.

**(d) Period of limitations.**--A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence

Add. 61

should have been discovered. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation.

**CREDIT(S)**

(Added Pub.L. 104-294, Title I, § 101(a), Oct. 11, 1996, 110 Stat. 3490; amended Pub.L. 107-273, Div. B, Title IV, § 4002(e)(9), Nov. 2, 2002, 116 Stat. 1810; Pub.L. 114-153, § 2(a), (d)(1), May 11, 2016, 130 Stat. 376, 381.)

Notes of Decisions (59)

18 U.S.C.A. § 1836, 18 USCA § 1836
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1291

## § 1291. Final decisions of district courts

Currentness

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 97-164, Title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

Notes of Decisions (3601)

28 U.S.C.A. § 1291, 28 USCA § 1291
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

End of Document          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 63

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1331

§ 1331. Federal question

Currentness

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; Pub.L. 85-554, § 1, July 25, 1958, 72 Stat. 415; Pub.L. 94-574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub.L. 96-486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

Notes of Decisions (3253)

28 U.S.C.A. § 1331, 28 USCA § 1331
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 64

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XV. Regulation of Trade (Ch. 93-110h)
            Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42B

§ 42B. Trade secrets; damages

Effective: October 1, 2018
Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

(a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation of information qualifying as a trade secret. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by the imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a).

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

M.G.L.A. 93 § 42B, MA ST 93 § 42B
Current through Chapter 25 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 65

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XV. Regulation of Trade (Ch. 93-110h)
      Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42F

§ 42F. Trade secrets; effect on other law

Effective: October 1, 2018
Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

(a) Except as provided in subsection (b), sections 42 to 42G, inclusive, shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret.

(b) Sections 42 to 42G, inclusive, do not affect:

(1) contractual remedies, provided that, to the extent such remedies are based on an interest in the economic advantage of information claimed to be confidential, such confidentiality shall be determined according to the definition of trade secret in section 42, where the terms and circumstances of the underlying contract shall be considered in such determination;

(2) remedies based on submissions to governmental units;

(3) other civil remedies to the extent that they are not based upon misappropriation of a trade secret; or

(4) criminal remedies, whether or not based upon misappropriation of a trade secret.

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

M.G.L.A. 93 § 42F, MA ST 93 § 42F
Current through Chapter 25 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 66

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.