# United States Court of Appeals
## For the First Circuit

---

No. 23-1575

BIOPOINT, INC.,

Plaintiff, Appellee,

v.

ANDREW DICKHAUT; CATAPULT STAFFING, LLC, d/b/a Catapult
Solutions Group,

Defendants, Appellants,

LEAH ATTIS,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Rikelman, Lynch, and Howard,
Circuit Judges.

---

Dana A. Zakarian, with whom Christopher J. Hurst, Steven D.
Procopio, and Smith Duggan Cornell & Gollub LLP were on brief, for
appellant.
Allison L. Anderson, with whom James W. Bucking, Rachel L.
Kerner, and Foley Hoag LLP were on brief, for appellee.

---

July 30, 2024

---

LYNCH, **Circuit Judge**.  Catapult Staffing, LLC and Andrew Dickhaut (collectively, "Catapult") appeal from separate jury and judge findings that they misappropriated BioPoint, Inc.'s trade secrets, misappropriated its confidential business information, were unjustly enriched by these activities, tortiously interfered with BioPoint's prospective business relationships, and violated the prohibitions on unfair and deceptive trade practices in the Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A, § 11 ("chapter 93A").

The jury found that Catapult had misappropriated and used BioPoint's trade secrets with respect to three candidates recruited by Catapult and with respect to two of BioPoint's clients, the firms Vedanta and Shire/Takeda.  It also found Catapult had engaged in tortious interference with BioPoint's business relationship with one candidate.  The jury awarded BioPoint $312,000 in lost profits.

The judge, prior to the jury trial, had reserved to the court decision on all equitable claims for relief.  He notified the parties he would hold a bench trial and decide those equitable claims after the jury trial.  He held a bench trial and then issued a twenty-nine-page decision entitled "Findings of Fact, Rulings of Law, and Order After a Bench Trial."  The judge found for BioPoint as to all equitable claims and awarded it $5,061,444, consisting of the amount by which "Catapult was unjustly enriched" by its

"misappropriation of BioPoint's trade secrets," trebled because "Catapult's conduct also violated [chapter 93A]." The court also awarded BioPoint reasonable costs, attorneys' fees, and prejudgment and postjudgment interest.

We largely affirm, but reduce the judge's award, and the award of judgment, by $157,068. We also reverse the district court's imposition of joint-and-several liability on Andrew Dickhaut and remand for further proceedings.

**I.**

"As this case comes to us following a bench trial" and a jury trial, "we recount the relevant facts as found by the district court, consistent with record support." Reyes v. Garland, 26 F.4th 516, 518 (1st Cir. 2022) (quoting Gonzalez-Rucci v. INS, 539 F.3d 66, 67 (1st Cir. 2008)).

BioPoint is a life sciences consulting firm based in Massachusetts which scouts for highly skilled candidates to place in temporary positions at pharmaceutical, biopharmaceutical, and medical device companies. Those companies pay BioPoint a (typically hourly) rate for the candidates' services (the "bill rate"), and BioPoint remits a portion of that payment to the candidates (the "pay rate"), profiting from the difference. BioPoint maintains an internal database in which it records proprietary information regarding clients, candidates, and their

respective bill and pay rates.  In 2015, BioPoint hired Leah Attis, who became one of the company's top salespeople.

Catapult, based in Texas, is also a placement company that operated in other industries until it attempted to enter the same field as BioPoint.  Catapult opened a Boston office in 2017 and hired Andrew Dickhaut, Attis's fiancé, as Managing Director. (Dickhaut and Attis were married on February 1, 2020.)  At the time that Catapult entered the Boston market, it had no intention of operating in the life sciences industry.  It planned to focus instead on the "technology, light industrial, accounting, and finance industries."  But Catapult's plans shifted and it began to target the life sciences space after a "disastrous" first year for the Boston office, which resulted in Dickhaut's having to take a pay cut.

In December 2017, Jeff Autenrieth, a talent acquisition consultant at Moderna, a pharmaceutical company, contacted Attis at BioPoint seeking to fill a life sciences placement at his company.  Dickhaut knew Autenrieth from high school and had introduced him to Attis in 2016 at her request.  Autenrieth had a particular candidate in mind, Chris Foley, and suggested that Foley be placed through BioPoint.  Attis initially agreed but then proposed to Autenrieth that Dickhaut handle the placement not through BioPoint but through Catapult, because "[h]e need[ed] the headcount."  When Autenrieth followed up, Attis stated that she

"[didn't] want to put anything in writing over [her] system" and that Dickhaut (her fiancé) "really need[ed] a deal." Catapult ended up placing Foley at Moderna, and he was the company's first-ever life sciences placement.

In February 2018, Autenrieth became a talent acquisition consultant at Vedanta, a biotechnology company. Although Autenrieth relied on Dickhaut to place several "somewhat entry level" contractor roles at Vedanta, Autenrieth did not think Catapult had the ability at that point to fill higher-level positions.

Soon, though, Catapult did begin to make a few of those high-level placements at Vedanta. In March 2018, Dickhaut identified a candidate for a quality-assurance life sciences role at Vedanta. Dickhaut told his boss that his fiancée Attis, though she was at BioPoint, had "helped [him] with the search" and was "pitching in a little bit too via LinkedIn."

Dickhaut continued to make inroads at Vedanta. In December 2018, Catapult and Vedanta entered into a "managed services provider" ("MSP") agreement, which had been pitched by Dickhaut, under which Catapult would manage all of Vedanta's candidates' labor contracts. That agreement also granted Catapult "master vendor status" with Vedanta, such that Catapult had the first opportunity to fill openings at Vedanta.

Under the MSP agreement, in January 2019, Vedanta had an opening for a "study team leader."  Dickhaut asked Attis to give him both BioPoint's bill and pay rates for that role and also to give him names of suitable potential candidates from information she had at BioPoint.  Attis provided him with the rates and said she "[couldn't] give [him] names from [BioPoint's] system" because "[p]eople ha[d] [gone] to jail for that."

Around this time, Attis suggested to her supervisors the possibility of BioPoint's "supporting [Dickhaut's] hiring needs for [Vedanta]" by becoming a vendor through their MSP.  Attis's superiors at BioPoint not only rejected this proposal, but they also warned Attis that she was not allowed to share any of BioPoint's confidential information with Dickhaut.

Attis did not heed that warning.  In January 2019, Dickhaut asked her what BioPoint's pay rate would be for a clinical operations director, and she responded that she would "look up" someone in a comparable role whom she had just placed through BioPoint.  Attis also discussed candidates for Vedanta positions, apparently obtained from BioPoint's system, with Dickhaut.  Indeed, at one point, after Dickhaut had moved forward with a candidate without consulting Attis, Attis told him that "[n]ext time" he should "wait for [her] to check [her] system."

In March 2019, Vedanta needed to hire a medical director.  When Dickhaut was having trouble finding someone, he asked Attis

for help.  Attis again asked her supervisors whether BioPoint could partner with Catapult to help fill that role, and they once again refused, reiterating that there was a "conflict of interest" and that they had "no interest in partnering with a competitor." Dickhaut became "furious" when Attis conveyed this conversation to him, and he "criticiz[ed] [Attis] and BioPoint for not working with him."  Trying to appease Dickhaut, Attis wrote him: "I understand if you don't want to work with BioPoint, but I do have those two candidates set aside for you."

Using BioPoint's database information provided by Attis, Dickhaut went on to place three candidates in the medical director role, each of whom had been or was being vetted by BioPoint: Chris Da Costa, Stephen Haworth, and Candida Fratazzi.  In fact, BioPoint had been about to place Fratazzi at Shire, a pharmaceutical company and Attis's biggest client, for a pay rate of $250 an hour, when Fratazzi suddenly withdrew from consideration because she had accepted a position at Vedanta for a pay rate of $300 an hour.  A few days before Fratazzi withdrew, Dickhaut asked Attis for the bill rates of Takeda, a company that was in the process of acquiring Shire.

BioPoint terminated Attis's employment on December 4, 2019, after discovering that she had helped Dickhaut place Fratazzi at Vedanta.  In May 2020, Vedanta terminated its MSP agreement with Catapult.

On January 21, 2020, BioPoint sued Catapult, Dickhaut, and Attis in the U.S. District Court in Massachusetts.  In March, the court dismissed without prejudice BioPoint's claims against Attis so that BioPoint could refile them in state court, as required by her employment contract.  BioPoint then filed a four-count amended complaint against Catapult and Dickhaut, bringing three Massachusetts state-law claims and one federal claim, under federal question and supplemental jurisdiction.  BioPoint alleged (1) misappropriation of trade secrets in violation of the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. Laws. ch. 93 § 42, (2) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831-39, (3) tortious interference with prospective relationships in violation of Massachusetts common law, and (4) unfair and deceptive trade practices in violation of chapter 93A. In the complaint, BioPoint requested damages under MUTSA and DTSA as well as "all damages authorized by" chapter 93A.

Catapult filed a motion to dismiss the complaint in full, which the court denied, and the case proceeded to discovery and ultimately to trial.  On December 22, 2021, Catapult filed a motion in limine to exclude at trial, as a discovery sanction, any damages calculations not yet disclosed by BioPoint.  The court granted the motion on January 4, 2022, ruling that "to the extent that lost profits damages were not disclosed during discovery, they w[ould]

be excluded," and that, because "unjust enrichment is an equitable remedy to which the right to a jury trial does not attach, . . . [d]isgorgement damages . . . [would] be reserved to the court and not presented to the jury."  On May 10, 2022, Catapult submitted a letter to the court seeking clarification as to the scope of the jury trial in light of the court's ruling.  The court issued this order on May 11, 2022: "As the only lost profits evidence disclosed during discovery concerns Ms. Fratazzi, the scope of the jury trial will be limited to issues regarding her placement.  Depending on the jury's finding of liability, the court may confer with the parties as to the necessity for further proceedings."  BioPoint filed a "motion for reconsideration and/or clarification," arguing that "[r]estricting the liability phase of this case to Fratazzi's placement" would mischaracterize the complaint, lead to the exclusion of "key evidence," and "prevent BioPoint from proving the claims which could lead the Court to award disgorgement."  In response, the court issued the following order on May 13:

> The jury will be asked to decide only questions at law, and issues of equity will be reserved for the court.  Damages at trial shall be limited to that of BioPoint's asserted lost profits disclosed during discovery, as the court previously ruled.  The court will confer with counsel . . . as to the scope and content of the liability issue to be presented to the jury.  To that end, parties shall submit their respective proposed jury verdict slips to the court . . . .

At a hearing on May 19, the court explained how it would divide the claims between a jury trial on legal claims and a possible subsequent bench trial on claims for equitable relief. Neither party objected. The court then issued its order:

> Having carefully considered the contours of the dispute in this case and the parties' respective positions, the court determines that the issues of liability at law -- that is, on plaintiff's claims for trade secret misappropriation and tortious interference -- will be presented at the jury trial. The bulk of the asserted damages (with the exception as to Ms. Fratazzi) are those sounding in equity and they will be considered together with the equitable unfair competition claim at a subsequent bench proceeding, should the jury return a finding of liability.

Both parties again did not object.

Before and during the trial, the court requested that the parties submit proposed special verdict forms ("verdict slips"). The court then issued a verdict slip for the parties' consideration, which, the court explained, was drafted so that all would know "what exactly the jury decided to do with respect to various aspects of information that are being claimed as trade secrets." The court rejected Catapult's objection to the verdict slip on the grounds that it did not require "the jury to identify what information it finds is a trade secret" and did not ask the jury to determine whether allegedly misappropriated trade secrets were actually used by Catapult.

At the jury trial, where Catapult's liability for lost profits was, due to BioPoint's discovery violation, limited to damages arising from Fratazzi's placement, BioPoint also presented evidence as to other candidates and clients. The verdict slip then asked the jury to determine whether Catapult had misappropriated BioPoint's trade secrets "concerning" five candidates, including Fratazzi, and two client firms, including Vedanta. The jury was given the standard Massachusetts trade secrets misappropriation instructions without any differentiation as to the causes of action stated.

The jury found that Catapult had misappropriated trade secrets concerning the firms of Vedanta and Shire/Takeda and also concerning candidate Fratazzi as well as other individual candidates, and that it had tortiously interfered with BioPoint's business relationship with Fratazzi. The jury awarded BioPoint $312,000 in damages "as reasonable compensation for the damages it incurred in the placement of Dr. Fratazzi because of Andrew Dickhaut's and Catapult's conduct[.]" That lost-profits number was calculated from BioPoint's disclosure that it had expected to make $5,000 per week on Fratazzi's placement at Shire.

The court then held, as it had said it would, a bench trial on the issues of whether Catapult had been unjustly enriched by its misappropriation of BioPoint's trade secrets, whether Catapult had engaged in unfair and deceptive trade practices,

whether that conduct was knowing and willful, and what damages were warranted. After the trial, the court issued a carefully reasoned twenty-nine-page order stating its findings of fact, conclusions of law, and order granting awards on the equitable claims.

In its Findings of Fact, Conclusions of Law, and Order, the court began by carefully noting the jury's findings:

> At the conclusion of a June 14-22, 2022[,] trial, a jury found defendants Andrew Dickhaut and [Catapult] liable for the misappropriation of trade secrets from plaintiff [BioPoint]. Catapult and BioPoint are competitors in the highly lucrative life sciences consultant search market. The jury found that Catapult and Dickhaut had misappropriated trade secrets with respect to three candidate consultants recruited by BioPoint and had tortiously interfered with BioPoint's prospective business relationships with one of those candidates. The jury awarded BioPoint $312,000 on the successful tortious interference claim. The jury also found that Catapult and Dickhaut misappropriated BioPoint's trade secrets concerning two of its prospective clients, Vedanta and Shire. Following the jury trial, a two-day bench trial was convened on October 18-19, 2022, to try BioPoint's remaining equitable claims for unjust enrichment, violations of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A, and for an award of enhanced damages and attorneys' fees.

Turning to the requested equitable relief before the court of unjust enrichment, the court correctly stated: "The unjust enrichment 'attributable' to trade secret misappropriation is distinct from the issue of whether a defendant appropriated a trade

- 13 -

secret."  The court stressed that "Catapult's use of BioPoint's
trade secret ha[d] already been determined by the jury," thus
laying the basis for an unjust enrichment award by the court.  In
weighing whether to make such an award, it stated that:

> One theory of unjust enrichment is a
> plaintiff's trade secret giving a defendant a
> head start.  To establish that a
> misappropriated trade secret gave a defendant
> a head start, plaintiff must proffer evidence
> "(1) that the alleged misappropriation gave
> [defendant] a head start and (2) that the head
> start helped to bring about certain earnings
> over the following months or years." Alifax
> Holding Spa v. Alcor Sci. Inc., 2021 WL
> 3911258, at *1 (D.R.I. Sept. 1, 2021).

Later the court also noted as to the chapter 93A claims:

> To determine whether conduct violates Chapter
> 93A, the court considers "(1) whether the
> practice . . . is within at least the penumbra
> of some common-law, statutory, or other
> established concept of unfairness; (2) whether
> it is immoral, unethical, oppressive, or
> unscrupulous; [and] (3) whether it causes
> substantial injury to consumers (or
> competitors or other businessmen)." PMP
> Assocs., Inc. v. Globe Newspaper Co., 366 Mass
> 593, 596 (1975). . . .  A finding of trade
> secret misappropriation is also sufficient to
> establish an unfair or deceptive act under
> Chapter 93A. See Mass. Eye & Ear Infirmary v.
> QLT Phototherapeutics, Inc., 412 F.3d 215, 243
> (1st Cir. 2005) ("Under Massachusetts law,
> misappropriation of trade secrets alone can
> constitute a violation of Chapter 93A."); see
> also Prescott v. Morton Int'l, Inc., 769 F.
> Supp. 404, 407 (D. Mass. 1990) ("The standards
> for finding misappropriation of a trade secret
> provide the criteria for finding an unfair or
> deceptive act."); Juncker Assocs. & Co. v.
> Enes, 2002 WL 31104013, at *4 (Mass. Sup. Ct.
> Sept. 5, 2002) (same).  The same is true with

respect to a jury's finding of tortious
interference. <u>See</u> <u>People's Choice Mortg.,</u>
<u>Inc.</u> v. <u>Premium Cap. Funding, LLC</u>, 2010 WL
1267373, at *18 (Mass. Super. Ct. Mar. 31,
2010) ("Topdot's actions constituted a
tortious interference with an advantageous
business relationship. Thus, Topdot's actions
were within a concept of unfairness
established at common-law. For this reason,
the court concludes that Topdot's actions
merit relief under [Mass. Gen. Laws ch.] 93A,
§ 11.").

Under the law and under the findings set forth in the judge's

order, the court then stated: "The court finds that the jury's

verdict amply supports a determination that Catapult violated

Chapter 93A and that <u>no further findings of fact on this issue</u> are

required." <u>BioPoint, Inc.</u> v. <u>Dickhaut</u>, No. 20-10118, 2023 WL

3071422, at *8 (D. Mass. Apr. 25, 2023) (emphasis added).

The court held accordingly: (1) citing to a Rhode Island

case on the head start doctrine, that BioPoint was entitled to the

entirety of Catapult's profits arising from its relationship with

Vedanta, because those profits "were made possible because of

BioPoint's trade secret information and therefore amount to unjust

enrichment"; and (2) that Catapult was liable under chapter 93A

and that its conduct was knowing and willful under the statute,

which authorized an award of exemplary damages. The court also

held that "Dickhaut at all times was acting within the scope of

his employment for the benefit of Catapult" and that "Dickhaut's

conduct and culpable state of mind [were] imputable to Catapult as

his employer under the long-established principles of vicarious liability."  As to damages, the court awarded treble damages jointly against Dickhaut and Catapult, totaling $5,061,444: Catapult's Vedanta profits, multiplied by three, plus the jury's award for Catapult's lost profits on Fratazzi, multiplied by three. Catapult's Vedanta profits included the profits made from placing Fratazzi at Vedanta, such that BioPoint was awarded both lost profits related to Fratazzi (by the jury) and unjust enrichment based on Catapult's profits from placing Fratazzi at Vedanta (by the court).

In May 2023, after entry of final judgment, Catapult filed a motion requesting judgment as a matter of law, a new trial, remittitur, and amendment of the judgment.  The court denied the motion, and Catapult timely appealed to this court.

## II.

We analyze first the most important issues presented by the appeal.

### A.    Unjust enrichment and the court's award based on the head start doctrine

Catapult argues that the district court erred in awarding to BioPoint as unjust enrichment the entirety of the profits that it derived from its relationship with Vedanta.

When evaluating the district court's unjust enrichment award, we review the court's factual findings for clear error and

its legal conclusions de novo.  See SEC v. Sanchez-Diaz, 88 F.4th 81, 87 n.2 (1st Cir. 2023).

Catapult argues to us, but did not timely argue to the district court, that the district court relied on an inapplicable legal theory, the "head start" doctrine, to justify the award of the entire Vedanta profits.  The district court stated that it found, "[c]onsistent with the jury's verdict" that Catapult had misappropriated some of BioPoint's trade secrets, and that Catapult's misappropriation of those trade secrets "gave [it] a head start in developing a working relationship with Vedanta, enabling it to obtain the MSP agreement," such that Catapult was unjustly enriched to the extent that it profited from that relationship.  In its rulings of law, the court noted that "[o]ne theory of unjust enrichment is a plaintiff's trade secret giving a defendant a head start," and cited Alifax Holding Spa v. Alcor Sci. Inc., No. 14-440, 2021 WL 3911258 (D.R.I. Sept. 1, 2021), for the elements of that theory.  The court then described in its findings of fact[1] how Catapult had obtained and used information that Dickhaut and his fiancée Attis had misappropriated from BioPoint in order to develop and maintain a working relationship with Vedanta.  Rejecting Catapult's argument that BioPoint could

---

[1]    The court also noted again that "[t]he court has discretion whether to apply a jury's factual findings to a Chapter 93A claim or whether to ask the jury for a non-binding advisory opinion with respect to the chapter 93A claim."

not recover as unjust enrichment profits from placements that had not been submitted to the jury, the court held that "[b]ut for the misappropriation of BioPoint's trade secrets, there would have been no ongoing relationship between Catapult and Vedanta" and that "Catapult's entire relationship with Vedanta was enabled and sustained with BioPoint information."  That conclusion, the court noted, was "further supported by the fact that Catapult did not make any further placements at Vedanta after BioPoint terminated Attis."

Catapult argues both that, in this Massachusetts case, the court erred in relying on Rhode Island law, see BioPoint, Inc., 2023 WL 3071422, at *6 (citing Alifax Holding Spa, 2021 WL 3911258, at *1), and that under Massachusetts law the head start doctrine is limited to certain manufactured product trade secret cases.

As the Massachusetts Supreme Judicial Court ("SJC") has explained, the "'head start rule' has no application" in a case in which the "trade secret . . . has never appeared in any marketed product or otherwise lawfully been made publicly accessible." USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 354 (1984) (citing Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 171 n.11 (1979) ("Generally, the 'head start rule' has been applied in cases where the plaintiff's product, including the trade secret, has been marketed.")).  It is possible to read the SJC cases as establishing that in product trade secret cases alleging unjust enrichment,

such damages under the head start doctrine are limited to the time that it would take to reverse engineer, or otherwise legitimately discover, the secret in the public domain.  The rationale for this limitation is that "[t]he marketing of the product gives competitors a legitimate opportunity to study the product and to learn the principles of the trade secret through reverse engineering or similar procedures." Jet Spray, 377 Mass. at 171 n.11.

Regardless, Catapult did not argue in a timely fashion to the district court either of its two points.  In its proposed findings of fact and conclusions of law following the bench trial, BioPoint argued:

> Catapult's Vedanta profits [could] also be disgorged based on an unfair "head start" theory.  []"Head start" damages refer to the development and delay costs defendants avoid through misappropriation that can be inferred from the evidence presented.  See Alifax Holding Sp[a] v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 577-78 (D.R.I. 2019) (explaining that one year of profits attributable to the defendant's unfair head start, gained through its misappropriation, was a rational measure of damages).

In Catapult's reply to BioPoint's proposed rulings, it did not argue either of the two points it now asserts on appeal, noting instead that "Autenreith's testimony . . . destroy[ed] BioPoint's 'head start' argument. . . .  Catapult's 'head start' was Dickhaut's relationship with Autenreith -- not BioPoint's alleged

trade secrets."[2]  Catapult did not, then, make a legal argument that the head start doctrine was not applicable, but argued, rather, that it was contradicted by the evidence.  The district court then issued its findings of fact and rulings of law, in which it cited the Alifax case and held that the Catapult's misappropriation of trade secrets gave it a head start.  In Catapult's postjudgment motion, it briefly stated that the head start rule did not apply to this case, but failed to cite any authority for this statement, as BioPoint noted in its opposition to that motion.  Because Catapult "did not adequately present . . . to the district court" the argument that Massachusetts law limits the head start rule in unjust enrichment cases to contexts involving manufactured products under Jet Spray and USM, "[it] has waived" the argument.  See Kelly v. Riverside Partners, LLC, 964 F.3d 107, 117 (1st Cir. 2020).

The district court may well have extended Massachusetts law as to unjust enrichment as set forth in Jet Spray and USM, which federal courts usually may not do if a proper objection is made and preserved.  See CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 58 (1st Cir. 2020) ("[A federal court] must 'take care not to

---

[2]    BioPoint did not argue to the district court the theory asserted by the dissent that the jury's finding of no misappropriation as to one of the Vedanta candidates precluded the court from determining that there was a causal relationship between Catapult's misappropriation of trade secrets and its profits from the Vedanta relationship.

extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts.'" (omission in original) (quoting <u>Markham</u> v. <u>Fay</u>, 74 F.3d 1347, 1356 (1st Cir. 1996))). We leave that issue for a case in which it is properly raised.[3]

We turn to Catapult's other, not waived, attacks. Based on the fact that, in its special verdict form, the jury found that BioPoint had proven misappropriation of trade secrets concerning only three out of the five candidates that BioPoint had chosen to

---

[3]    It is clear that it is not the law of Massachusetts that a jury which has found misappropriation of a plaintiff's trade secrets (but has rejected certain claims of misappropriation) limits the court from making a full award of the defendant's unjust enrichment and/or chapter 93A violations. Nor does it limit the use of the head start doctrine against a defendant whose misappropriation gave it a head start in a relevant new business it would not otherwise have had. In <u>Jet Spray</u>, the SJC noted that "[a]n award to a plaintiff of the defendant's net profits is made primarily to ensure that the defendant is not unjustly enriched as a result of his wrongful acts," such that "the plaintiff may actually recover far more than its actual loss." 377 Mass. at 159, 182. The court next stated:

> Here, the plaintiffs have been awarded the entirety of the defendants' net corporate profits from 1964 to 1975. This award is made because it is impossible for the defendants to segregate the portion of their profits which is attributable to the misappropriated trade secrets from the portion of their profits which may be attributable to other factors.

<u>Id.</u> at 183; <u>see also</u> <u>Governo L. Firm LLC</u> v. <u>Bergeron</u>, 166 N.E.3d 416, 428 (2021) ("[O]bject of restitution in certain contexts is to eliminate profit from wrongdoing[.]" (citing Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011))).

submit to the jury (Candida Fratazzi, Steven Haworth, and Chris Da Costa), Catapult argues there was no basis for the court to award all of the Vedanta profits as unjust enrichment.  Catapult argues that the only damages that can be awarded as unjust enrichment are those arising from life sciences placements as to which the jury found that Catapult had misappropriated trade secrets.

This argument misunderstands the law, the procedural history of this case, and the jury verdict.  The district court ruled, without objection, that "the scope of the jury trial w[ould] be limited to issues regarding [the] placement" of Fratazzi, consistent with its prior ruling sanctioning BioPoint for its discovery violation.  The court ruled further that "[t]he bulk of the asserted damages (with the exception as to Ms. Fratazzi) [were] those sounding in equity," and that those would "be considered . . . at a subsequent bench proceeding, should the jury return a finding of liability."  The court explained accordingly at a hearing before the jury trial took place that if the jury returned a finding of liability as to Fratazzi, the court would "sort out the rest" at a subsequent bench trial.  The parties assented.  The jury did find trade-secrets misappropriation as to Fratazzi, so Catapult cannot have been surprised that the district court did exactly what it said that it would do by awarding disgorgement damages that exceeded the lost profits arising from the Fratazzi placement.

We repeat that the court correctly noted in its rulings of law that "[t]he unjust enrichment 'attributable' to trade secret misappropriation is distinct from the issue of whether a defendant [mis]appropriated a trade secret."  The jury had already determined that Catapult was liable with respect to the placement of Fratazzi, and the amount of gain (not including lost profits) that was attributable to, or which arose on account of, Catapult's improper conduct was for the court to decide as an equitable matter.[4]  The court did not err in finding that but for Catapult's misappropriation of BioPoint's trade secrets, it would not have had a business relationship with Vedanta, such that all of the Vedanta profits arose on account of Catapult's misappropriation and thus were recoverable as unjust enrichment.[5]

In the special verdict form, the jury found, too, that Catapult had misappropriated trade secrets concerning Vedanta, separately from its finding of misappropriation concerning Fratazzi and other candidates.  In Catapult's filed objections to

---

[4]    Indeed, under MUTSA, damages for misappropriation "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Mass. Gen. Laws ch. 93, § 42B(a) (emphasis added); see also 18 U.S.C. § 1836(b)(3)(B)(i)(II) (similar language in DTSA).

[5]    The court's citation to a case under Rhode Island law and its invocation of the head start doctrine may have been inapposite, but this arguable error, if any, was at most harmless error.  The court's reasoning was sound and grounded in Massachusetts unjust enrichment law and the text of MUTSA and DTSA.

- 23 -

the court's draft verdict slip, Catapult in fact agreed with the court that the jury should be asked for a finding regarding misappropriation as to Vedanta specifically, separately from its findings regarding misappropriation as to individual candidates.[6] By negative implication, Catapult admitted that the equitable claim regarding Vedanta was not coextensive with the claim regarding Fratazzi and the other candidates.[7]    And the jury

---

[6]    Catapult did request, by contrast, that the jury not be asked whether Catapult had misappropriated trade secrets concerning <u>Moderna</u>, because "[t]he equitable claim for Moderna is the same as [the claim for] Chris Foley," whom the verdict slip already included.

[7]    Indeed, "Massachusetts law provides two distinct theories of recovery based on the improper use of confidential information: misappropriation of trade secrets and unjust enrichment." <u>Mass. Eye & Ear Infirmary</u> v. <u>QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 61 (1st Cir. 2009) (citing <u>Jet Spray Cooler, Inc.</u> v. <u>Crampton</u>, 361 Mass. 385, 282 (1972) and <u>USM Corp.</u> v. <u>Marson Fastener Corp.</u>, 379 Mass. 90, 393 (1979)). "Thus, the entry of judgment with respect to [a] trade secrets claim d[oes] not legally compel the same result with respect to [an] unjust enrichment claim." <u>Id.</u>

The case <u>Specialized Technology Resources, Inc.</u> v. <u>JPS Elastomerics Corp.</u>, 80 Mass. App. Ct. 841 (2011), is also relevant to the issue of separate jury and judge findings in trade secret cases.    There, the plaintiff had asserted a claim for misappropriation of trade secrets under the common law and a claim under chapter 93A.    <u>Id.</u> at 842.    The jury found in favor of the defendants on the common-law misappropriation claim, but the judge, in a subsequent bench trial, disagreed with the jury and found the defendants liable for misappropriating trade secrets, awarding damages under chapter 93A.    <u>Id.</u>

The Massachusetts Appeals Court affirmed, holding, in accordance with prior caselaw, that "a judge who has reserved a c. 93A claim is [not] bound by [the] jury's factual findings[.]"    <u>Id.</u> at 846.    The court also affirmed the award of disgorgement of profits under chapter 93A.    <u>Id.</u> at 850.    Citing <u>Jet Spray</u> and the

subsequently found that Catapult had misappropriated trade secrets concerning Vedanta, separately from its finding that Catapult had misappropriated trade secrets concerning three individual candidates. The district court appropriately relied on this jury finding, which should not be read as redundant, in disgorging the Vedanta profits.

We do agree with Catapult, however, that "[t]he disgorged profits from the placement of Dr. Fratazzi" are "duplicative of BioPoint's lost profits claim." Under the governing law, BioPoint may not recover both the lost profits associated with Fratazzi and the unjust enrichment that accrued to Catapult as a result of her placement. See 18 U.S.C. § 1836(b)(3)(B)(i) (providing for "damages for actual loss caused by the misappropriation of the trade secret; and . . . damages for

---

Restatement (Third) of Unfair Competition, the court noted that the plaintiff was "entitled to the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts." Id. Rejecting the defendants' argument that the plaintiff had not established "the requisite monetary harm," the court found that "the precise scope of [plaintiff's] monetary loss [was] difficult to quantify," and, "[h]aving satisfied the requirement that it demonstrate some monetary loss, the use of disgorgement of profits to compensate [plaintiff] for the defendants' misuse of the trade secret was entirely appropriate." Id. (citing Jet Spray, 377 Mass. at 170-71).

This case shows that the court, when considering a chapter 93A claim, may adopt factual findings that contradict the jury's prior findings with respect to trade secrets misappropriation, and the court may award disgorgement for trade-secret misappropriation under chapter 93A.

any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss"); Mass. Gen. Laws ch. 93, § 42(B)(a) ("Damages can include both actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account computing actual loss."); Jet Spray, 377 Mass. at 170 ("Of course, a plaintiff is not entitled to both the profits made by the defendant and his own lost profits."). The district court awarded $52,356 as disgorged profits for the placement of Fratazzi, and then trebled that sum, for a total of $157,068. Because this constituted clear error, the unjust enrichment award must be reduced by that amount.

**B.      Dickhaut's joint and several liability**

Catapult further contends that the district court improperly disgorged Dickhaut of unreceived profits when it held him jointly and severally liable for the unjust enrichment award. We agree that holding an individual like Dickhaut jointly and severally liable for the entirety of his employer's unjust enrichment is a bridge too far.

After the district court awarded damages "jointly against both Dickhaut and Catapult," the defendants asked the court to "specify that the unjust enrichment award [was] against Catapult only." Citing Liu v. SEC, the defendants argued that Dickhaut could not be disgorged of profits he never received. 591 U.S. 71

(2020).  The district court disagreed, maintaining Dickhaut's joint-and-several liability because he "collaborated with and ranks high in the firm."  According to the court, Liu "did not address situations in which multiple parties engage in concerted wrongdoing" and so provided no obstacle to imposing joint-and-several liability on Dickhaut.

We read Liu differently.  Liu explicitly recognized that -- notwithstanding the general rule against joint-and-several liability for profits that have accrued to another, see id. at 82-83 (citing Belknap v. Schild, 161 U.S. 10, 25-26 (1896); Keystone Mfg. Co. v. Adams, 151 U.S. 139, 148 (1894); Jennings v. Carson, 4 Cranch 2, 21 (1807)) -- the common law permitted "some flexibility to impose collective liability" in equity, specifically on "partners engaged in concerted wrongdoing," id. at 90-91 (citing Ambler v. Whipple, 87 U.S. 546, 559 (1874)).  Though the Liu Court admittedly declined to "wade into all the circumstances" in which the concerted-wrongdoing exception might apply, it pointed to several factors that might render joint-and-several liability inappropriate.  Id. at 91.  These circumstances included where the defendants' "finances were not commingled," where "one [defendant] did not enjoy the fruits of the scheme," where "one [defendant] was a mere passive recipient of profits," and where "other circumstances would render a joint-and-several disgorgement order unjust."  Id.  In addition to these guideposts,

the Liu Court clarified the structure of the analysis: lower courts must determine, based on the facts of each case, whether joint-and-several liability would be consistent with traditional equitable principles at common law.  Id.

Here, BioPoint does not dispute that the profits attributable to trade-secret misappropriation accrued to Catapult and not to Dickhaut.  Thus, the district court should have analyzed whether -- given factors like Dickhaut's relationship to Catapult, his role in the scheme, his enjoyment (or lack thereof) of the profits, and his status as an individual -- joint-and-several liability would be consistent with traditional equitable principles at common law.  The district court did not conduct this inquiry.[8]  Examining the issue ourselves, we conclude that imposing joint-and-several liability on Dickhaut is inconsistent with traditional equitable principles.

We begin with Liu itself.  Multiple red flags identified in Liu are present here.  BioPoint does not allege, and there is no reason to believe, that Catapult and Dickhaut commingled

_____

[8]    To support its position that "parties can be held joint-and-severally liable where the individual 'collaborated with and ranks high in the firm,'" the district court cited only an unpublished, out-of-circuit, district-court case, SEC v. Bahgat, 17-CV-9721, 2023 WL 3491733 (W.D.N.Y. May 17, 2023).  Bahgat itself did not contend with Liu; it did not conduct an analysis of equitable powers at common law; and it involved, in stark contrast to Catapult and Dickhaut, a "managing member," id. at *2, and "a company that [he] owned," Complaint at 2, Bahgat, 2023 WL 3491733 (No. 17-CV-971).

finances.   And other than through his salary and commissions, evidence of which the district court excluded from trial, Dickhaut did not receive any profits or otherwise enjoy the fruits of the scheme.

Massachusetts state courts have rejected joint-and-several liability in similar circumstances before.  In USM Corp., the SJC vacated the imposition of joint-and-several liability on an employee who had misappropriated trade secrets because the employee had "not been unjustly enriched by the use of [the] trade secret."  392 Mass. at 340.  The SJC compared the USM defendant to the "stockholders, officers[,] and directors" in Jet Spray Cooler, 361 Mass. at 844, who had reaped "the benefits of [trade] secrets" and for whom joint-and-several liability had been appropriate. Id. (quoting Jet Spray Cooler, 361 Mass. at 844).  The control Dickhaut exercised over Catapult and the benefits he received are more similar to USM than to Jet Spray Cooler.  Dickhaut, a regional manager for a national company, exercised far less control over his entity co-defendant than did the stockholder-officer-director defendants in Jet Spray Cooler.  And, as in USM, the district court did not address whether Dickhaut benefited from the illegal scheme and, if so, to what extent.

No other circuit has applied Liu's concerted-wrongdoing exception to a non-owner employee as minor as Dickhaut.  In SEC v. Johnson, the Fourth Circuit allowed the imposition of

joint-and-several liability on an entity and an individual who was the entity's control person and owner.  43 F.4th 382, 389-93 (4th Cir. 2022).  In SEC v. World Tree Financial, LLC, the Fifth Circuit allowed joint-and-several liability on an entity and an individual who was the entity's 60% owner and CEO.  43 F.4th 448, 448, 467 n.15 (5th Cir. 2022).  In Integrity Advance, LLC v. CFPB, the Tenth Circuit allowed joint-and-several liability on an entity and an individual who was the entity's sole employee, founder, president, CEO, and majority shareholder.  48 F.4th 1161, 1165, 1177 n.21 (10th Cir. 2022); see Petitioner's Reply Brief at 13-14, Integrity Advance, 48 F.4th 1161 (No. 21-9521); see also SEC v. Camarco, No. 19-1486, 2021 WL 5985058, at *18 (10th Cir. Dec. 16, 2021) (rejecting joint-and-several liability where non-profiting defendant merely "indirectly benefited" from profiting defendant's wrongdoing).  Each of these defendants was more closely related to and exerted more control over the profiting entity than did Dickhaut.

We need not and cannot define all the facts and relationships that would render defendants "partners engaged in concerted wrongdoing" such that joint-and-several liability would be appropriate.  It is sufficient, for today, to decide that the district court exceeded its equitable powers when it imposed joint-and-several liability on an individual, non-owner, non-director employee, without concluding whether or how much the

employee benefited from the scheme, merely because the employee "collaborated with and ranks high" in the entity that profited from the wrongdoing.  Given this conclusion, Dickhaut cannot be held severally liable for the entirety of Catapult's unjust enrichment.  Due to the state of the record, it is difficult from our vantage to calculate the amount by which Dickhaut was unjustly enriched through his earnings.  On remand, however, it ought to be a simple matter for the parties to agree on these earnings.  If not, the district court will need to conduct further proceedings.

**C.      Catapult's other arguments**

We address and reject Catapult's remaining arguments.

First, Catapult argues that the district court should have granted its motion for a new trial under Rule 59(a) because of alleged errors in the jury's special verdict form.  We review for abuse of discretion the district court's denial of such a motion, which should be granted "only 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'"  Sánchez v. Foley, 972 F.3d 1, 16 (1st Cir. 2020) (quoting Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 60 (1st Cir. 2019)).  Legal error does not warrant a new trial if it is harmless (or not prejudicial) to the moving party.  See, e.g., Granfield v. CSX Transp., Inc., 597 F.3d 474, 488 (1st Cir. 2010) ("We have sent cases back for a new trial when we have found the trial court abused its discretion in not

granting a new trial where it had admitted irrelevant and highly prejudicial damages evidence which tainted the award."); <u>Dall</u> v. <u>Coffin</u>, 970 F.2d 964, 969 (1st Cir. 1992) ("[W]e have held that a party seeking a new trial based on nondisclosure by a juror must 'demonstrate actual prejudice or bias.'" (quoting <u>United States</u> v. <u>Aponte-Suarez</u>, 905 F.2d 483, 492 (1st Cir. 1990))).

Catapult argues that the district court abused its discretion by issuing a special verdict form that did not require the jury to (1) "make specific findings regarding the trade secrets that were allegedly misappropriated," or (2) to determine that Catapult had actually <u>used</u> the trade secrets that it misappropriated.

"The questions in a special verdict form must be 'reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment.'" <u>Johnson</u> v. <u>Teamsters Loc. 559</u>, 102 F.3d 21, 28 (1st Cir. 1996) (quoting <u>United States</u> v. <u>Real Property Located at 20832 Big Rock Dr.</u>, 51 F.3d 1402, 1408 (9th Cir. 1995)). "[T]he court's instructions to the jury" and "the special verdict form are examined as a whole to determine if they fairly presented the issues to the jury." <u>Id.</u>

We hold that there was no error in the special verdict form, because, read in context with the jury instructions, it enabled the jury to determine all the relevant factual issues. The court provided the definition of a trade secret and instructed

the jury that BioPoint, in order to prevail, had to show by a preponderance of the evidence that its "asserted information constituted confidential trade secrets" and that "Catapult [had] misappropriated and used this trade secret information [w]ithout BioPoint's permission."    Neither party objected to those instructions.  The jury then indicated in the special verdict form that Catapult had "misappropriated BioPoint's trade secrets concerning" certain "individuals/entities," including Fratazzi, whom Catapult had placed at Vedanta.  Considered with the jury instructions, the verdict form adequately presented the issues to the jury.

Second, Catapult argues that the district court erred by imposing exemplary damages pursuant to chapter 93A because, as Catapult argues, MUTSA supersedes and prevents the award of damages under chapter 93A in this case.  Section 42F(a) of MUTSA provides that MUTSA "supersede[s] any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret." Mass. Gen. Laws ch. 93, § 42F(a).  In contrast to chapter 93A, MUTSA requires a finding of maliciousness to award exemplary damages for trade secret misappropriation and, even then, permits only double, not treble, damages. Mass. Gen. Laws ch. 93, § 42B; see Mass. Gen. Laws ch. 93A, § 11.

We will assume arguendo in Catapult's favor that BioPoint's MUTSA claim is not barred by MUTSA's retroactivity

clause.[9]  We find, in any case, that Catapult did not preserve this
argument at the district court.  Catapult raised this argument for
the first time in its postjudgment motion, and the district court
ruled, correctly, that Catapult had forfeited the argument by
failing to raise it earlier.  Catapult did argue during the bench
trial that a finding of maliciousness was required for an award of
exemplary damages under MUTSA, but it did not timely argue the
separate issue of whether MUTSA would supersede chapter 93A in
this case.  "[L]egal arguments are preserved only when 'raised
squarely' in the district court," United States v. Lindsey, 3 F.4th
32, 41 (1st Cir. 2021) (quoting United States v. Peake, 874 F.3d
65, 72 (1st Cir. 2017)), which Catapult did not do.

Because the argument was not preserved, we review it for
plain error.  See Triantos v. Guaetta & Benson, LLC, 91 F.4th 556,
563 (1st Cir. 2024).  To prevail under this standard, Catapult
must show that "(1) an error was committed; (2) the error was
'plain' (i.e. obvious and clear under current law); (3) the error
was prejudicial (i.e. affected substantial rights); and (4) review
is needed to prevent a miscarriage of justice." Dimanche v. Mass.
Bay Transp. Auth., 893 F.3d 1, 10 (1st Cir. 2018) (quoting Smith
v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999)).  We need not

---

[9]    For that reason, we do not need to resolve the question
of whether judicial estoppel plays any role in this case.

- 34 -

conclusively resolve each prong of the test to reject Catapult's plain-error argument.  See id. at 12 (bypassing the final prong).

Here, we find that Catapult's argument fails under the second prong because, if there was any error, it was not plain. As Catapult notes, "no appellate court ha[s] provided guidance on the issue" of "[w]hether MUTSA super[s]edes Chapter 93A[.]" Because there was no precedent to guide resolution of this issue, there was no plain error.  See United States v. Olano, 507 U.S. 725, 734 (1993) ("At a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.").

## III.

For the reasons stated, we reject Catapult's requests for a new trial, to remit the exemplary damages award, and to remit the jury's lost profits award, but reduce the damages award by $157,068, and reverse the district court's decision to hold Dickhaut jointly and severally liable and remand for further proceedings.  No costs are awarded.

**-Dissenting Opinion Follows-**

      **RIKELMAN**, <u>**Circuit Judge**</u>, **dissenting in part.**   I respectfully dissent from part II.A of the majority opinion.  In my view, the district court's unjust enrichment award went far beyond the jury's verdict on the extent of Catapult's liability for using BioPoint's trade secrets.  And because the trade secret statutes allow a plaintiff to recover only unjust enrichment "caused by" a defendant's misappropriation, the court erred as a matter of law in awarding the entirety of Catapult's Vedanta profits to BioPoint.  Thus, I would vacate and remand for a recalculation of the unjust enrichment award before any trebling under chapter 93A.

      I part ways with the majority opinion on this critical issue because I have a different view of the record and the legal questions resolved by the district court.  To explain this disagreement, I recount what the record demonstrates about the key twists and turns of this case.

### I. BACKGROUND

      BioPoint sued Catapult in January 2020, six weeks after it terminated Leah Attis.  It brought four claims against Catapult: two statutory trade secret misappropriation claims under MUTSA and DTSA, a tortious interference claim under Massachusetts common law, and a chapter 93A claim.

      As the case proceeded, the parties disagreed heatedly on the scope of discovery.  BioPoint sought information about every

life-sciences consultant and client with whom Catapult had worked since March 1, 2017; Catapult objected that this request was far too broad.  In the course of this dispute, Catapult disclosed that it had directly placed at least twenty life-sciences consultants at Vedanta.

Eventually, the district court had to intervene to resolve the parties' discovery disputes.  It ruled that Catapult had to provide BioPoint with a list of around forty-five life-sciences consultants placed by Catapult across five clients so that BioPoint could cross-reference this list against the consultants in its own confidential, internal database.  Under the district court's ruling, BioPoint could then obtain further discovery only about the consultants or clients who appeared both on Catapult's list and in BioPoint's database.  By comparing Catapult's list to its database, BioPoint identified twelve overlapping life-sciences consultants, nine of whom Catapult had placed at Vedanta.  The parties then completed their discovery process.

After discovery ended, the parties discussed with the district court the scope of the jury and bench trials.  Eventually, the court ruled that BioPoint's trade secret and tortious interference claims would be presented at the jury trial, and thus Catapult's liability on those claims would be decided by the jury.

At the jury trial, BioPoint pursued its trade secret claim based on Catapult's work with just five life-sciences consultants (Chris Foley, Candida Fratazzi, Chris Da Costa, Stephen Haworth, and Jordan Pothier) and three companies (Moderna, Vedanta, and Shire/Takeda). The jury found trade secret misappropriation as to only three of these five consultants -- the individuals Catapult placed into Vedanta's medical director role. The jury expressly rejected the claim that Catapult had misappropriated BioPoint's trade secrets when Catapult placed Pothier as a research associate at Vedanta, the only other Vedanta consultant BioPoint put to the jury. (It also rejected BioPoint's claim that Catapult had tortiously interfered with BioPoint's relationship with Vedanta.) Thus, the jury found trade secret misappropriation for only a fraction of the life-sciences consultants Catapult placed at Vedanta.

The jury also rejected BioPoint's trade secret claim for Foley, Catapult's first ever life-sciences placement, even though BioPoint had argued strenuously that Foley had "launched" Catapult's life-sciences business. Foley was the Moderna consultant "payrolled" by Catapult, and he was placed at Moderna while Jeff Autenrieth still worked there. On the special verdict form, the jury found that Catapult had not misappropriated any of BioPoint's trade secrets concerning Foley or Moderna. Thus, although the majority opinion suggests that Catapult used

BioPoint's trade secrets to place Foley and several other unnamed life-sciences consultants, the jury made no such findings.

Importantly, there was also no liability finding by the jury on Catapult's first life-sciences placement at Vedanta in March 2018.  The Vedanta placements for which the jury <u>did</u> find trade secret liability, the three consultants Catapult placed into the medical director role, did not begin until May 2019, more than a year later.  In sum, the jury found liability for only a fraction of the consultants Catapult placed at Vedanta, and those placements occurred long after Catapult began its relationship with Vedanta, fourteen months later to be precise.[10]

After the jury trial, the district court again reviewed with the parties the scope of the coming bench trial.  According to the court, the bench trial would focus on the disgorgement damages, meaning the unjust enrichment award, and the chapter 93A claim.  The court said: "The issue of disgorgement damage[s] [was] not presented to the jury, and [thus] the court will hear evidence of causation to the extent not presented at the jury trial (that is, whether the profits sought [to be] disgorged <u>are attributable</u>

---

[10]    The majority opinion also discusses that Catapult did not place any more consultants at Vedanta after BioPoint terminated Attis.  It is important to put this fact in context.  Vedanta functionally ended its relationship with Catapult about two months after BioPoint sued Catapult in late January 2020, which was just one month after BioPoint terminated Attis in December 2019. Vedanta featured in BioPoint's lawsuit against Catapult; indeed, Vedanta was named twenty-two times in BioPoint's complaint.

to the use of the misappropriated trade secret[s])." (Emphasis added.) The court indicated that it would determine the amount to disgorge without "disturb[ing] the jury's verdict that [Catapult] misappropriated trade secrets relating to certain consultants/client[s]."

With the district court's directive about the bench trial in mind, BioPoint argued that MUTSA and DTSA provided the statutory authority to disgorge all of Catapult's Vedanta profits. As BioPoint said, citing the statutes, "a court may award 'damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss.'"  (Quoting 18 U.S.C. § 1836(b)(3)(B)(i)(II).)

Catapult disagreed that BioPoint was entitled to all the Vedanta profits.  It argued that the district court could not award the full Vedanta profits "as a matter of law" because doing so would "disgorge Catapult's profits for the placement of a consultant for which the jury found no liability," Pothier.  More generally, Catapult contended that BioPoint was not legally entitled to its profits for placing Vedanta consultants "for whom BioPoint has not even claimed trade secret misappropriation" and "for which there was no finding of liability," because BioPoint had failed to prove that these profits were "caused by misappropriation of BioPoint's trade secrets."

During the bench trial, BioPoint tried to enforce the district court's ruling that it would not disturb the jury's liability verdict.  When Catapult sought to offer testimony or argument that was arguably inconsistent with the jury's verdict, BioPoint objected.  In response, the court agreed with BioPoint that "[t]he jury did [already] determine" the misappropriation issue.  And BioPoint made a similar point in its briefing after the bench trial, arguing that the court had decided that "the jury verdict [would] provide[] the full set of facts for c. 93A liability."

After the bench trial, the district court issued its ruling on the unjust enrichment award and Catapult's chapter 93A liability.  In its decision, the court evaluated the unjust enrichment issue first, as an entirely separate issue from Catapult's chapter 93A liability.  In addressing unjust enrichment, the court reiterated that "Catapult's use of BioPoint's trade secrets ha[d] already been determined by the jury."  The court's only task, in its own words, was to determine whether Catapult's Vedanta profits were "attributable to the use" of those trade secrets.  The court ultimately determined that all the Vedanta profits fell into this category by relying on BioPoint's argument about the "head start" theory, including a case cited by BioPoint that discussed this theory and was decided under the Rhode Island trade secret statute.  See BioPoint, Inc.

v. Dickhaut, No. 20-10118-RGS, 2023 WL 3071422, at *6 (D. Mass.
Apr. 25, 2023) (citing Alifax Holding Spa v. Alcor Sci. Inc., C.A.
No. WES 14-440, 2021 WL 3911258, at *1 (D.R.I. Sept. 1, 2021)).

The district court also ruled that Catapult had violated
chapter 93A, which prohibits unfair or deceptive acts.  The court
explained that, under Massachusetts law, "[a] finding of trade
secret misappropriation is . . . sufficient to establish an unfair
or deceptive act under Chapter 93A."  Thus, the court concluded
that "the jury's verdict amply support[ed] a determination that
Catapult violated Chapter 93A and . . . no further findings of
fact on this issue [were] required."  Id. at *7-8 (emphasis added).
To determine whether BioPoint was entitled to exemplary damages
under chapter 93A, the court then evaluated whether Catapult's
violations had been knowing and willful.  Based on its conclusion
that Catapult's conduct was knowing and willful, the court trebled
the lost profits and unjust enrichment awards.  Id. at *10.

I reach three conclusions based on this record.  First,
the jury explicitly found that Catapult did not use BioPoint's
trade secrets in all its work for Vedanta.  To the contrary, the
jury verdict indicates that BioPoint's trade secrets played a role
in a fraction (substantially less than fifty percent) of Catapult's
life-sciences placements at Vedanta.  Second, the district court
awarded BioPoint unjust enrichment damages under the trade secret
statutes, not chapter 93A.  Third, the district court decided that

it would base its chapter 93A liability ruling on the jury's
verdict.  It expressly declined to treat the jury's verdict as
only advisory for chapter 93A purposes.

## II. DISCUSSION

The district court's unjust enrichment award cannot be
squared with the governing law.  Based on how the district court
structured the jury and bench trials, the court's unjust enrichment
award had to be consistent with the jury's liability verdict.  And
it was not.  The jury found liability for trade secret
misappropriation for only a fraction of the life-sciences
consultants that Catapult placed at Vedanta.  And this finding
severs the legally necessary causal connection between Catapult's
misappropriation of BioPoint's trade secrets and all the Vedanta
profits.

### A. The Scope of the Award

BioPoint sought Catapult's Vedanta profits as a measure
of the "actual damage[]" caused by Catapult's trade secret
misappropriation.  BioPoint was expressly authorized to seek this
recovery under the trade secret statutes, which provide that
damages "can include both the actual loss caused by
misappropriation and the unjust enrichment caused by
misappropriation that is not taken into account in computing actual
loss."  Mass. Gen. Laws ch. 93, § 42B(a); see also 18 U.S.C. §
1836(b)(3)(B)(i)(II) (similar language in DTSA).

But to recover under the trade secret statutes, BioPoint had to prove that Catapult's unjust enrichment was "caused by" its misappropriation, see Mass. Gen. Laws ch. 93, § 42B(a), and BioPoint failed to do that for all the Vedanta profits. At trial, BioPoint failed to prove by a preponderance of the evidence that Catapult had misappropriated trade secrets with respect to two of the five consultants BioPoint put to the jury, including, crucially, Pothier, a Vedanta placement. Thus, the jury absolved Catapult of using BioPoint's trade secrets for some of the life-sciences consultants it placed at Vedanta. That liability finding contradicts the district court's conclusion that all of Catapult's life-sciences placements at Vedanta, not to mention the entirety of Catapult's Vedanta profits, were attributable to Catapult's misappropriation of BioPoint's trade secrets.

To be sure, the jury also found that Catapult misappropriated trade secrets "concerning Vedanta." And the district court's task was to apply the jury's verdict. But viewing the verdict as a whole, it is clear the jury did not intend to hold Catapult liable for every consultant placed at Vedanta, given that it found no liability for Pothier. Further, the jury's liability finding on Vedanta follows necessarily from its finding that Catapult misappropriated BioPoint's trade secrets when it placed three consultants at Vedanta -- Fratazzi, Haworth, and Da

Costa (the medical director placements).[11]  Indeed, in response to a question from the jury about what misappropriating trade secrets "concerning Vedanta" meant on the special verdict form, the district court instructed the jury that the phrase meant simply "relating to" the client.  Thus, the jury's verdict did not establish with any "degree of certainty" that the <u>entirety</u> of Catapult's Vedanta profits were caused by Catapult's misappropriation of BioPoint's trade secrets.  <u>See</u> Restatement (Third) of Unfair Competition § 45(2) (Am. L. Inst. 1995) (listing factors courts should consider when determining "[w]hether an award of monetary relief is appropriate" in a trade secret misappropriation case).

       To the contrary, BioPoint did not put the vast majority of Catapult's life-sciences placements at Vedanta to the jury at all.  (Indeed, it put to the jury only four of the nine "overlapping" Vedanta consultants identified through discovery.)  And BioPoint failed to meet its burden of proof on one of the few life-sciences Vedanta placements that it did include in the trial.

---

[11]    The majority opinion concludes that, before the jury trial, Catapult admitted by "negative implication" that the Vedanta claim was not coextensive with the claims related to the individual consultants placed at Vedanta.  Even if this were true, it would mean only that Catapult conceded that it could be liable on the Vedanta claim for damages <u>beyond</u> those associated with individual consultants.  It would not mean that Catapult conceded that it could be liable for damages relating to Vedanta consultants for whom the jury found no liability.

Thus, the jury's verdict reflects a practical resolution: The jury agreed with some of BioPoint's trade secret claims, but not all, and found that some of Catapult's Vedanta profits, but not all, were "caused by" Catapult's misappropriation of BioPoint's trade secrets.

The district court reached a different conclusion by relying on the "head start" theory discussed in a decision about the Rhode Island trade secret statute. See Alifax Holding Spa, 2021 WL 3911258, at *1. The majority opinion concludes that Catapult waived any legal argument about the application of this theory in non-products-liability cases like this one. Still, even assuming such a waiver, the head start theory cannot save the unjust enrichment award for two reasons.

First, however one frames the head start theory, it cannot overcome the explicit requirement in the trade secret statutes of a causal connection between the misappropriation and the extent of the unjust enrichment award. The parties may not waive or stipulate away this statutory requirement, and, in any event, Catapult repeatedly argued that all its Vedanta profits were not "caused by" any misappropriation. See TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995) ("Issues of law are the province of courts, not of parties to a lawsuit . . . . Courts, accordingly, 'are not bound to accept as controlling[]

stipulations as to questions of law.'" (quoting Sanford's Est. v. Comm'r, 308 U.S. 39, 51 (1939))).

Second, head start, in any iteration, cannot bridge the causal gap between the jury's finding of liability for just three Vedanta placements and the district court's award of all of Catapult's Vedanta profits.  Under Massachusetts law, for example, the head start "rule" limits, rather than expands, the scope of damages.  As the Supreme Judicial Court of Massachusetts has explained, the rule "limit[s] damages to that period of time in which 'others in the trade are likely, through legitimate business procedures, to have become aware of [the misappropriated trade] secrets.'"  Jet Spray Cooler, Inc. v. Crampton, 385 N.E.2d 1349, 1357 n.11 (Mass. 1979) (citation omitted).  But the district court did not use the head start rule in this way.  In crafting the unjust enrichment award, it never defined the time period of any head start by Catapult; instead, it simply awarded the entirety of Catapult's Vedanta profits.

Nor does the theory invoked by federal courts when measuring the "benefit conferred" upon a trade secret defendant by the value of the "head start" it obtained in its business through misappropriation bridge the causal gap here.  Epic Sys. Corp. v. Tata Consultancy Servs. Ltd., 980 F.3d 1117, 1130 (7th Cir. 2020).  For example, a court might measure the value of the defendant's head start by its total avoided research and development costs,

see id., or the profits obtained during the period that it would
have taken the defendant to develop the product on its own, see
Alifax Holding Spa v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 576-77
(D.R.I. 2019), aff'd in part, rev'd in part sub nom. Alifax Holding
SpA v. Alcor Sci. LLC, No. 2022-1641, 2024 WL 2932910 (Fed. Cir.
June 11, 2024).  But the district court did not attempt to measure
the value of Catapult's head start by calculating its saved
expenses or its profits during a limited time period.  To put it
differently, the court did not separate the discrete value of
Catapult's head start from any other benefit that accrued to
Catapult through its misappropriation.  Thus, like the
Massachusetts rule, this version of head start does not provide
the necessary causal link between the jury's limited liability
verdict and the sweeping unjust enrichment award.

      In sum, I recognize that there is no precise science to
calculating the unjust enrichment that accrued to a defendant
because of its trade secret misappropriation.  Indeed, unjust
enrichment "can take several forms and cover a broad array of
activity." See Syntel Sterling Best Shores Mauritius Ltd. v. The
TriZetto Grp., Inc., 68 F.4th 792, 809 (2d Cir. 2023).  But the
requirement of a causal connection remains, and the lack of that
connection here to the entirety of Catapult's Vedanta profits means
that the award exceeded the legal boundaries of the trade secret

statutes.[12]    See, e.g., SEC v. First City Fin. Corp., Ltd., 890
F.2d 1215, 1231 (D.C. Cir. 1989) (explaining that disgorgement
must "be a reasonable approximation of profits causally connected
to the violation").

### B. The Majority Opinion's View

At times, the majority opinion suggests that the
district court awarded disgorgement under chapter 93A, not under
the trade secret statutes, and thus the award simply reflects that
the district court found Catapult's liability under chapter 93A to
extend beyond its statutory trade secret liability.[13]  Based on my
review, the record does not support this conclusion for two
reasons.

First, the district court's ruling, especially when read
in light of the case's procedural history, orders disgorgement of
the Vedanta profits as a remedy for Catapult's statutory trade

---

[12]    I agree with the majority opinion that a court may
"make[] a full award of the defendant's unjust enrichment."  But,
in my view, the award here was legally invalid because it included
profits that the jury concluded were not "unjustly" obtained by
Catapult because they were not "caused by" Catapult's trade secret
misappropriation.

[13]    The majority opinion also briefly suggests the presence
of a free-standing, common-law equitable unjust enrichment claim
against Catapult, based on Catapult's misappropriation of
BioPoint's confidential information.  Cf. Mass. Eye and Ear
Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 56 (1st
Cir. 2009).  But there was no free-standing unjust enrichment claim
in the complaint.  Instead, as BioPoint argued, unjust enrichment
is a measure of damages under the trade secret statutes.

secret violations.[14]  And, as I explained above, the scope of the district court's remedy cannot be squared with the damages provisions of those statutes.

Second, even if the district court had awarded unjust enrichment as a remedy for BioPoint's chapter 93A claim, the award would still be legally invalid as inconsistent with the jury's verdict.  I agree with the majority opinion that, under Massachusetts law, the court could have decided to treat the jury's verdict on a related claim as merely advisory for chapter 93A purposes.  See Specialized Tech. Res., Inc. v. JPS Elastomerics Corp., 957 N.E.2d 1116, 1120 (Mass. App. Ct. 2011).  In my view, however, that's just not what happened here.

The district court treated Catapult's chapter 93A liability as derivative of BioPoint's claims that went to the jury.  As the court noted in its decision following the bench trial, "[a] finding of trade secret misappropriation is . . . sufficient to establish an unfair or deceptive act under Chapter 93A."  BioPoint,

---

[14]    That chapter 93A, unlike MUTSA or DTSA, does not expressly authorize unjust enrichment as a measure of damages supports my view.  The statute provides that "[a] person may assert a claim under [chapter 93A] . . . for money damages only."  Mass. Gen. Laws ch. 93A, § 11.  Such "damages may include double or treble damages" and "attorneys' fees or costs," but chapter 93A does not refer to unjust enrichment, unlike MUTSA and DTSA.  And the SJC has never addressed whether chapter 93A authorizes disgorgement.  See Atlantic Rsch. Mkt'g Sys., Inc. v. Troy, No. 07-11576-PBS, 2010 WL 1904849, at *6 (D. Mass. May 11, 2010) (declining to award disgorgement damages under chapter 93A "[g]iven the statute's focus on actual monetary loss").

2023 WL 3071422, at *7.  And although the court recognized that it "ha[d] discretion whether to apply [the] jury's factual findings to [the] Chapter 93A claim," it elected not to stray from the jury's verdict.  Id.  Instead, the court concluded that "the jury's verdict amply support[ed] a determination that Catapult violated Chapter 93A and . . . no further findings of fact on this issue [were] required."  Id. at *8 (emphasis added).  Thus, in my view, the district court ruled that Catapult's chapter 93A liability would be coextensive with its trade secret liability, as found by the jury, and that is how the parties litigated the case.[15]

So, regardless of whether the district court awarded the Vedanta profits under the trade secret statutes or chapter 93A, its unjust enrichment remedy had to square with the jury's liability findings.  And, for the reasons I explained, it does not.  Thus, I respectfully dissent from part II.A of the majority opinion.

---

[15]    As BioPoint argued vigorously after the bench trial, "[p]er the Court's many earlier rulings, and its authority to treat the verdict as definitive, the jury verdict provided the full set of facts for c.93A liability."